**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01707

KOSHER EATS LLC,
EMERALD CONSULTING PARTNERS LLC,
ABBSON LLC,
MSC COMPANIES, LLC, and
HOMEPEOPLE CORPORATION,

Plaintiffs,

vs.

MESSNER REEVES LLP,
DANIEL CHARTRAW,
TODD OWEN, and
CLEARWATER PREMIERE PERPETUAL MASTER LLC,

Defendants.

---

# COMPLAINT

---

Plaintiffs Kosher Eats LLC, Emerald Consulting Partners LLC, Abbson LLC, MSC Companies LLC, and HomePeople Corporation file this Complaint against Defendants Messner Reeves LLP, Daniel Chartraw, Todd Owen, and Clearwater Premiere Perpetual Master LLC.

**TABLE OF CONTENTS**


INTRODUCTION .......... 3
PARTIES .......... 11
JURISDICTION AND VENUE .......... 12
STATEMENT OF FACTS .......... 13
I. Instrumentalities of the Fraudulent Scheme .......... 13
II. The All Net Project Was a Floundering and Fraud-Addled Disaster. .......... 24
III. The RICO Enterprise Appears Together on October 19, 2022 .......... 26
IV. On November 16, 2022, Messner Defrauded the Las Vegas Zoning Commission with Phony Financing and a Fake Funding Commitment Letter. .......... 28
V. The Bond Scheme Failed and the Enterprise Shifted to the BELOC Fraud in February 2023. .......... 33
VI. In the BELOC Phase of the Scheme, the Enterprise Treated INBE as a Useful Idiot Whom Messner Later Tried to Frame for Messner's Theft. .......... 38
VII. The BELOC Scam Is a Classic Chartraw Advance-Fee Fraud Scheme, which Follows a Formula Chartraw Has Repeatedly Used. .......... 47
VIII. The Enterprise Deployed Marty Hale to Pepper Plaintiffs with Lies Intended to Stall Legal Action. .......... 55
IX. Messner's Statements to the Las Vegas Zoning Commission on November 21, 2023, Through Welch, Demonstrate the Fraud Scheme. .......... 59
X. Clearwater Grabbed an Additional $600,000 Through Its Confederate Counsel Jason Aufdermaur .......... 70
XI. Messner Concocted Titan Financial to Burnish the Shadow Ledger .......... 74
XII. Even After the Scheme Collapsed, Messner Continued to Issue Bond-Custody Paperwork for the Same Phantom Bonds .......... 84
XIII. Individual Plaintiffs' Allegations .......... 87
A. Kosher Eats LLC .......... 90
B. Emerald Consulting Partners LLC .......... 92
C. Abbson LLC .......... 94
D. MSC Companies LLC .......... 96
E. HomePeople Corporation .......... 97
CAUSES OF ACTION .......... 100
I. Count I (RICO against all Defendants) .......... 100
II. Count II (RICO conspiracy against all Defendants) .......... 118
III. Count III (Civil Theft against all Defendants) .......... 119
IV. Count IV (Conversion against Messner) .......... 122
V. Count V (Fraud, False Promise against Messner) .......... 123
VI. Count VI (Fraud, Concealment against Messner) .......... 125
VII. Count VII (Breach of Fiduciary Duty against Messner) .......... 127
VIII. Count VIII (Unjust Enrichment and Constructive Trust against all Defendants) .......... 129
IX. Count IX (Aiding and Abetting / Civil Conspiracy against Chartraw, Owen, and Clearwater) .......... 130
X. Count X (Negligence against Messner) .......... 132
PRAYER FOR RELIEF .......... 135

## INTRODUCTION

1. Defendant Messner Reeves LLP ("Messner"), a 100-attorney Colorado law firm, partnered with Daniel Chartraw ("Chartraw"), a convicted felon and serial fraudster, his associate Todd Owen ("Owen"), and their company Clearwater Premiere Perpetual Master LLC ("Clearwater"), to orchestrate and cover up an advance fee fraud scheme pursuant to which Messner stole $8.3 million from the five Plaintiffs.

2. The purpose of the scheme was to generate a slush fund so Messner could make payments pursuant to a now-defunct Las Vegas construction project named All Net Arena ("All Net"), which was operated by an entity named Dribble Dunk, LLC ("Dribble Dunk").

3. Per the fraudulent loan scheme, Messner drafted a sham loan agreement for a shell Wyoming LLC with no money to loan named INBE Capital LLC ("INBE").

4. The loan terms Messner drafted were nonsensical from the lender's side, as the lender would supposedly issue more than $30 million of effectively unsecured loans, to new companies, with no personal guarantee, no real estate collateral, no principal to be repaid for 10 years with interest only payments at 6%, which was just 1% higher than the inflation rate at the time, with no credit check and no underwriting. Messner drafted what was essentially an offer on behalf of a shell company to give away $30 million in free money.

5. The "catch" was that, to become eligible for the loan, the borrowers had to deposit 25% of the loan amount into Messner's trust account where, per the Business Expansion Line of Credit ("BELOC") agreement, the deposit may be held by Messner for up to 90 days in Messner's "sole possession and control" pending issuance of the loans which Messner knew were never going to occur. Messner's BELOC provided that if the loan did not fund within 90 days, the borrower's escrow deposit would be returned.

6. None of the loans funded and Plaintiffs requested the return of their deposits. But to this day, Messner has not returned those stolen funds.

7. The Messner-drafted paperwork contained the following false representations, among many more, regarding the Plaintiffs' escrow funds held in Messner's Northern Trust COLTAF account x8494 in Colorado.

> "Funds remain with the Trustee [Messner Reeves] until we've delivered the loan."
>
> "We contractually agree to reimburse the Borrower the amount of their ICA Advance Cost."
>
> "We keep insurance on all funds held by our trustees."
>
> "You are never exposed to any risk of loss."
>
> "The most important issue for us is the safety of your capital."
>
> "We even pay for your money to be fully insured."

8. Plaintiffs reasonably relied on Messner's representations in the paperwork drafted by the law firm, and Plaintiffs justifiably believed that a 100-attorney law firm's "fully insured" trust account was a safe place for a 90-day escrow to see if the "too-good-to-be-true" loan offer became a reality.

9. Plaintiffs did not anticipate that the law firm would steal their money and then lie about it.

10. Plaintiffs deposited $8,345,000 into Messner's Northern Trust COLTAF trust account x8494 between April 2023 and June 2023.

11. Messner immediately commenced stealing Plaintiffs' money and lying about it. The law firm has been lying about it ever since:

| **Date** | **Plaintiff's Deposit** | |
|---|---|---|
| 4/21/2023 | $1,000,000 | HomePeople |
| 4/27/2023 | $2,000,000 | Kosher Eats |
| 6/13/2023 | $700,000 | Emerald |
| 6/23/2023 | $1,145,000 | MSC |
| 6/29/2023 | $3,500,000 | Abbson |
| Total | $8,345,000 | |
| **Date** | **Messner's False Statement** | **About the Deposited Funds** |
| 8/24/2023 | Messner | "The bankers are still working through transfer protocols..." |
| 11/3/2023 | Messner | "The funds are under the Firm's possession and control..." |
| 1/25/2024 | Messner | "The funds remain part of the escrow under our control at Titan Financial, LLC." |
| 2/15/2024 | Messner | "The funds continue to be under our control in a firm trust account at Titan Financial, LLC." |
| 3/11/2024 | Messner | "We remain on schedule... I am awaiting final confirmation." |
| 3/20/2024 | Messner | "I have spoken with the national bank partner this morning ..." |

12. Bank records now confirm that Messner indeed stole Plaintiffs' money, wired it to the following recipients among others, and then engaged in substantial lulling behavior in coordination with the felon Chartraw, who is presently out on bail pursuant to another wire fraud indictment.

| **Date** | **Plaintiff's Deposit** | |
|---|---|---|
| 4/21/2023 | $1,000,000 | HomePeople |
| 4/27/2023 | $2,000,000 | Kosher Eats |
| 6/13/2023 | $700,000 | Emerald |
| 6/23/2023 | $1,145,000 | MSC |
| 6/29/2023 | $3,500,000 | Abbson |
| Total | $8,345,000 | |

| Date | Messner's Transfer Out | Receipient |
|---|---|---|
| 4/24/2023 | $250,000.00 | Clearwater |
| 4/24/2023 | $500,000.00 | Sahara Las Vegas Corp |
| 5/1/2023 | $75,000.00 | Chartraw |
| 5/1/2023 | $75,000.00 | Owen |
| 5/1/2023 | $150,000.00 | Clearwater |
| 5/1/2023 | $400,000.00 | Dribble Dunk LLC |
| 5/3/2023 | $300,590.77 | Internal Debit Transfer (01117247) |
| 5/11/2023 | $50,000.00 | Chartraw |
| 5/11/2023 | $60,000.00 | Owen |
| 5/15/2023 | $904,777.00 | Valley Bank of Nevada (CTS) |
| 6/1/2023 | $100,000.00 | Sahara Las Vegas Corp. |
| 6/12/2023 | $500,000.00 | Harris Bank NA (Loan IQ) |
| 6/20/2023 | $100,000.00 | Chartraw |
| 6/26/2023 | $600,000.00 | Sahara Las Vegas Corp. |
| 7/3/2023 | $50,000.00 | Owen |
| 7/3/2023 | $207,500.00 | Dribble Dunk LLC |
| 7/3/2023 | $218,998.99 | Chartraw |
| 7/3/2023 | $600,000.00 | Wyatt Aufdermaur LLC |
| 7/13/2023 | $600,000.00 | Sahara Las Vegas Corp. |
| 7/18/2023 | $150,000.00 | Owen |
| 8/3/2023 | $50,000.00 | Owen |
| 8/3/2023 | $50,000.00 | Chartraw |
| | | |
| **Date** | **Messner's False Statement** | **About the Deposited Funds** |
| 8/24/2023 | Messner | "The bankers are still working through transfer protocols…" |
| 11/3/2023 | Messner | "The funds are under the Firm's possession and control…" |
| 1/25/2024 | Messner | "The funds remain part of the escrow under our control at Titan Financial, LLC." |

| | | |
|---|---|---|
| 2/15/2024 | Messner | "The funds continue to be under our control in a firm trust account at Titan Financial, LLC." |
| 3/11/2024 | Messner | "We remain on schedule… I am awaiting final confirmation." |
| 3/20/2024 | Messner | "I have spoken with the national bank partner this morning …" |

13. As the purpose of Messner's fraud scheme was to prop up the floundering All Net project, Messner used Plaintiffs' money for the following payments:

| **Amount** | **Recipient** | **Description** |
|---|---|---|
| $1,800,000.00 | Sahara Las Vegas Corp. | Messner's client Dribble Dunk's Landlord in Las Vegas for Dribble Dunk's rent |
| $904,777.00 | Valley Bank of Nevada (FBO: CTS) | Settlement of debt owed to Dribble Dunk's engineering creditor Construction Testing Service |
| $758,918.09 | Dribble Dunk | Messner's client and Failed Developer of Las Vegas Stadium |
| $853,898.99 | Defendant Daniel Chartraw | Convicted felon / advance fee fraud specialist |
| $500,000.00 | Harris Bank NA (Loan IQ) | Apparent loan repayment |
| $500,000.00 | Defendant Clearwater Premiere Perpetual Master LLC | Company operated by Chartraw and Owen |
| $465,000.00 | Defendant Todd Owen | Accomplice of convicted felon Daniel Chartraw |
| $414,705.00 | Hoehn JLR Inc. | Car dealership (vehicle purchased for Chartraw) |
| $329,540.77 | Internal Debit Transfer to Messner (x8687) | Transfer by Messner to another Messner bank account |

14. Messner transferred $3.4 million directly to All Net and All Net's creditors, including $1.8 million to All Net's landlord, $904,777 to All Net's engineering creditor and $758,918 directly to All Net/Dribble Dunk.

15. All of these transfers were unauthorized and concealed.

16. Messner transferred another $1.8 million directly to co-defendants Chartraw, Owen and Clearwater with another $414,705 paid to an auto dealership to purchase vehicles for Chartraw.

17. Messner paid $500,000 of Plaintiffs' money to Harris Bank to satisfy either its own obligation or the obligation of someone else unrelated to Plaintiffs.

18. Messner also transferred $329,540 to itself without any explanation or valid basis.

19. Misconduct this brazen by members of the Bar is difficult to believe. Attached to the Complaint are the trust account bank statements showing the outrageous conduct.

20. Messner not only failed to obtain or even request any Plaintiff's approval for any of the transfers out of escrow, Messner affirmatively and repeatedly lied to Plaintiffs, absurdly claiming that the stolen funds were still "under the Firm's possession and control" many months after the funds were stolen.

21. Messner lied directly to Plaintiffs and directed others to lie and obfuscate on its behalf by telling Plaintiffs that their funds were on the verge of being returned and legal action would only slow things down.

22. Messner concocted the existence of a phony "bank" named Titan Financial, LLC ("Titan Financial") which was nothing more than a Wyoming shell LLC created by Welch himself housing absolutely none of Plaintiffs' money.

23. Messner provided Plaintiffs with a fake Titan Private Bank account statement as Messner falsely asserted that "[t]he funds remain part of the escrow under our control at Titan Financial, LLC."

24. Messner's lies continued into 2024, as Messner publicly denied that the escrowed funds have disappeared or gone missing, falsely stating that Messner was legally prohibited from

returning the money it stole. Messner never identified the legal prohibition to which it referred, because no such prohibition ever existed.

25. Messner not only refused to return Plaintiffs' money, Messner stonewalled and refused to provide an accounting of the escrow account despite more than 10 written requests.

26. Regarding INBE, on August 23, 2023, Messner stated in a letter "[w]e serve as outside counsel to INBE and its affiliates and partners… The purpose of this communication is to confirm that INBE stands ready, willing and able to proceed with the financing…" Messner knew INBE had no money to loan

27. Messner then denied that INBE was ever its client and claimed 14 months later that "Plaintiffs agreed with *INBE* to invest money with *INBE*…[and] *INBE* never funded the loans and never returned their ICA payments… Plaintiffs' remedy, if one exists, is to seek recovery from… *INBE*… Plaintiffs are all investors who invested with INBE, who are disappointed that the money they invested with INBE has not been returned… [the funds] were not returned by INBE… INBE… owned the funds after the transfer…" (Emphasis added).

28. Messner stole the money and attempted to frame INBE, its former client.

29. Messner knew that none of the money went to INBE, but the law firm tried to pin its theft on its own former client.

30. During this time, Messner lied to INBE too.

31. On December 20, 2023, Welch texted INBE's principal: "Current plan is to get the ICA deposits ready to return and get released. I am dependent on Dan [Chartraw] there and nothing yet on that front." On January 31, 2024, Welch texted him again: "We have ledger funds blocked right now that is the entirety of the deposits. They are not yet ready to disburse... obviously that

cannot happen without additional funds." On February 20, 2024, Welch texted him: "Todd/Dan will be in a position to refund ICA [deposits] tomorrow I believe."

32. When the deposits were not returned to the Plaintiffs, Welch texted INBE's principal as follows: "Out of my hands, partners don't want to settle. The plan is to interplead funds and fight." No interpleader was ever filed. The funds were never returned.

33. When INBE's principal asked Welch again for an update on the return of the deposit funds to the Plaintiffs, Welch stopped responding.

34. On October 29, 2025, Messner's president stated under oath that indeed Messner received $8,345,000 from Plaintiffs between April 21, 2023 and June 29, 2023, but "there were no funds from the above-referenced $8,345,000 deposits remaining in the account by August 2, 2023."

35. This extremely belated admission demonstrates that Messner had been lying and fabricating documents for more than two years regarding the status of Plaintiffs' money.

36. In his October 29, 2025 statement, however, Messner's president claimed that INBE provided authorizations to disburse $2,490,333, which is less than 30% of the missing funds. Upon inspection of the documents that Messner's president attached included, none of the documents reflected a single authorization.

37. On December 19, 2025, INBE's principal submitted a written request for an accounting to Messner, which was ignored.

38. Plaintiffs bring this action pursuant to claims for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act per 18 U.S.C. 1962(c), RICO conspiracy per 18 U.S.C. 1962(d), civil theft per C.R.S. 18-4-405, conversion, fraud, breach of fiduciary duty, unjust enrichment, aiding and abetting, and negligence.

39. Plaintiffs seek the return of their $8.3 million in stolen escrow funds together with consequential damages, trebled under the RICO and civil theft statutes, in addition to costs, prejudgment interest, and attorney's fees.

## PARTIES

40. Plaintiff Kosher Eats LLC ("Kosher Eats") is a Florida limited liability company with one member, Frysta Management LLC, a Florida limited liability company, whose two members, Noah Lasko and Deborah Lasko, are Florida residents and Florida citizens.

41. Plaintiff Emerald Consulting Partners LLC ("Emerald") is a Florida limited liability company with two members, Jonathan Fodera, a Florida citizen, and Titan Strategic Partners, LLC, a New Jersey limited liability company. Titan Strategic Partners, LLC has two members, Titan Advisory Services, LLC, whose member, Saleem Elmasri, is a New Jersey citizen, and Thomas Murphy, a New York citizen.

42. Plaintiff Abbson LLC ("Abbson") is a New York limited liability company with two members, First Principles Holdings LLC, a New York limited liability company, whose member Chad Abbott is a New York citizen, and Verum Holdings, Inc., a Delaware corporation with a principal place of business in New York.

43. Plaintiff MSC Companies, LLC ("MSC") is a Utah limited liability company whose member, Nimesh Chaudhari, is a Utah citizen.

44. Plaintiff HomePeople Corporation ("HomePeople") is a New York corporation with a principal place of business in New York.

45. Defendant Messner is a Colorado limited liability partnership with its principal place of business at 1430 Wynkoop Street, Suite 300, Denver, Colorado 80202, whose partners are Bryant S. "Corky" Messner, P.C., a Colorado corporation, Bruce A. Montoya, P.C., a Colorado

corporation, David A. Reeves, P.C., a Colorado corporation, Douglas C. Wolanske, Inc., a Colorado corporation, Torben M. Welch, P.C., a Utah corporation, M. Caleb Meyer, P.C., a Colorado corporation, Michelle L. Harden, P.C., a Colorado corporation, Matthew R. Sullivan, P.C., a Colorado corporation, and Jon B. Zimmerman, P.C., a California corporation.

46. Defendant Chartraw is an individual who resides in California and is a citizen of California.

47. Defendant Owen is an individual who resides in California and is a citizen of California.

48. Defendant Clearwater is a Wyoming limited liability company whose sole member is Owen, who is a citizen of California.

## JURISDICTION AND VENUE

49. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the RICO Act, 18 U.S.C. § 1961 et seq. RICO's civil damages provision is codified at 18 U.S.C. § 1964(c).

50. This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction is conferred pursuant to these claims per 28 U.S.C. § 1367 because (i) this Court has original jurisdiction over this action, and (ii) Plaintiffs' state law claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

51. Venue is proper in this Court pursuant to 18 U.S.C. §1965(a), RICO's venue provision, because Messner resides in this district and "transacts its affairs" here, and the Northern Trust COLTAF bank account at issue in this litigation is in this state.

52. The other Defendants may be sued here pursuant to RICO's nationwide service of process provision, 18 U.S.C. §1965(b), and because "the ends of justice" require them to be part of this case as their actions are part of the overall controversy.

## STATEMENT OF FACTS

### I. Instrumentalities of the Fraudulent Scheme

53. As discussed in the Introduction, this case arises from the theft of $8,345,000 of Plaintiffs' escrow deposits from the Colorado Lawyer Trust Account Foundation ("COLTAF") account of a national law firm.

54. The law firm is Defendant Messner Reeves LLP, a Colorado limited liability partnership that publicly holds itself out as having more than 100 attorneys, 70 partners, and 10 offices. Messner maintained the relevant trust account at Northern Trust Bank in Denver, Colorado, account number ending in x8494. Plaintiffs' deposits were received into that account between April 20, 2023 and June 29, 2023. Every dollar of those deposits was transferred out of the account, without Plaintiffs' authorization, by August 2, 2023.

55. The five deposits at issue are as follows:

| Plaintiff | Deposit Amount | Date of Deposit | Stated Loan Amount | Stated First-Tranche Due Date | First-Tranche Amount Actually Received | ICA Deposit Returned |
|---|---|---|---|---|---|---|
| HomePeople Corporation | $1,000,000 | April 21, 2023 | $4,000,000 | July 19, 2023 | $0 (a sham "partial funding" of $973,333 was later staged on July 3, 2023) | $0 |
| Kosher Eats, LLC | $2,000,000 | April 27, 2023 | $8,000,000 | July 26, 2023 | $0 | $0 |

| Plaintiff | Deposit Amount | Date of Deposit | Stated Loan Amount | Stated First-Tranche Due Date | First-Tranche Amount Actually Received | ICA Deposit Returned |
|---|---|---|---|---|---|---|
| Emerald Consulting Partners, LLC (Bridge Lender for Hard AF Seltzer, LLC) | $700,000 | June 12, 2023 | $2,800,000 | September 11, 2023 | $0 | $0 |
| MSC Companies, LLC | $1,145,000 | June 22, 2023 | $4,580,000 | September 20, 2023 | $0 | $0 |
| Abbson, LLC | $3,500,000 | June 29, 2023 | $14,000,000 | September 27, 2023 | $0 | $0 |
| **TOTAL** | **$8,345,000** | | **$33,380,000** | | **$0** | **$0** |

56. The Messner partner who drafted the loan agreements, directed unauthorized wire transfers, and was in contact with Plaintiffs throughout the scheme and its cover-up is Torben Welch ("Welch"). Welch is a managing partner of Messner, and he is a member of the Colorado Bar. He identified himself to Plaintiffs and to the Clark County Zoning Commission as Messner's lead attorney on matters relating to Clearwater, INBE, and the All Net project. Each allegation in this Complaint concerning Welch's conduct is made against Messner as the principal for whose benefit, at whose direction, and within the scope of whose authority Welch acted at all times relevant.

57. The convicted felon who designed the fraud scheme and directed it from outside the firm is Defendant Daniel "Danny" Chartraw. Chartraw uses aliases, and he used an alias "Leon Chartue" in connection with this scheme, which is a variant of his father's first name. Plaintiffs did not discover Chartraw's involvement until well after Plaintiffs lost their money, and Chartraw was referred to as "Leon" up through the time when Chartraw's name came through on a Plaintiff's

caller ID. Welch and Messner knowingly kept up the alias aspect of the scam, knowingly referring to Chartraw as "Leon" in emails and even later in court filings.

58. Chartraw was indicted in 2012 in the Eastern District of California on 18 counts of wire fraud. *United States v. Chartraw*, No. 2:12-cr-00184 (E.D. Cal.). He absconded, and after he was apprehended in Mexico under the alias "James Murphy," he pled guilty to wire fraud on September 12, 2013, and was sentenced to 57 months in federal prison. Chartraw also pled guilty to state felonies for grand theft, embezzlement, domestic violence (for breaking his estranged wife's nose in front of five children), and violation of a restraining order, and received a concurrent seven-year state prison sentence.

59. In 2021 and 2022, after his release from prison, Chartraw operated another advance fee scam related to his company Crypto-Pal, and in November 2024, he was arrested and indicted by a federal grand jury on 12 counts of wire fraud in the Eastern District of California. *United States v. Chartraw*, No. 2:24-cr-00311-WBS (E.D. Cal.). Those charges remain pending and Chartraw's trial is scheduled to commence on June 9, 2026, unless Chartraw pleads guilty.

60. The front man for Clearwater is Defendant Todd Owen. The enterprise deployed Owen as Clearwater's public face because Chartraw's notorious criminal record prominently appears upon a Google search of Chartraw's name and a person who performed a search for "Daniel Chartraw" would likely discover his criminal history and prison sentences. Per the federal government's filings, Owen was a co-conspirator in Chartraw's 2021 to 2022 Crypto-Pal advance-fee scheme, which occurred just before the BELOC scheme began with some likely overlap. *United States v. Chartraw*, No. 2:24-cr-00311-WBS, ECF No. 49 at 2 (E.D. Cal. Apr. 10, 2026) ("At all relevant times, Defendant and an associate, Todd Owen, controlled multiple businesses, including Crypto-Pal LLC and TDA Global LLC.").

61. The corporate vehicle through which the scheme's proceeds were distributed is Defendant Clearwater, a Wyoming limited liability company incorporated on May 26, 2022. It has no documented assets, no operations, no employees, and no regulatory authorization as a financial institution, lender, securities broker, or bond dealer. The felon Chartraw, and his accomplice Owen, controlled Clearwater.

62. The sham lender whose name appears on the face of the loan agreements is INBE, a Wyoming limited liability company formed on September 26, 2022 at 30 North Gould Street, Sheridan, Wyoming 82801. That is a generic commercial mail-drop address that Clearwater also used, and that Welch later used to register additional shell companies for the scheme including INBE-Clear Capital Group LLC in April 2023 and Titan Financial, LLC in November 2023.[1]

63. INBE also had no capital, no operations, no lending license, and no capacity to fund any loan of any amount. Its principal Craig Boddington has stated under oath, and bank records have confirmed, that INBE received none of Plaintiffs' deposit money, authorized none of the disbursements from the Messner trust account, and does not know what Messner did with the money. INBE's knowledge, Defendants used INBE as a nominal counterparty lacking any control over the escrowed funds, so that, when victims later demanded their money back, Messner could redirect those demands to INBE in an attempt to avoid liability.

---

[1] The Wyoming corporate registrations of the companies involved in this matter do not necessarily reflect any real physical connection to Wyoming other than the fact that Wyoming allows an unusually high level of anonymity in its secretary of state filings. In Wyoming, third party companies can be hired to file corporate registration paperwork to maintain the secrecy of newly-formed Wyoming company's principals. Wyoming has thus become a magnet for questionable enterprises such as the ones operated by Defendants.
See https://www.icij.org/investigations/cyprus-confidential/with-sharp-rise-in-incorporations-wyoming-cements-reputation-as-us-secrecy-haven/ (last visited Apr. 21, 2026).

64. The phony "bank" invoked during the cover-up is Titan Financial, LLC. Welch registered Titan Financial on November 7, 2023, using the email address of his own Messner administrative assistant, Donna DeFalco, on the Wyoming formation documents. Welch registered Titan at the same 30 North Gould Street, Sheridan, Wyoming mail-drop address already used for Clearwater, INBE, and INBE-Clear Capital. Welch would later claim that Plaintiffs' escrow funds were held at Titan Financial, which is an outrageous statement for many reasons including that Titan Financial was created three months *after* the last of Plaintiffs' deposits had been transferred out of the Messner trust account. Moreover, Titan Financial has never been licensed as a bank of any kind in any state or federal jurisdiction, has no employees, no offices, no deposits, and no operations.

65. Welch nonetheless invoked "Titan Financial, LLC" and an entity he called "Titan Private Bank, LLC" in written communications to Plaintiffs beginning in December 2023, as the purported custodian of Plaintiffs' escrow deposits. The evidence demonstrates that Welch, a member of the Colorado Bar, was lying.

66. The Las Vegas construction project for whose benefit the scheme was conducted is All Net, operated by Messner's client Dribble Dunk. By the time the scheme began, All Net had been stalled for the better part of a decade and had burned through more than $37 million in reported capital without meaningful construction. All Net's development entitlements and permits[2] from Clark County were set to expire unless meaningful construction progress could be demonstrated.

[2] It was later asserted that the only open permit that Dribble Dunk actually obtained was a grading permit.

67. All Net owed a $17 million judgment to Las Vegas Paving Corporation, had unpaid rent arrears to its landlord Sahara Las Vegas Corp., and faced construction liens filed by Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC. By early 2023, Dribble Dunk's bank account had been frozen following a creditor's garnishment. Messner and its co-defendants needed cash promptly, and in large amounts, to pay those creditors and to manufacture the appearance of construction progress by the November 2023 deadline. Plaintiffs' deposits provided that cash.

68. The defining and most troubling feature of the scheme is its use of a law firm's client trust account, a COLTAF account in Colorado, to lure victims. A COLTAF account is among the most sacrosanct instrumentalities of the legal profession. Colorado Rule of Professional Conduct 1.15, as supplemented by Rules 1.15A through 1.15E, requires attorneys to hold client and third-party funds in such accounts separate from the lawyer's own property, to disburse those funds only as authorized, and to deliver them promptly to the persons entitled to receive them.

69. Messner wrote the similar rules into the loan agreements, and much more, as inducements to Plaintiffs. Messner promised in writing that the deposits would remain in Messner's "sole possession and control," that the funds would be returned if no loan funded, and that Plaintiffs were "never exposed to any risk of loss." Those representations did the inducing. Plaintiffs wired millions of dollars to a strange law firm in Denver because they believed a Colorado law firm would do what a Colorado law firm is required by law to do.

70. Messner occupied multiple irreconcilable roles simultaneously and concealed each one from Plaintiffs. The same firm that served as "escrow trustee" for Plaintiffs' deposits was also project counsel for Dribble Dunk, the intended beneficiary of the funds, was also bond counsel and "bookrunner" for Clearwater, whose sham bonds were presented to the Clark County Zoning

Commission as the supposed financing source for Dribble Dunk, was also individual counsel to Chartraw and Owen, both of whom received Plaintiffs' money in their personal bank accounts, was also counsel for INBE, was also the drafter of the organizational documents of INBE-Clear Capital, was also counsel for Shah Mathias and his entities Ameri-Metro and GIFDA, and was also counsel for Titan Financial, LLC.

71. None of these conflicts was disclosed to Plaintiffs. Messner represented every side of every sham transaction while writing into its escrow agreements the promise that it would serve as a neutral trustee that would hold Plaintiffs' money in its sole possession and control. That promise was false when Messner wrote it and Messner knew it was false.

72. The racketeering enterprise alleged in this Complaint is an association-in-fact consisting of (i) the four Defendants named herein and (ii) non-party participants who performed discrete roles in furtherance of the scheme. Those non-party participants include: (a) Martin Hale and his entity, Latham Funding, LLC, who acted as a post-default intermediary to lull victims after funding failed and who are not employees, partners, affiliates, or clients of Messner; and (b) Jason Aufdermaur and his law firm, Wyatt Aufdermaur LLC, a Georgia law firm that received $600,000 from the Messner trust account and acted as secondary counsel in the effort to deflect and contain victim demands, and who likewise are not employees, partners, affiliates, or clients of Messner.

73. The BELOC Enterprise is distinct from Messner. Its membership includes Daniel Chartraw, Todd Owen, Clearwater Premiere Perpetual Master LLC, Martin Hale, Latham Funding, LLC, Jason Aufdermaur, and Wyatt Aufdermaur LLC, none of whom is an employee, partner, affiliate, client, or subsidiary of Messner.

74. At all relevant times, Torben Welch, his associate Jake Brigham, and Messner's president Jim Smith acted within the scope of their roles at Messner. Their acts and knowledge are

imputed to Messner under settled principles of agency and respondeat superior, as further alleged in the Statement of Facts.

75. Plaintiffs do not allege that Messner operated as, or was constituted as, a general partnership. Plaintiffs do not seek to impose liability on any Messner attorney for conduct in which that attorney did not personally participate.

76. The conduct alleged throughout this Complaint is drastically different from the ordinary provision of legal services by Messner to its clients. Messner's conduct was rogue and inappropriate in that it involved fabricating financial instruments, inventing sham financial institutions, abusing its institutional credibility before regulators and the public, simultaneously representing every side of structurally sham transactions, misusing its Colorado COLTAF trust account as a slush fund, and then lying to courts, clients, and counterparties to conceal the theft.

77. Among other things, Messner: (a) created, transmitted, and caused to be presented to the Clark County Zoning Commission on November 16, 2022 a forged PG Asia Investment Bank commitment letter attributed to a Philippine institution that publicly disavowed the document and issued a fraud alert; (b) caused associate attorney Jake Brigham to vouch for that letter on the record, even though Brigham later admitted he had never verified it and PG Asia had no involvement with the All Net project, and (c) used its status as "lawyers we trust" in Chair Gibson's words to induce the Zoning Commission to extend All Net's entitlements, despite knowing that neither PG Asia financing nor the FIDES funds were real.

78. Messner also caused its managing partner Welch to appear before the Clark County Zoning Commission on November 21, 2023 and assert the existence of a $5 billion offshore account at a Mexican entity called "FIDES," which Welch claimed to have personally inspected on his flight to Las Vegas that morning, even though no such account existed.

79. On its own letterhead, Messner drafted and issued more than 10 letters representing, on Messner's institutional credibility, the existence of nonexistent bank accounts, nonexistent financial institutions, nonexistent correspondent-banking arrangements, and nonexistent wire clearances. Those letters included a December 26, 2023 letter purporting to confirm $10 billion at Titan Financial LLC, $92 billion at "Clearwater and 3FR LLC," and $1.545 trillion in "gold-backed funds," even though Titan, Clearwater, and 3FR had no such assets.

80. Messner itself conceived, registered, and used Titan Financial, LLC and "Titan Private Bank" as phony financial institutions in the cover-up phase of the scheme. Welch formed Titan in November 2023 at the same Wyoming mail-drop address used by Clearwater and INBE, using his assistant's email address, after Plaintiffs' deposits had already been drained from the Messner trust account. Titan has never been licensed as a bank in any jurisdiction, maintained no deposits, had no employees, and had no operations, yet Messner invoked Titan as the purported custodian of Plaintiffs' "fully insured" escrow funds and furnished Plaintiffs with a fake Titan Private Bank account statement.

81. Throughout this period, Messner simultaneously purported to represent Clearwater, INBE, Chartraw, Owen, Dribble Dunk, Ameri-Metro, Shah Mathias, Titan Financial, LLC, and essentially every significant counterparty in the sham bond and BELOC transactions, while also holding itself out as neutral "Trustee" and escrow holder for Plaintiffs' deposits. Messner never disclosed these irreconcilable conflicts of interest to Plaintiffs and never obtained informed written waivers from any affected party.

82. Messner also copied a fraudulent loan template from another advance-fee scheme, Prime Capital Ventures, LLC, and "improved" it by inserting Messner as Trustee with "sole possession and control" over borrower deposits and by eliminating collateral. Messner then used

its BELOC form to offer more than $30 million in effectively unsecured loans on economically absurd terms no legitimate lender would offer, 4-to-1 leverage, 6% interest-only for 10 years, no personal guarantees, no real-estate collateral, in order to induce Plaintiffs and at least three additional borrowers to wire more than $10 million into Messner's COLTAF trust account.

83. Once the funds arrived, Messner held its Colorado COLTAF trust account out to non-clients as a safe, fully insured escrow instrumentality and then used that account to pay Dribble Dunk's rent, Dribble Dunk's engineering creditors, Dribble Dunk's other creditors, Messner's own internal accounts via intercompany transfers, loan obligations of unrelated third parties, consultants, luxury vehicles, and personal accounts of Chartraw, Owen, and Clearwater. Messner never sought or obtained Plaintiffs' consent for any of these transfers.

84. Bank records show that Messner transferred at least $3.4 million of Plaintiffs' money directly to All Net and its creditors, at least $1.8 million directly to co-defendants Chartraw, Owen, and Clearwater, $414,705 to purchase vehicles for Chartraw, $500,000 to Harris Bank to satisfy a loan obligation unrelated to Plaintiffs, and $329,540.77 to another Messner account, all without authorization and without disclosure. Every dollar of Plaintiffs' $8,345,000 in deposits had been emptied out of the COLTAF account by August 2, 2023, months before Messner falsely and repeatedly told Plaintiffs their funds remained safely in escrow.

85. To keep Plaintiffs from discovering the theft, Messner engaged in an extended campaign of lulling and concealment. On dates including August 24, 2023, November 3, 2023, January 25, 2024, February 15, 2024, March 11, 2024, and March 20, 2024, Messner told Plaintiffs in writing that "the bankers are still working through transfer protocols," that "the funds are under the Firm's possession and control," that the funds "remain part of the escrow under our control at Titan Financial, LLC," and that the funds "continue to be under our control in a firm trust account

at Titan Financial, LLC," even though Messner knew the COLTAF account had been drained and Titan had no deposits.

86. During the same period, Messner publicly smeared Plaintiff Emerald on its website by accusing Emerald of falsely claiming that Plaintiffs' funds had "disappeared," and it persisted in that accusation while knowing, from its own bank records, that the funds had in fact been misappropriated. Messner also refused to provide an accounting of the COLTAF account despite more than 10 written requests, all while telling Plaintiffs that legal action would "slow things down" and that refunds were supposedly imminent.

87. Messner's misconduct extended to its handling of INBE. On August 23, 2023, Messner wrote on firm letterhead that "we serve as outside counsel to INBE and its affiliates and partners" and that INBE "stands ready, willing and able" to fund the BELOC loans, even though Messner knew INBE had no capacity to fund any loan and had not received any of Plaintiffs' deposits. Fourteen months later, in court filings, Messner denied that INBE was ever its client, claimed that Plaintiffs were merely "investors" with INBE, and falsely asserted that Plaintiffs' deposits had been "with INBE" and were actually "owned" by INBE.

88. Messner then attempted to pin its own theft on INBE. Messner falsely represented to tribunals multiple times that Plaintiffs' funds had been invested "with INBE" and that Plaintiffs' remedy was to recover from INBE, while knowing, per unambiguous bank records, and INBE's sworn statements that INBE never received the funds and never authorized any disbursements from Messner's trust account. Messner caused its non-attorney president, Jim Smith, to execute false sworn declarations asserting supposed "authorizations" from INBE that INBE has denied under oath having given and that Messner has never produced.

89. Internally and in communications with Plaintiffs, Messner promoted a "shadow ledger" narrative involving standby letters of credit, European "trade desks," "private placement programs," and interbank SWIFT messaging (MT 799 and MT 760) as the supposed mechanism by which Plaintiffs' deposits would be monetized to fund the BELOC loans. No standby letter of credit was ever issued, no trade was ever run, no monetization proceeds were ever generated, and Messner knew that the only "proceeds" being realized were the unauthorized transfers of Plaintiffs' deposits to the enterprise's preferred recipients.

90. Messner's misconduct was not limited to Plaintiffs. The same BELOC template and trust-account structure were used to solicit and receive large deposits from at least three additional borrowers, whose funds were likewise misappropriated through the Colorado COLTAF account and routed to many of the same recipients. Messner's Colorado trust account functioned as an engine for an ongoing advance-fee fraud scheme, not as a neutral instrumentality for safekeeping client funds.

91. These acts are not the provision of legal services. They are the acts of a participant and director of a racketeering enterprise, carried out by a Colorado limited liability partnership that misused its professional status, institutional reputation, trust-account infrastructure, and multijurisdictional reach as core features of an advance-fee fraud scheme targeting multiple victims across several states.

## II. The All Net Project Was a Floundering and Fraud-Addled Disaster.

92. All Net Resort and Arena was pitched as a $5 billion megaplex to be built on the vacant parcel of the former Wet N Wild water park property in Las Vegas. The proposed project consisted of two luxury hotels, a five-star spa, rooftop pools and dining, a 3,000-seat ballroom, and a 22,000 seat sports and entertainment arena with a retractable roof.

93. The project's promoter was Jackie Robinson, a former college basketball player who played 22 games in the NBA before retiring in 1982. Robinson had no construction experience. After failed business pursuits resulted in a judgment, Robinson filed for bankruptcy twice in 2012.

94. Beginning in 2013, Robinson promoted the project through a constellation of related entities including All Net Development, Inc., All Net, LLC, and Dribble Dunk (collectively, "All Net").

95. In 2013, Robinson claimed All Net had secured more than $1 billion through bank loans and EB-5 investments. No documentation was ever produced. In 2014, Robinson held a ceremonial groundbreaking. Construction never began.

96. In 2017, Robinson announced that a bank in Qatar had committed to fully fund the project, which had by then expanded to a projected cost of $2.6 billion. Officials at the named Qatari bank denied any involvement with All Net or Robinson.

97. In 2019, Robinson told Clark County officials that $3 billion had been secured from banks in Qatar, Zurich, and Frankfurt. He promised to produce supporting bank records within a week. No records ever arrived.

98. In early 2022, Robinson's team announced a $4.7 billion commitment supposedly from a firm called Active Capital Holdings. Robinson later admitted the announcement was premature. No financing materialized.

99. By 2022, All Net had burned through at least $37 million in reported capital without meaningful construction. Creditors had filed numerous lawsuits, and the property was encumbered by judgments, mechanic's liens, and arrearages in rent. In May 2022, All Net agreed to pay $17 million in past-due excavation costs to Las Vegas Paving Corporation. When All Net could not

pay, a $17 million agreed judgment was entered against All Net in favor of Las Vegas Paving. *Las Vegas Paving Corp. v. All Net Land Development, LLC*, No. A-18-771361-B (Clark County Dist. Ct.).

100. All Net's stated budget grew in lockstep with its history of failure, from $1.3 billion in 2014, to $2.6 billion in 2017, to $3 billion in 2019, to $4 billion in 2021, to $4.9 billion by 2022. All Net had fallen behind on lease payments, had failed to exercise the purchase option, and had no realistic path to financing what was on its face one of the most expensive proposed real estate developments in history.

101. Meanwhile, other stadiums in the Las Vegas area were actually built during this timeframe. T-Mobile Arena opened in 2016 as the home arena of the NHL's Vegas Golden Knights. Las Vegas Ballpark opened in 2019 as a modern baseball stadium hosting Triple-A and other professional and multi-purpose events. Allegiant Stadium, a 65,000-seat venue that houses the NFL's Las Vegas Raiders and UNLV football, broke ground in 2017 and opened in 2020 at a reported construction cost of approximately $1.97 billion.

102. By the time of Defendants' supposed "$5 billion" All Net arena, the Las Vegas stadium and arena market was already saturated. The region had a brand-new NFL stadium, a modern NHL arena, and a newly constructed Triple-A ballpark, all of which had moved from announcement to actual construction and completion. Las Vegas did not have an NBA team.

103. It was under these desperate circumstances that Defendants entered the All Net picture in 2022.

**III. The RICO Enterprise Appears Together on October 19, 2022.**

104. The members of the enterprise assembled publicly on October 19, 2022, at a press conference in Las Vegas promoting the All Net arena. The stated purpose of the event was to tout

the supposed securing of $4.9 billion in financing for the project. No such financing had been secured. The financing did not exist. Every Defendant seated at the table on the stage knew the "financing" story was a sham as they delivered false public statements on live television.

105. The press conference featured Welch, Owen, Robinson, and three Las Vegas officials seated together at a table. Welch and Owen sat side by side at the table, while Chartraw sat in the front row just a few feet away. Video footage and reports of the press conference were carried on the evening news and circulated on social media.

https://www.reviewjournal.com/business/casinos-gaming/long-delayed-strip-arena-hotel-project-announces-new-funding-2660845/ (last visited Apr. 21, 2026).




Robinson, Owen, and Welch



Owen Welch




Chartraw
Using his alias "Leon Chartue"



Owen, Welch, and Chartraw
(from clockwise)



Chartraw

106. At the conference, Owen spoke on behalf of Clearwater, declaring, "The financing before always came to a stall because of the actual assets. We are bringing the assets. Clearwater is bringing them to the table to be able to put the financing together, finally."

107. Welch spoke on behalf of Messner, and stated "Over the last year, the inflation numbers have kind of changed the numbers a little bit, so that made the sell a little more difficult, and construction issues did that, but we were able to find somebody that was able to oversee those and say, 'Hey, this is gonna work this time.'"

108. After the press conference, Owen and Welch gave a joint interview, in which Owen stated that banks like Credit Suisse, Goldman Sachs, and Bank of America would be used, and for now, "We're bringing the missing piece of this puzzle to the table, which is assets."



Owen and Welch

109. The "assets" Owen and Welch publicly represented as the basis of a $4.9 billion financing commitment had been acquired for no money at all. Those assets were nothing but contract rights Clearwater purportedly held to "monetize" sham bonds issued among the shell companies of Shah Mathias's Ameri-Metro enterprise, which is discussed in Section V below. The bonds were worth nothing. Three months before the press conference, the Delaware Court of Chancery had described the Ameri-Metro enterprise as a "classic Ponzi scheme." *Lentz v. Mathias*, No. 2022-0374-JTL (Del. Ch. July 13, 2022). The $4.9 billion did not exist.

### IV. On November 16, 2022, Messner Defrauded the Las Vegas Zoning Commission with Phony Financing and a Fake Funding Commitment Letter.

110. Four weeks after the October 19, 2022 press conference, the enterprise executed the act that would set the November 2023 deadline the BELOC scheme was built to satisfy. All

Net's development entitlements and permits from Clark County were set to expire in November 2022. Absent an extension, the project could not proceed. For the show to go on, Defendants needed that extension, and securing it became the immediate objective of their next round of misrepresentations.

111. Welch, on behalf of Messner and All Net, sought a one-year extension from the Clark County Zoning Commission. Welch knew the Commission had grown skeptical of All Net's ever-changing financing stories and that no extension would be granted without purported proof that the project was, this time, actually funded. Welch therefore supplied that "proof" by fabricating it.

112. On November 16, 2022, Welch sent associate attorney Jake Brigham, a Messner lawyer working under Welch's supervision, to appear before the Zoning Commission. Brigham's presentation to the Commission is reflected in the official minutes of that hearing, and his representations are quoted verbatim in this Complaint.

113. Brigham told the Commission, "My name is Jake Brigham, B-R-I-G-H-A-M and I'm an attorney with the law firm Messner Reeves and our firm is both bound [sic] counsel and book runner with respect to various infrastructure bonds which are sponsored by our client, Clearwater. And we are also project counsel for the Dribble Dunk Project."

114. Brigham told the Commission that financing had been secured, describing "a $1.5 billion-dollar revolving line of credit from Clearwater to Dribble Dunk for amounts up to $7 billion dollars," which had been "previously executed and remains effective and binding on both the lender, Clearwater, and the developer, Dribble Dunk."

115. Brigham told the Commission that, "as of yesterday, Dribble Dunk has received a funding commitment letter which is deemed legally binding from PG Asia Investment Bank,

confirming funding in the amount of $5 billion dollars to Clearwater as required for the Dribble Dunk Project funding expectations."

116. Brigham told the Commission the PG Asia letter was "signed by the Financial Director of the bank," was "printed on bank letterhead," and was "as good as cash."

117. Commissioner Justin Jones directly challenged that representation. Jones told Brigham, "I appreciate your representation here that the one-and-a-half-page letter from Mister Welch is as good as cash, but it's not." Jones noted that Clearwater "did not even appear in a Google search" and asked Brigham to explain where the $5 billion was actually coming from. Jones observed that "the applicant has come in here with funding sources that are different every single time and last time it was magic money from the Middle East and this time it's a one-and-a-half-page letter from a law firm. And I'm really trying to understand where the money is actually coming from."

118. Brigham backpedaled. He conceded, "I may have mis-spoke. I didn't mean my colleague's letter was worth the cash. I meant the funding commitment letter from the bank itself." Brigham admitted he "didn't have the commitment letter from the bank" the prior week because he had "received it yesterday." Brigham also represented to the Commission that he had "personally placed the bonds themselves on the Bloomberg Exchange Platform, so those bonds are verifiable on the market."

119. Chair James Gibson, in granting Messner the benefit of the doubt, explained what Messner's institutional credibility meant to the Commission's decision. Gibson told the hearing that "one of the things that is comforting is that we have assurances from lawyers we trust, people we know and know how competent you are that this financing is in place and that it is real, and

these dollars are available to build this project out. And that gives a measure of comfort that is important to us."

120. That is the core of this pernicious fraud scheme. Messner's institutional credibility induced the Commission's grant of the extension. Seeing that it worked, the same institutional credibility would later induce Plaintiffs to wire $8,345,000 into Messner's Colorado trust account.

121. The PG Asia letter on which Brigham's entire presentation depended was a forgery. PG Asia Investment Bank Ltd. had no involvement in the Dribble Dunk project, had issued no commitment letter to Clearwater, and did not know Welch, Brigham, Messner, Clearwater, Owen, Chartraw, Robinson, or any other Defendant

122. PG Asia issued an "Attempted Fraud Alert Notice" on its website:

> It has come to our attention that PG Asia Investment Bank Ltd's logo and email has been used by unauthorised third parties without our prior knowledge nor approval for various correspondences including but not limited to the issuance of bank comfort letters, confirmation of bank accounts opening and other documents. These documents may be targeted at misleading and/or deceiving the public…
>
> PG Asia Investment Bank Ltd is not in any way associated or involved in the financing of the All Net Resort & Arena project in Las Vegas, United States of America. We have neither approved nor issued any financial instrument/s to support any institution/s involved in the Project.

https://web.archive.org/web/20240304235323/https://www.pgaib.com/ (visited Apr. 21, 2026).

123. The PG Asia letter appears clearly fake on its face. It purports to have been signed by one "William Murphy," identified as PG Asia's "Financial Director and CFO." "William Murphy" is a known alias of Chartraw. *See United States v. Chartraw*, No. 2:24-cr-00311-WBS, ECF No. 47 at Ex. 210 (E.D. Cal. Apr. 10, 2026) ("Jun. 26, 2022 Email between Jarnell Stokes, Dan Chartraw, and William Murphy"). Chartraw used "William Murphy" as an alias five months before the forged PG Asia letter, in the course of defrauding a former NBA player named Jarnell Stokes. *See United States v. Chartraw*, No. 2:24-cr-00311-WBS, ECF No. 49 at 7 (E.D. Cal.

Apr. 10, 2026) ("Defendant also represented that Stokes would be investing with William Murphy, who was affiliated with a bank and could secure Stokes' investment… In reality, the wallet belonged to Defendant."). "William Murphy" is almost identical to "James Murphy," the alias Chartraw used in 2012 while evading federal authorities in Mexico.

PG Asia Investment Bank Ltd
A Pied Piper Group Global Company

Licensed Labuan Investment Bank
Registration No. LL08568 / License No. 12011181

11/16/2022 BCC
#8 ET-22-400109 (UC-0519-14)
#9 ET-22-400110 (UC-0568-14)

November 15, 2022

**Dribble Dunk, LLC/All Net, LLC**
Attn: Jackie Robinson
3770 Howard Hughes Pkwy,
Suite 100
Las Vegas, NV 89169

Sir,

The undersigned bank officer, at your request, hereby confirms that we, PG Asia Investment Bank, LTD, located at 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, are Ready, Willing, and Able to issue a Letter of Credit to the order of **Clearwater Premiere Perpetual Master, LLC** for the total amount of Five Billion United States Dollars ($5,000,000,000.00) as required for the Dribble Dunk Project funding expectations. The term of such guarantee(s) will be for a minimum of one calendar year plus one calendar month. A new Letter of Credit containing the same or similar terms will be issued to replace each expiring Letter of Credit for an additional two (2) consecutive periods of one year and one month each. We also confirm that the the underlying capital assets supporting this Letter of Credit is free of any liens, encumbrances and/or restrictions and consists of clean, clear funds of non-criminal origin.

Upon receipt of your written request, we will verify the approved Letter of Credit via SWIFT MT760, sent to your indicated bank and corresponding account coordinates, communicated by the undersigned banking officer, Mr. William Murphy. We acknowledge that the approved Letter of Credit satisfies contractual terms and conditions for your mutual engagement with our client, functioning primarily as security and/or to satisfy periodic payments according to the projects requirements. A signed facsimile and/or email copy of this confirmation is deemed legally binding, with such delivery classified as an original correspondence.

For and on behalf of PG Asia Investment Bank, LTD of 10, Jalan P. Ramlee, Kuala Lumpur, 50250 Kuala Lumpur, Wilayah Persekutuan Kuala Lumpur, Malaysia, executed Tuesday, November 01, 2022.

William Murphy (Nov 15, 2022 08:59 EST)

William Murphy
*Financial Director and CFO*
**PG Asia Investment Bank, LTD**
Email: wmurphy@pgaib.com
US Ph: +1 631 375 0701
URL: http://www.pgaib.com

Principal Office : Level 7(E)-2, Main Office Tower, 87000 Federal Territory of Labuan, Malaysia
Marketing Office : Level 22(E), UBN Tower, 10, Jalan P Ramlee 50250 Kuala Lumpur, Malaysia
U.S. Office : 233 S. Wacker Dr. 67th Floor, Chicago, IL 60606
DMCC Office : Bin Haidar Bldg, Ste. 217: Port Saeed Deira, Dubai UAE
Zurich Office : Freischutzgasse 3, 8004 Zurich, Switzerland

trade@piedpipergroup.com
+6 087 416160
+6 087 417160

124. The fake PG Asia letter listed a U.S. phone number, (631) 375-0701, which is a New York-based mobile number associated with an unrelated small business. When that number is called, the line plays only a generic voicemail. The letter also listed a U.S. office address at 233 S. Wacker Drive, 67th Floor, Chicago, Illinois, which corresponds to The Metropolitan, a private social club with no known connection to PG Asia. An online search for "William Murphy" as an officer of PG Asia returns no results. The obviously fake nature of this letter, which Messner passed off as genuine, has the hallmarks of Chartraw's handiwork and it demonstrates the potent and nefarious joining of forces between Messner and Chartraw.

125. At the same November 16, 2022 hearing, Robinson compounded the deception. Robinson told the Commission that the Ameri-Metro bonds had been listed on the Bloomberg terminal with CUSIP numbers and were "backed by the federal government." That representation was wildly false. The federal government does not back shell-company private bonds. The Bloomberg entries referenced non-existent shell entities, with a fabricated maturity date of June 30, 2052. Welch had directed Brigham to enter that data five weeks before the hearing specifically to manufacture the appearance that a tradable, verifiable bond asset existed.

126. The Zoning Commission voted 3 to 2 to grant All Net a one-year extension of its development entitlements, running through November 2023. That extension set into motion the events that followed. The November 2023 deadline was the deadline Defendants needed to satisfy. To satisfy it, they needed money. Plaintiffs' stolen escrow deposits became that money.

**V. The Bond Scheme Failed and the Enterprise Shifted to the BELOC Fraud in February 2023.**

127. The $5 billion in phony PG Asia financing never materialized because it never existed. The question facing Defendants by early 2023 was how to manufacture the appearance of construction progress by November 2023.

128. The bond scheme presented to the Zoning Commission in November 2022 was the direct antecedent of the BELOC scheme at issue in this Complaint. Welch and Chartraw built the BELOC scheme out of the same raw materials, with the same cast, for the same underlying purpose.

129. The bond scheme kicked into gear on August 2, 2022, when Welch issued a letter on Messner letterhead asserting that Messner represented Clearwater, Clearwater Premiere Perpetual Master Trust, the Global Infrastructure Finance & Development Authority, Inc. ("GIFDA"), and GIFDA's controlling shareholder Shahnawaz ("Shah") Mathias. The August 2, 2022 letter identified Welch and Messner as "bond counsel and bookrunner" for a proposed $60 billion bond issuance.

130. On September 8, 2022, Welch issued a second letter on Messner letterhead proclaiming Messner's representation of Mathias-controlled Ameri-Metro, Inc., whose previous counsel had been disbarred. The September 8, 2022 letter represented that Clearwater owned a $60 billion bond, purportedly acquired through a March 29, 2022 "Transfer Agreement" with GIFDA. That Transfer Agreement is publicly filed with the Securities and Exchange Commission.[3]

131. The Transfer Agreement is patently absurd. This document purports to reflect a transfer from GIFDA (one of Mathias' shell companies) to Clearwater as the transferee with Owen acting as the trustee, valuing the "Asset" at "Four Hundred and Fifty Nine Billion Five Hundred Million ($459,500,000,000,000 USD) Dollars."

---

[3] https://www.sec.gov/Archives/edgar/data/1534155/000089109222001164/ex99-5.htm (last visited Apr. 21, 2026).

132. The filing party had just represented to the Securities and Exchange Commission that an asset worth *half a trillion dollars* just changed hands. This is higher than the GDP of the state of Colorado.

133. And yet, there is no economic activity among the 23 shell companies controlled by Mathias, as none of those companies had any revenue or operations. Mathias executed sham contracts among his own shell entities, signing on both sides of each agreement, and used that circular self-dealing to assign the bond a fictional stated value of $459.5 billion. And this filing is the basis on which Welch and Owen had been publicly representing that Clearwater held a bond worth nearly half a trillion dollars. These were the "Assets."

134. No actual consideration was exchanged for this so-called half-trillion dollar asset. The consideration Clearwater purportedly provided for the $60 billion bond was a promise to attempt to "monetize" the bond on consignment. In other words, Clearwater received this enormously valuable "asset" by stating that it would try to "monetize" it. The arrangement also likely involves unlicensed securities brokerage, among other serious problems, and these are issues which would likely be considered by a law firm actually performing legal services. Messner was doing no such thing.

135. Another problem is that the transfer agreement is dated March 29, 2022, and Clearwater was not created until May 26, 2022, approximately two months later.

136. The Mathias parties were on notice of the wrongfulness of their actions. By July 13, 2022, three weeks before Welch's first Messner-letterhead representation of the bond scheme, the Delaware Court of Chancery had described the Ameri-Metro business model as a "classic Ponzi scheme." *Lentz v. Mathias*, No. 2022-0374-JTL. This would have given pause to an attorney, but that was not the role of Messner in this situation, as Messner proceeded to provide cover and

legitimacy by representing and thus vouching for the bond issuer anyway, along with all the other parties in the sham transaction.

137. Mathias contemporaneously filed a Form 10-K for Ameri-Metro claiming $510 billion in construction contracts and $6.9 trillion in “comprehensive income,” based on supposed gains from “available-for-sale securities.” Mathias also circulated a fake tender offer to Ameri-Metro shareholders purporting to come from Owen on behalf of Clearwater, which valued Ameri-Metro at $20.24 trillion. That figure exceeds the GDP of the European Union.

138. The July 13, 2022 Delaware Court of Chancery opinion also discussed a connection between Chartraw and Mathias that pre-dated the October 19, 2022 press conference. The tender offer Mathias circulated through Penndel in March 2022 was structured to “create[] the impression that TDA Global Systems, LLC, a third-party investment firm, [was] making the Tender Offer.” *Lentz v. Mathias*, No. 2022-0374-JTL, slip op. at 5. TDA Global Systems, LLC was one of the two Wyoming limited liability companies Chartraw was simultaneously using to run the Crypto-Pal advance-fee scheme for which he would be indicted in the Eastern District of California in November 2024. The Mathias bond scheme and the Chartraw advance-fee scheme were already linked through TDA Global in March 2022, six months before Welch, Owen, Robinson, and Chartraw appeared together at the All Net press conference.

139. On July 18, 2025, the Securities and Exchange Commission filed a civil enforcement action against Mathias, Ameri-Metro, Inc., Penndel Land Development Co., and HSRF Trust, alleging the sale of unregistered securities, securities fraud, and violations of Rule 10b-5. *SEC v. Mathias*, No. 1:25-cv-02313 (D.D.C. July 18, 2025). Messner and Welch had represented the very defendants the SEC would later sue.

140. The bond scheme became too much for Mathias. On February 13, 2023, Mathias, on behalf of Ameri-Metro, sent Chartraw a termination letter formally terminating all agreements with Clearwater and revoking Clearwater's rights to market or monetize the bonds. After that date, Clearwater had no continuing contractual basis to hold itself out as a bondholder having any rights to the Ameri Metro bonds.

141. Welch ignored the termination. Seven days after the February 13, 2023 termination, on February 20, 2023, Welch emailed two brokers with new links to the bond materials, copying Brigham and Owen, and attached a document falsely claiming that Messner was safeguarding $60 billion in bond assets for Clearwater. Welch knew the bonds were worthless, he knew Clearwater paid nothing for them, and he knew Clearwater had no right to market them. But desperate times called for the desperate measures which ensued.

142. By February 2023, the idea of monetizing the bond was mortally wounded. Defendants needed a new mechanism, one that would generate actual cash rather than phantom contract rights. They found one in a document already in circulation among advance-fee fraud operators in upstate New York.

143. By April 20, 2023, Welch obtained a copy of a fraudulent loan agreement used by Prime Capital Ventures, LLC, an Albany-based advance-fee scam whose principals have since been indicted for wire fraud. *United States v. Roglieri,* No. 1:24-*CR-261 (N.D.N.Y.); United States v. Snyder*, No. 1:25-CR-195 (N.D.N.Y.). Prime's template offered the basic form of an advance-fee fraud, namely multimillion-dollar loans with no personal guarantee and no real estate collateral, in exchange for a large upfront deposit to a supposedly neutral escrow, followed by misappropriation.

144. Welch improved upon Prime's template in one crucial respect. Where Prime's version had designated a private escrow holder, Welch's version named Messner as the "Trustee" and specified that deposited funds would remain in Messner's "sole possession and control" until the loan funded. Welch's version eliminated the objection on behalf of the victim as to the safety of the deposit funds, given the perceived safety of the deposits in a major law firm's trust account. The result was a document that did what Prime's version could never have done. It put the full institutional weight of a 100-attorney Colorado law firm behind the safety of a would-be borrower's deposit. That is what induced Plaintiffs to wire their money.

145. If not for Messner's involvement, none of the Plaintiffs would have tendered their deposits for the BELOC.

146. The BELOC scheme was more dangerous than the Prime scheme because Prime's scheme required the victim to trust a stranger with a deposit, but BELOC scheme allowed the victim to trust the sanctity of a law firm's trust account, a thing most people correctly trust to hold their money in escrow.

### VI. In the BELOC Phase of the Scheme, the Enterprise Treated INBE as a Useful Idiot Whom Messner Later Tried to Frame for Messner's Theft.

147. The nominal lender under the BELOC agreements was INBE. This shell Wyoming LLC, created on September 26, 2022, had no capital, no regulatory registration as a lender, no track record, and no capacity to fund a loan of any amount. INBE's listed principals, Jonathan Wright and Craig Boddington, had no capacity or credentials to operate a lending institution.

148. In December 2022, when INBE had existed for less than three months and held no assets, its website claimed INBE managed a $13.36 billion global investment pipeline. By June 2023, INBE's website claimed that pipeline had grown to $35.72 billion. No legitimate financial institution triples its lending pipeline by more than $20 billion in ten weeks without public

announcements, regulatory filings, or market activity. INBE had no such announcements, filings, or activity.

149. INBE's website also claimed INBE had the capacity to fund up to $50 billion per transaction. Had INBE possessed anything remotely like those resources, it could have funded the Dribble Dunk arena directly without soliciting deposits from unrelated small businesses across the country.

150. INBE's function in the scheme, unbeknownst to INBE, was to be a nominal counterparty and, ultimately, a fall guy or patsy. Its name went on the agreements so that when Plaintiffs later demanded their money back, Messner and its confederates could point at INBE and claim the quarrel was with the lender, not the law firm. Defendants used INBE as what, in the scheme's own internal communications, is described as a "useful idiot." In lulling communications with Plaintiffs, intermediaries such as Hale reinforced that narrative by telling Plaintiffs that "INBE screwed you," urging that "you can sue INBE," and suggesting that Plaintiffs should "get [their] deposit back from INBE then come to us for project funding," while at the same time stating that "Torben's only legal obligation is to return the ICA $." Those statements reflect a deliberate effort to cast INBE as the problem and the litigation target, confirming that INBE was never a genuine lending institution in this structure but a disposable prop.

151. The BELOC terms, considered objectively, show that INBE was never going to make any loan. Each proposed loan was for an amount equal to four times the borrower's deposit, at six percent interest only for ten years, with no personal guarantee and no real estate collateral. Across the five Plaintiffs, the total loan commitment exceeded $33 million. No legitimate lender would offer such terms. Six percent interest only for ten years was barely above the then-prevailing inflation rate of approximately five percent. On an inflation-adjusted basis, such a loan would be

effectively free money to the borrower. A borrower could take the loan, dissolve the business, and keep the proceeds with no personal recourse. The economic absurdity of the loan terms betrays the agreement's true purpose: Messner drafted paperwork that, in substance, allowed Messner to borrow Plaintiffs' deposits for up to 90 days at no cost, with the understanding that Messner would either return the money if no "funding" materialized or, failing that, plug the deposits into a shadow-ledger, Ponzi-style story in which new victims' money would be used to paper over the last round of promises.

152. Welch knew all of this. He had drafted the agreements. On March 22, 2023, Messner prepared a Memorandum of Cooperation between Clearwater and INBE. On March 31, 2023, Messner prepared a Memorandum of Understanding formalizing that arrangement. On April 10, 2023, Welch registered INBE-Clear Capital Group LLC, a joint venture between INBE and Clearwater, at the same 30 North Gould Street mail drop, using his own Messner assistant's email address. That same day, Messner prepared a Manager Appointment Resolution for INBE-Clear Capital and obtained an EIN for it. On April 18, 2023, Messner drafted INBE-Clear Capital's Operating Agreement. On April 20, 2023, Welch finalized the BELOC template. On April 23, 2023, Messner prepared a joint venture agreement between Clearwater and INBE. On June 1, 2023, Welch obtained an Axos Bank account for INBE-Clear Capital. After the scheme collapsed and victims began asking questions, Welch quietly filed articles of dissolution for INBE-Clear Capital on March 29, 2024.

153. The mechanism by which the promised BELOC loans were supposed to be funded, or at least "handled" on the back end when deposits came due, is referred to in Defendants' internal communications as the "shadow ledger." Under that theory, which Chartraw sold to Welch and which Welch sold to Plaintiffs, the ICA deposits parked in Messner's trust account were not

supposed to be used to fund loans directly. They were supposed to serve as cash collateral for a standby letter of credit ("SBLC") to be issued by a correspondent bank to INBE or Clearwater. The SBLC would then be "monetized" through what Defendants described as a European "trade desk" or "private placement program," using interbank messaging protocols such as SWIFT MT 799 and MT 760 and "year-and-a-day" instrument-lease arrangements. The monetization trade would purportedly generate profits large enough to (a) fund the four-to-one BELOCs promised to Plaintiffs, (b) pay a spread to Clearwater and INBE, and (c) leave Messner with a fee on the side. In other words, INBE's role as "lender of record" was contingent on proceeds from a speculative trading arrangement in which neither INBE nor Clearwater had any track record and for which no legitimate documentation was ever produced. The BELOC structure could not work unless Defendants somehow manufactured money out of nothing through this opaque and obviously improper instrument-trading program.

154. Defendants' shadow-ledger theory collapsed for the reason such schemes collapse, namely that Defendants diverted Plaintiffs' trust-account deposits to themselves and to Dribble Dunk's creditors before any standby letter of credit was ever issued. On the bank records, the ICA deposits were emptied out of the Messner trust account before any SBLC existed, before any trade was ever run, and before any monetization proceeds were ever generated. No SBLC was ever issued. No trade was ever run. No proceeds ever came. What the shadow-ledger theory actually did was furnish Welch with a plausible-sounding explanation he could offer Plaintiffs throughout 2023 and 2024 as to why their loans had not funded and why the return of their deposits was being delayed. Welch then layered that explanation with payments of Plaintiffs' money to Chartraw and Owen personally, styled as "monetization fees," to keep the theory active and to keep Chartraw feeding Welch the next round of excuses. This was Chartraw's specialty.

155. Throughout 2023, while the scheme was in its collection phase, Welch wrote to Plaintiffs on Messner letterhead affirming Messner's representation of INBE. On August 23, 2023, after funding deadlines had begun to arrive and Plaintiffs had begun asking questions, Welch sent a comfort letter on Messner letterhead stating, "We serve as outside counsel to INBE and its affiliates and partners… INBE stands ready, willing and able to proceed with the financing subject to the terms and conditions of its standard agreements governing such BELOC." At the moment Welch wrote those words, every dollar of Plaintiffs' deposits had already been transferred out of the Messner trust account. INBE had no capital to loan and no ability to fund any loan. Welch knew that, yet he nonetheless affirmatively, authoritatively, and falsely stated otherwise.

156. Plaintiffs began demanding the return of their money in late October 2023, Welch's story changed. On November 3, 2023, Welch wrote to Plaintiffs, "We do not represent INBE related to these matters at this time." On December 1, 2023, Welch wrote again, "Messner served only as the Paymaster and recipient of the ICA Payment under the Agreement." Messner had held itself out as INBE's counsel long enough to induce the deposits and then disclaimed the representation once the deposits were demanded back.

157. By that point, the fraud scheme was in high gear, and Messner was not being candid with either Plaintiffs or INBE. Messner was aligned with Chartraw, a mastermind of sophisticated financial-fraud schemes, and Owen, a front-facing former Navy SEAL who was at least passable on paper. Messner had brushed off INBE yet continued to speak on INBE's behalf, lent its imprimatur to instruments reflecting fantastical numbers, and stood behind Clearwater as Clearwater publicly touted billions of dollars in supposed assets.

158. Plaintiffs, for their part, had no prior reason to suspect that a law firm would be the driver at the eye of this fraud storm. They reasonably believed that a 100-attorney Colorado firm,

appearing on letterhead and before tribunals as bond counsel, project counsel, and escrow trustee, was performing legal services rather than orchestrating and covering up an advance-fee theft

159. In sworn discovery responses served in May 2024, INBE confirmed under oath that it received none of Plaintiffs' money, authorized none of the disbursements from the Messner trust account, had no capitalization table, no financial records, no contribution or distribution history, and no contracts with Clearwater, Titan Financial, or Messner other than the BELOC template Welch himself had drafted. INBE's sworn position was, and remains, as confirmed by bank records, that it was not a lender, it received nothing, and it does not know what Messner did with the money. INBE has since been dissolved. Its website has been taken offline. Its principals have removed all references to INBE from their public profiles.

160. Messner attempted to frame INBE, its own former client, for the theft. In a sworn statements dated February 21, 2025 and October 29, 2025, Messner's non-attorney president Jim Smith stated, "INBE provided authorizations to Messner, confirmed by Clearwater, to disburse funds at its direction and benefit totaling $2,490,333.00 [$2,490,33 per the 2/21/2025 statement]." As to Smith's October 29, 2025 declaration, Smith attested that "Those authorizations are attached." But the documents Smith attached reflect no authorizations by INBE to disburse any of Plaintiffs' money. Moreover, Smith's declaration offered no explanation for $5,854,667 of the stolen $8,345,000, which is 70% of the missing funds. The partial explanation he did offer for $2,490,333 is refuted by the very documents he attached.

161. Although requests had been made dating back to October 2023, beginning on February 23, 2024, Plaintiffs' had made formal requests for Messner to provide an accounting of the deposit funds. The responses ranged from "inquiries have been made" to "we expect to find out shortly" to "Clearwater has it" to "we never said Clearwater has it" to "we cannot answer

because of privilege with Clearwater" to finally this scripted mantra beginning on January 2, 2026: "Between April 21, 2023 and June 29, 2023, Plaintiffs deposited a total of $8,345,000 into the COLTAF account. INBE provided authorizations to Responding Party, confirmed by Clearwater, to disburse funds at its direction and benefit. INBE also authorized Clearwater to direct Responding Party to disburse the balance of the funds from the account holding the funds at Clearwater's discretion. Responding Party complied with these authorizations and distributed the funds at INBE's request or at Clearwater's request (after Clearwater confirmed its authority from INBE to direct Responding Party's disbursement of the funds), resulting in the funds being fully disbursed. There were no funds from the above-referenced $8,345,000.00 deposits remaining in the account by August 2, 2023." The response is fundamentally unresponsive because, not only does INBE vigorously deny authorizing the release of the funds, Messner still refused to state where it had sent the funds.

162. What Welch told Boddington privately in contemporaneous messages is glaringly inconsistent with Messner's current false story about purported "authorizations" by INBE. On December 19, 2023, Boddington texted Welch: "Torben I am somewhat concerned about the complete lack of communication. Please respond back with an update as professional courtesy" and again "Torben?" On December 20, 2023, Welch texted Boddington, "Current plan is to get the ICA deposits ready to return and get released. I am dependent on Dan there and nothing yet on that front." "Dan" was Chartraw. On January 31, 2024, Welch texted Boddington, "We have ledger funds blocked right now that is the entirety of the deposits. They are not yet ready to disburse… obviously that cannot happen without additional funds." On February 20, 2024, Welch texted, "Todd/Dan will be in a position to refund ICA [deposits] tomorrow I believe." On February 27, 2024, Welch texted, "Out of my hands, partners don't want to settle. The plan is to interplead funds

and fight." No interpleader was ever filed. The funds were never returned. When Boddington pressed for an accounting, Welch went silent.

163. The Messner firm was aware of the fraud at the highest level. As shown in a group chat among Welch, Chartraw, and others, on July 10, 2023, Welch stated "Chatting with Jim now – can you send over the full doc stack?" The reference is to Jim Smith, Messner's president. On July 23, 2023, Welch confirmed "Jim is with MESSNER (Firm President) and can respond." Smith acknowledged his awareness of the BELOC deposits, he also strangely claimed that "[w]tih the exception of Torben Welch, none of the named partners or employed attorneys at Messner Reeves, LLP had any knowledge or involvement in any of the deposits."

164. If it was indeed true that only Welch and Smith were aware of the millions of dollars that flowed through the law firm's trust account, that would indeed be inculpatory. But it is worse than that because Smith's sworn statement conflicts with Welch's September 12, 2023 text which refers to his "partners'" knowledge of the BELOC scheme: "Just sent you an email – my partners are blocking all new BELOCs for deposit. I convinced them to keep the monetization side, but we will need to find another pathway on the loans." Smith claimed that only he and Welch knew about the BELOC scheme, but Welch referred to his "partners" in stating what those partners would, and would not, allow as the scheme continued.

165. March 22, 2024, Boddington texted Welch "Can you please confirm the $10,300,000 ICA funds are still in Messner's Titan bank account? if not where it is currently?" Welch ignored the text.

166. On December 19, 2025, Boddington submitted to Messner a formal written Request for Accounting of Escrow Deposits which was directed to Messner, Welch, Smith, Messner's Chief Executive Officer Caleb Meyer, and Messner's Chief Operating Officer Michelle Harden. Messner

provided no accounting. If Messner had in fact disbursed the funds "at INBE's direction and benefit" as Messner has falsely sworn in litigation filings, Messner could have produced a simple accounting to INBE showing the disbursements made pursuant to INBE's own purported instructions. Messner refused.

167. On September 11, 2023, with the trust account already empty and multiple victims demanding answers, Welch sent Boddington a single line that captures the enterprise's operating theory. Welch wrote, "Funds go where we tell them after they sign. We can put them where ever we need." Welch did not tell Boddington that all the real money was gone.

168. Plaintiffs in this action were not the only victims of the BELOC Enterprise. Between April 2023 and August 2023, the BELOC Enterprise induced cash deposits totaling in excess of $10 million from at least eight borrower victims. In addition to the five Plaintiffs in this action, the BELOC Enterprise also received ICA deposits from, among others: (a) Konala, LLC, in the amount of $325,000, wired on or about August 1, 2023 into the Messner COLTAF account; (b) Delaware Valley Automation, LLC, in the amount of $700,000, wired on or about July 7, 2023 into the Messner COLTAF account; and (c) Master Systems Integrators, LLC, whose deposit was routed through a different Enterprise collection vehicle but whose receipt of a $1,274,000 "sham first-tranche" wire from the Messner COLTAF account on July 3, 2023 was funded by Plaintiffs' deposits and was used to create the false appearance that BELOC loans were being funded. No BELOC loan was ever funded by INBE. No BELOC ICA deposit was ever returned to any borrower. These additional victims, their deposits, and the sham partial fundings confirm that the BELOC Enterprise operated as a continuing scheme with multiple victims and multiple victim-facing contact points.

## VII. The BELOC Scam Is a Classic Chartraw Advance-Fee Fraud Scheme, which Follows a Formula Chartraw Has Repeatedly Used.

169. The BELOC scheme is the latest iteration of a pattern of conduct Defendant Chartraw has been perpetrating for nearly two decades. The two federal indictments against Chartraw in the Eastern District of California, one in 2012 and one in 2024, document at least nine separate advance-fee fraud schemes. Each of those schemes shares the same architecture as the BELOC scheme. The BELOC scheme's only innovation was its use of a law firm trust account as the collection vehicle.

170. The 2012 indictment, *United States v. Chartraw*, No. 2:12-cr-00184-MCE (E.D. Cal.), charged Chartraw with 18 counts of wire fraud in violation of 18 U.S.C. § 1343 for eight separate schemes run between January 2007 and November 2011, netting approximately $2.4 million in victim losses. These are only the schemes for which Chartraw was caught and prosecuted and this does not include Chartraw's state law crimes. Each scheme employed the same structural core, which is a fraudulent claim of asset ownership or financial capacity, an upfront fee or deposit requirement, and conversion of the deposited funds to personal use, followed by excuses, communication games, and even counterthreats against victims.

**The Darwin Mine Fraud**

171. Chartraw approached an investment firm in San Francisco seeking a $15 million loan, falsely representing that he owned an interest in the Darwin Mine in California, held a net worth in excess of $75 million, and controlled the Miller's Mill mineral refinery in Nevada. None of those representations was true. The Darwin Mine was owned by a third party and had no connection to Chartraw. Chartraw obtained $75,000 from a firm partner and converted it to personal expenses.

**The Oil Broker Fraud**

172. Chartraw obtained $50,000 from two prospective oil commodity brokers, falsely representing that he would open bank accounts in the brokers' names carrying $100 million in deposits to establish their credibility, that their $50,000 would be held in segregated accounts that would not be drawn upon, and that their funds would be secured by a promissory note. The promissory note bore a forged signature. Chartraw converted the funds to personal use.

**The Precious Metals Concentrate Fraud**

173. Chartraw obtained $100,000 from two victims by contracting to sell 180 barrels of "concentrate" purportedly containing precious metals. No such concentrate existed. Chartraw converted the funds to personal use.

**The Dairy Financing Fraud**

174. Chartraw obtained $200,000 from a dairy operator by representing that he owned a licensed and operational offshore bank called Cascabel Bank and held a genuine 1.5 billion Euro Certificate of Deposit issued by that bank. Cascabel Bank was a shell company with no license to operate as a financial institution of any kind. Chartraw converted the funds to personal use.

**The Gold Refinery Financing Fraud**

175. Chartraw obtained $100,000 as an advance fee for Chartraw's promise to secure up to $10 million in funding from Cascabel Bank to build a gold refinery, falsely representing that he owned an interest in Cascabel Bank and a fifty percent interest in the AZ Rock Mine in Arizona. Neither representation was true. Chartraw converted the funds to personal use.

**The Dore Bar Fraud**

176. Chartraw obtained $1 million from an investor by representing that he and an associate were officers of AZ Rock Holdings with authority to sell dore bars containing precious

metals, that the investor's funds would be placed in an escrow account at JPMorgan Chase, and that a Letter of Introduction and Mandate Authority from AZ Rock authorized the transaction. The Letter bore forged signatures. AZ Rock had no connection to Chartraw. The investor's funds were disbursed from the purported escrow account to personal accounts controlled by Chartraw and his associates, including to an attorney-client trust account maintained by a named attorney on Chartraw's behalf. The attorney was later sued for his role. The Dore Bar Fraud is the direct structural ancestor of the BELOC scheme. Its crucial innovation was using an attorney's trust account as the purported safe harbor to induce the victim's deposit.

**The Trading Platform Fraud**

177. Chartraw obtained $113,258.30 from a victim by representing that he would invest the funds in a bank "trading platform" generating 15% interest every 30 days, with principal returned after ninety days. No such platform existed. Chartraw converted the funds to personal use.

**The Movie Production Fraud**

178. Chartraw obtained $100,000 from a movie producer by representing that he held a genuine $100 million certificate of deposit at Cascabel Bank that could be placed into an inter-bank "trading program" to generate revenue, and that the $100,000 advance fee would ultimately fund the producer's movie to the tune of $350 million. Cascabel Bank was a shell. Chartraw converted the funds to personal use.

**Conviction, Flight, and Return**

179. Chartraw pled guilty to one count of wire fraud on September 12, 2013 and was sentenced to 57 months in federal prison. Before that, Chartraw had absconded to Baja California, Mexico, where the FBI apprehended him operating under the alias "James Murphy." Chartraw

also pled guilty to state felonies for grand theft, embezzlement, domestic violence (breaking his estranged wife's nose in front of five children), and violation of a restraining order, and received a concurrent seven-year state prison sentence.

**The Crypto-Pal Scheme, Parallel to the BELOC Scheme**

180. Upon release from his 57-month federal prison sentence, which he served concurrently with a 7-year state prison sentence, Chartraw returned to the conduct for which he had been imprisoned. Between approximately March 2021 and February 2022, which lined up precisely with the May 2022 formation of Clearwater, Chartraw operated a second advance-fee fraud through two Wyoming limited liability companies, TDA Global Systems, LLC and Crypto-Pal, LLC. Chartraw registered both entities using the names of third parties on the incorporation documents, keeping his own name off public filings. That is the same structural device later used for Clearwater, INBE, INBE-Clear Capital, and Titan Financial, LLC.

181. On November 21, 2024, a second federal grand jury in the Eastern District of California returned a twelve-count wire fraud indictment against Chartraw for the Crypto-Pal scheme. *United States v. Chartraw*, No. 2:24-cr-00311-WBS. The government's trial brief in that pending case documents Chartraw's methods. *See id.*, ECF No. 49 (Apr. 10, 2026).

182. Chartraw deliberately used his father Leonard's name as a stand-in for his own participation. As the government states, "Defendant told numerous people working for him that he could not have his name associated with the companies, but needed to use the alias of Leonard, or Leon. Defendant told his associates this was because he had previously been convicted of fraud, and if investors knew of his conviction, they would be less likely to invest." *Id.* at 2. That statement of Chartraw's subjective intent, in a Department of Justice trial brief, confirms the identical rationale behind Chartraw's use of the "Leon Chartue" alias in the BELOC scheme.

183. Owen was a control-person co-conspirator in the Crypto-Pal scheme alongside Chartraw, per the Government's evidence. "At all relevant times, Defendant and an associate, Todd Owen, controlled multiple businesses, including Crypto-Pal LLC and TDA Global LLC." *Id.* The government's corresponding exhibit list identifies text messages between Owen and Chartraw relating to the Crypto-Pal fraud. *United States v. Chartraw*, No. 2:24-cr-00311-WBS, ECF No. 47 at Exs. 208, 220, 221. Owen was not merely Clearwater's "front man" in the BELOC scheme. Owen was Chartraw's longstanding operational partner in the prior federal-indictment-triggering advance-fee fraud.

184. Owen's partnership with Chartraw began well before Crypto-Pal and is documented in an additional prior fraud scheme that ended in a federal RICO class-action complaint. On May 15, 2019, Chartraw and Owen caused the formation of DTEC Ventures, LLC as a Nevada limited liability company. Chartraw did not appear on the public corporate filings. The named members of DTEC were Edward Vrab, Owen, Christopher Martin, and "Leonard Chartraw," which is the same "Leonard" alias Chartraw used in the subsequent Crypto-Pal scheme and the same structural device Chartraw and Owen would later employ with Clearwater, INBE, INBE-Clear Capital, and Titan Financial, LLC.

185. Weeks after DTEC's formation, Chartraw and Owen targeted Bluegrass BioExtracts, LLC ("BBE"), a hemp-processing company in Owensboro, Kentucky founded by Gerald Edds and Bruce Peters. In September 2019, BBE's management consultants introduced DTEC to Edds and Peters on the representation that DTEC was a well-capitalized Nevada-based acquirer and that "money was not an option." DTEC proposed a $75 million all-asset purchase of BBE. When Edds flew to California on November 8, 2019 expecting to meet DTEC's principals for closing, he was met instead by Chartraw, who identified himself to Edds as DTEC's "managing

partner" despite not being named anywhere on DTEC's corporate filings. Chartraw informed Edds that the market for BBE was falling and that Edds had to accept a revised "take it or leave it" agreement immediately. Chartraw told Edds DTEC could not advance any cash before closing due to "regulatory guidelines." Edds, under pressure, executed the restructured agreement. The restructured agreement obligated DTEC to deposit $1 million by January 15, 2020, $33 million by March 2, 2020, and $35 million by May 1, 2020, into escrow for BBE's founders. None of those deposits was ever made. Upon taking control of BBE, DTEC swept BBE's cash accounts of more than $220,000, laid off BBE's workforce, ceased operations, and began selling off BBE's collateral property. Edds and Peters sued DTEC in Kentucky state court for breach of contract and fraud in January 2020. A separate federal RICO class action by BBE's hemp-contract growers was filed against DTEC Ventures, Chartraw, and the Owen-aligned principals three months later. *Allen v. Bluegrass Bioextracts, LLC*, No. 4:20-cv-00058 (W.D. Ky. Apr. 10, 2020).

186. The DTEC scheme is a template for the BELOC scheme. A Nevada limited liability company was formed for the occasion. Corporate filings bore nominee names including Chartraw's "Leonard Chartraw" alias. Owen's real name appeared on the filings. Chartraw showed up personally to close the deal using pressure tactics. The agreement promised staged escrow deposits that were never made. The company was stripped of its cash and assets. Victims were left to litigate. Four years later, Chartraw and Owen would execute a structurally identical scheme through Clearwater, with Owen again on the corporate filings, Chartraw again off them, and Plaintiffs' $8,345,000 again disappearing into accounts controlled by Chartraw, Owen, and their associates. The only new ingredient in the BELOC iteration was Messner's trust account as the collection vehicle.

187. Through TDA Global and Crypto-Pal, Chartraw induced investors to transfer funds by representing that Crypto-Pal employed a proprietary algorithm capable of generating high-yield returns on cryptocurrency investments without risk to principal, that investor principal would be maintained in a bank account not subject to any risk, that investors could withdraw their funds at any time, and that all funds would be used solely for cryptocurrency trading. Chartraw instead converted the funds to his personal use and the use of his associates. *See id.*, ECF No. 49 at 3.

188. When investors asked about their funds, Chartraw deployed the same lulling-statement methodology he had used between 2007 and 2011. Chartraw told investors their principal had grown in value, that board meetings were required before withdrawals could occur, and that funds were located overseas pending transfer. The government describes Chartraw's September 17, 2021 email to victim Alison Hitz-Vukich, "purporting that it was sent by his father, describing the growth in her investment." *Id.* That pattern, which is to say, fabrication of false status reports while diverting the principal, is the pattern Welch and Hale would later deploy against Plaintiffs in the BELOC scheme.

189. The government's trial brief also identifies Chartraw's use of "William Murphy" as a key operational alias in the Crypto-Pal scheme, specifically in defrauding former NBA player Jarnell Stokes. "Defendant also represented that Stokes would be investing with William Murphy, who was affiliated with a bank and could secure Stokes' investment… Stokes invested by making a series of bitcoin transactions into a cryptocurrency wallet Stokes believed belonged to Murphy or Murphy's bank. In reality, the wallet belonged to Defendant." *Id.* at 7. Five months after Chartraw deployed "William Murphy" against Stokes, "William Murphy" appeared as the signatory of the forged PG Asia letter Brigham presented to the Clark County Zoning Commission

on November 16, 2022. Those are the same "William Murphy." Chartraw personally forged the PG Asia letter.

190. The government's exhibit list identifies no fewer than six aliases Chartraw used in the Crypto-Pal scheme, each documented in a specific text message, email, or document the government intends to introduce at trial, namely "Leon Chartraw" (Exs. 207, 211, 505), "Le Chartraw" (Ex. 207), "L Chartraw" (Ex. 403), "Crypto Dan" (Exs. 208, 209), "Dan Logistical Consultant" (Exs. 205, 206), and "William Murphy" (Ex. 210). *See United States v. Chartraw*, No. 2:24-cr-00311-WBS, ECF No. 47.

191. The timing of the Crypto-Pal scheme is critical. At the very moment Chartraw was operating the Crypto-Pal scheme, he was also laying the groundwork for the BELOC scheme. Both schemes used Wyoming limited liability companies with third-party names on the incorporation documents. Both schemes promised extraordinary returns from a proprietary mechanism the victim could not verify. Both schemes converted advance deposits to personal use. Both schemes deployed identical lulling-statement methodology to delay discovery. The BELOC scheme is not a departure from Chartraw's pattern. It is the continuation of it, at greater scale and with greater institutional sophistication, made possible by the one ingredient Chartraw had never before had, which is a major law firm willing to provide its trust account as the collection vehicle.

192. Within the BELOC enterprise, Chartraw performed the operational functions his two-decade résumé had prepared him to perform. Chartraw designed the "shadow ledger" narrative, under which ICA deposits would supposedly be placed into European bank instruments, monetized through private placement programs, and leveraged into capital sufficient to fund the promised loans. That narrative gave Welch a plausible-sounding reason to offer Plaintiffs when they asked why their loans had not funded, and it provided the apparent justification for Welch's

continuing personal payments to Chartraw as purported "monetization fees." Chartraw directed the enterprise's external communications strategy, instructing Boddington in the fall of 2023 that only Welch would speak on behalf of the enterprise and that Boddington should defer to Chartraw on the pipeline of new victims.

193. Chartraw operated within the BELOC enterprise under the alias "Leon Chartue," for the same reason he stated to his Crypto-Pal associates, namely to conceal his federal criminal record from victims. Welch permitted and facilitated the use of that alias, copied "Leon Chartue" on internal Messner firm emails directing the disbursement of Plaintiffs' deposits, and identified Chartraw by the alias "Leon Chartue" on Messner's own privilege logs produced in litigation.

194. Had Plaintiffs known that the individual directing disbursements from their escrow accounts was a federally convicted advance-fee fraudster who had served four years in federal prison for running identical schemes, none of them would have wired a dollar. That is why Chartraw used a false name. And it is why Welch let him.

## VIII. The Enterprise Deployed Marty Hale to Pepper Plaintiffs with Lies Intended to Stall Legal Action.

195. By late August 2023, the trust account was empty. Welch understood that Plaintiffs' questions were about to become impossible to answer with false statements about banking-procedure generalities. On August 30, 2023, Welch referred Plaintiffs to a new "intermediary" and stepped back.

196. The intermediary was Martin Hale, a Florida resident who operated an entity called Latham Funding, LLC. Hale styled himself as an earnest "fixer" working diligently in the background to release Plaintiffs' funds. Hale's actual function was to flood Plaintiffs' inboxes with lulling statements designed to keep Plaintiffs from filing suit, contacting law enforcement, or initiating regulatory action while the enterprise continued to dissipate traceable assets. Hale's

tenure as intermediary ran from approximately September 7, 2023 through March 22, 2024. During that period, Hale sent Plaintiffs dozens of text messages and emails containing false statements.

197. Hale was not a Messner employee, Messner partner, Messner affiliate, or Messner client. Hale operated his own separate advance-fee fraud finance business through Latham Funding, LLC, a Florida-based entity Hale controlled. Hale functioned within the BELOC Enterprise as an independent actor whose role, assigned to him by Chartraw and implemented through Messner, was to field and defer Plaintiffs' inquiries while Chartraw and Messner continued to dissipate traceable assets. Hale likely received compensation for this role out of Plaintiffs' misappropriated funds, as Hale and/or his company was reportedly represented by Aufdermaur, the recipient of $600,000 of Plaintiffs' money. Thus, Hale was likely paid with Plaintiffs' money for the task of deceiving Plaintiffs. Hale's participation in the BELOC Enterprise was not just as Messner's agent but as a separately-motivated actor pursuing his own financial interest in the success of the scheme.

198. On September 7, 2023, Hale told Kosher Eats, "The money for your loan will be proceeds from an investment trade. It's locked and allocated. You're in the first tier… Torben & Danny are aware of this issue and are working diligently to remedy this." There was no investment trade. The escrow funds were already depleted.

199. Through September and October 2023, Hale sent a steady stream of imminent-delivery promises: September 11 ("We are expecting soon… Flying to LA tonight for this"), September 20 ("Things are moving as expected… End of this week or beginning of next… herding cats"), September 27 ("we are expecting a substantial update as to timing here in a couple of hours"), September 28 ("I'm waiting for Danny [Chartraw] to arrive and update me… He expects to have things wrapped up shortly"), October 4 ("I'm still trying to connect with Danny

[Chartraw]… Moving money into USA is a nightmare these days"), and October 11 ("Expecting money literally at any time"). Each statement was false when Hale made it.

200. On October 5, 2023, Hale explicitly urged Kosher Eats to stop contacting Welch: "Do not call torben [Welch]… I will speak to Danny [Chartraw] shortly and come back to you." On October 11, 2023, when Kosher Eats asked for proof that any wire had been sent, Hale responded, "You will never get proof of a wire. It's just not done for compliance purposes." No wire had been sent. No compliance rule restricted sharing a wire confirmation. The statement was pure fabrication.

201. On October 26, 2023, Hale invoked a new invention, namely that the funds could not be returned because the enterprise faced a purported 49% tax: "Money has always been in account… Issue is that until we complete some tasks we will be subject to 49% taxation… Which is more billions than you can imagine… We aren't doing this for ourselves." There was no 49% tax. The funds had not been "in account" for nearly three months.

202. On November 1, 2023, Hale told Kosher Eats he would "get answers today" and mentioned for the first time an entity called "Clearwater." Kosher Eats had never heard of Clearwater before that moment. On December 13, 2023, Hale wrote, "We do have a plan… We are working on details… Once I speak with Danny today I will reach out to everyone."

203. On December 19, 2023, after Plaintiffs' counsel began reaching out directly to Welch, Hale turned angry. Hale wrote, "I'm not going to play the 'are we there yet' game with everyone… People are doing this to me, Jason and torben… And we are about to walk as a result… ALL OF YOU were told NOT to contact torben. ONLY JASON. Jason's email said he's handling everything… And Danny is about to stop everything because you will not stop harassing torben."

204. On February 7, 2024, Hale wrote to Kosher Eats: "Torben is finishing up last items hopefully today… Well I'm telling you on my word this is REALLY almost done… And if suit is filed it doesn't hurt us it only hurts all of you… Which we are trying to avoid." That statement was not subtle. Plaintiffs were being told that filing suit would harm *them*, not the people who had taken their money.

205. On February 8, 2024, Hale wrote, "We only tell you what banks tell us… But the money IS in our banks. Just not released… So calling Messner is a waste and Torben can't talk to you… We are LITERALLY expecting a phone call at any time telling us funds are 'free to move…' It's hurting us also!!… We are doing EVERYTHING HUMANLY POSSIBLE to get this finished including having people IN THE BANK standing over the bankers… But he can't put a gun to their head."

206. On February 12, 2024, Hale wrote, "Waiting for a document from Torben… We are just waiting for final release from bank. Expected today. Will be any time… Everything cleared… Totally done." On March 4, 2024, Hale wrote, "we are almost over the finish line." On March 19, 2024, Hale wrote, "Things are moving… We will have this settled very shortly… YOU are going to be made whole… Not everyone will be… But we will get you there."

207. On March 21, 2024, one day after Welch's infamous "national bank partner" email described in Section XI below, Hale escalated to personal testimonial. Hale wrote, "Torben isn't lying… He's telling you what he's being told when he being told… We will make you whole… I've been nothing but 100% honest with you… And my word is my bond… I don't lie… I don't deceive… I don't misrepresent… You will be taken care of… But it's real. 10,000%."

208. On March 22, 2024, after Plaintiffs made clear they intended to file suit, Hale switched to dissuasion. Hale wrote, "Torben is working… And I'm telling you that you're making a poor choice [by pursuing legal action]… I'm waiting on an update to give to you."

209. Each of the statements set forth above was false when Hale made it. Hale had no basis on which to believe any of them. The funds had been gone for months. No "bankers" were clearing anything. No investment trade existed. No 49% tax existed. No "national bank partner" was working on disbursement. Hale's statements were not the reports of an informed intermediary. They were operational components of a cover-up.

210. Hale's purpose was to buy time. Every week of delay Hale purchased through false assurances was a week during which Plaintiffs did not contact law enforcement, did not file suit, and did not pursue prejudgment remedies. During that period of delay, Kosher Eats incurred $480,000 in emergency financing costs, MSC incurred more than $1 million in emergency financing costs, HomePeople's planned commercial launch collapsed, and Abbson shut its doors entirely, laying off 25 full-time employees and more than 50 independent contractors, defaulting on office leases in New York, Los Angeles, and Washington, D.C., and abandoning a planned production studio in Washington, D.C.

211. These incremental harms flowed directly from the period of reliance on Hale's false promises. Plaintiff Kosher Eats has sued Hale in Broward County Circuit Court and obtained a default for Hale's refusal to respond to the complaint after service.

## IX. Messner's Statements to the Las Vegas Zoning Commission on November 21, 2023, Through Welch, Demonstrate the Fraud Scheme.

212. Welch publicly appeared for Messner before the Clark County Zoning Commission on November 21, 2023 and he made false statements to that tribunal. A video recording and transcript of the hearing are publicly available.

213. The hearing was held on the holdover item on which Brigham had appeared one year earlier, namely All Net's request for a further extension of its expiring development entitlements. The extension granted at the November 16, 2022 hearing, based on the forged PG Asia letter, had expired on September 6, 2023. All Net now sought an additional 90-day extension to December 6, 2023. The stakes were existential for the project. Another denial would end the Dribble Dunk entitlements, which in turn would end Dribble Dunk's ability to develop the site, which in turn would expose the Messner enterprise's failure and would put the scheme beyond the point of rescue by any further fabrication. It would also end the gravy train of Defendants pocketing money pursuant to a defunct project that had never gotten off the ground.

214. The November 21, 2023 hearing is the hearing at which Plaintiffs' $8,345,000 was on public display, disguised as construction progress. It is also the hearing at which Welch, having already spent the money, stood before a public body, on the record, and presented a fresh round of fabricated financing representations more preposterous than the fabrications he and Brigham had presented one year earlier.

**Kaempfer's construction-progress presentation depended on Plaintiffs' stolen money**

215. Chris Kaempfer, a Las Vegas land-use lawyer appearing for All Net, opened the presentation by reciting what the project had accomplished in the prior 12 months. Among other things, Kaempfer told the Commission, "over the past three years, over $14 million have been invested into this development with regard to construction and administrative fees and costs only. That only relates to construction dollars, and importantly, over $6 million of that amount has come in the last year since the extension was approved by you. So, we paid over $6 million since the last extension."

216. The unspoken funding source that Kaempfer described, whether or not he knew it, or should have known it, was the real money stolen from Plaintiffs and not the non-existent $5 billion coming from Clearwater, Fides, PG Asia, or Qatar. The bank records, finally obtained by Plaintiffs in January 2026, are conclusive. Messner had transferred $1.8 million directly to Sahara Las Vegas Corp., Dribble Dunk's landlord, from Plaintiffs' escrow deposits, paying down Dribble Dunk's rent arrears. Messner transferred another $1.8 million directly to co-defendants Chartraw, Owen and Clearwater. Messner had transferred $904,777 to counsel for Dribble Dunk's engineering creditors at Valley Bank of Nevada, settling the Construction Testing Services, LLC and Fenagh Engineering and Testing, LLC construction liens. Messner had transferred $753,038 directly to Dribble Dunk's JPMorgan Chase account. Messner paid $500,000 of Plaintiffs' money to Harris Bank to satisfy either its own obligation or the obligation of someone else unrelated to Plaintiffs. Messner also transferred $329,540 to itself without any explanation or valid basis.

217. If money was really available from the $5 billion in financing from Clearwater, or anyone else, Messner would have made a bigger dent than $6 million in the year following the last hearing on shutting down the project.

218. The creditors who had been paid with Plaintiffs' money were, as it happens, also present and happy. David Lowden, Sahara Las Vegas Corp.'s owner (who had received the $1.8 million in rent payments), appeared at the hearing and stated, "I just want to clarify to the Commission… we've been a hundred percent support of the All Net project from day one, and we remain in a hundred percent support today." Las Vegas Paving, whose $17 million judgment had been partially paid down with "the sum of $3.3 million over this last year" per Kaempfer, was described by Kaempfer as being "supporters of this project from the beginning." Each of them was reporting, accurately, that their debts had been addressed. They did not report, and probably did

not know, that their payments had come from the misappropriated escrow deposits of small businesses.

**Welch's representations about Clearwater's $5 billion at FIDES**

219. Welch then took the podium. He introduced himself to the Commission as follows:

> Commissioners, good afternoon. My name is Torben Welch with Messner Reeves. Our firm serves as outside business council for the All Net project, primarily out of our Las Vegas office, which is headed up by Renee Finch and Jason Martinez. My role, I'm based in the Salt Lake City, Utah office. My role is financing and international financing side for the project and to help undertake that.

220. Welch acknowledged, in the same sentence in which he disclaimed it, that the November 2022 financing representations had been fraudulent. Welch said, "when we came [last November], we presented some financing that was in place and through a variety of fraudulent things that happened of no consequence or no fault of All Net or its partner, that turned into something different. So, the partners immediately pivoted and were able to secure financing for this project through assets that they had."

221. Welch then represented to the Commission that the supposed "partner" Clearwater had secured new financing. Welch told the Commission:

> That partner is Clearwater Premier Perpetual Master, LLC, and they're an equity partner in this project and they have secured financing on behalf of All Net and have provided $5 billion in an account, an offshore account for the purposes of building this project. For intents and purposes today, it's a collateral account, meaning that those funds can be utilized to collateralize projects and liens and loans. To fund this project, that is not a U.S.-based account simply because U.S. based accounts don't act as escrow agents and hold that kind of money.

222. The $5 billion at "an offshore account" was a fabrication. No such account existed. No such funding existed. Clearwater had no documented financial capacity of any amount. The statement that U.S. accounts "don't act as escrow agents and hold that kind of money" is false and

nonsensical in context. Welch had himself been, for eight months, the custodian of a U.S. escrow account that was supposed to hold Plaintiffs' money and was in fact empty.

223. Welch subsequently, at the Commission's request, physically presented to the Commission a document he represented to be the bank statement of the Clearwater account. Welch told the Commission:

> This is a bank statement evidencing the account number x3602 that is in the name of Dribble Dunk. This is an account that is controlled entirely by Dribble Dunk. Mister Robinson is the sole controller over it and it's $5 billion. This was funded by their partner, Clearwater, on 8/25, and as we sit here today, it remains at that amount, $5 billion. It includes one transfer. This is accurate as of, I looked at the account this morning on the flight over.

224. Welch's statement that he had "looked at the account this morning on the flight over" and confirmed the $5 billion balance was a lie. No such account existed. Welch had no access to any Dribble Dunk account containing $5 billion. The document Welch held up was, on the record, later identified by Welch's co-presenters as a statement of an account at the same "FIDES" entity Welch had simultaneously been invoking in correspondence with Plaintiffs as the a possible custodian of their missing deposits. It was the same fake bank Welch had used in his private December 5, 2023 letter to Plaintiffs two weeks later, asserting Clearwater's ownership of a $57 billion FIDES account. Neither account existed.

**Commissioner Kirkpatrick's questioning of Welch**

225. Commissioner Marilyn Kirkpatrick addressed Welch directly, identifying him as "the finance guy" and asking pointed questions. The exchange on the record reads as follows:

> KIRKPATRICK: One, so then are you telling me that all your current construction invoices outstanding are paid up in full?
>
> WELCH: That they're in the process of being paid. On the construction side where we haven't, obviously there's a Las Vegas Paving debt. We know that that needs to be done and needs to be paid in full, and as soon as we have the ability to get these funds in, which will happen before December 6th to be able to pay those, it's

going to be through the line of credit, again, collateralizing those funds that are there and then have them released, all obligations will be paid in full.

KIRKPATRICK: And then let me ask the other question. Being that you guys have a project labor agreement, and you have folks out there, is there certified payroll that shows that they're being paid to their project labor agreements?

WELCH: Everybody working on the site today has been prepaid for their work, so to speak. I mean they have been paid in advance for work that's happened—

KIRKPATRICK: Prepaid, I never heard of that rule. How do you do that with the Labor Commissioner?

WELCH: How do we do that? Well, they've been paid—that portion of the contract that they are working on today has been paid in full, so they're working on payments that have already been paid. So, there will be no debt to the people that are working on site today.

KIRKPATRICK: Well, honestly, you boast about having a project labor agreement but yet—and then you have outstanding debt that you've got to get paid.
WELCH: Correct.

KIRKPATRICK: And then so I'm asking, one, are you complying with your own project labor agreement for those people that are out there today? And you're saying no that these people have been prepaid and there'll be no debt at the end of the day.

WELCH: Yeah, I'm not going to talk to the project labor agreement. That's not my area of expertise on that one.

226. Welch's representation that the construction workers "had been paid in advance" is flatly inconsistent with his representation that the project had no available funds beyond the supposed $5 billion offshore account. Unless Welch was outright lying, the workers had been paid with something. The bank records show the money transferred to Dribble Dunk was Plaintiffs' money.

**McMahon Capital and the $750 million line of credit**

227. Welch's presentation was augmented by one Ed Perez, purporting to represent "McMahon Capital." Perez told the Commission he was a former commissioner himself, that his

background was "commercial bond financing and platform markets," and that his "investor partner alone, one has over 34 years of proven track record with over $500 billion under management." Perez told the Commission McMahon Capital had "made the commitment to Mister Robinson" for "$5 billion in funding and also for a letter of credit based on the channels with the HBSC Bank of the U.K."

228. Michael Lanza, Perez's colleague, appeared by phone and told the Commission that $5 billion was in "an account under Triple [Dribble] Dunks Management in Mexico, in a bank in Monterrey, Mexico" that Lanza identified as "Fides." Lanza told the Commission that, "Because of the fact of where the funds are domiciled, they did require him to establish an account with a tier one bank. He chose to use HSBC London." Lanza told the Commission that a $750 million line of credit had been "approved," that "the first $100 million" would be "made available" once the HSBC London account was open, and that the remaining $650 million would follow once $1.5 billion was moved from FIDES Mexico to HSBC London.

229. None of this was real. FIDES Gestion Financiera, S.A.P.I. de C.V., is the same entity Welch would invoke in his December 5, 2023 private letter to Plaintiffs asserting a Clearwater account containing "approximately $57 billion." FIDES has no documented status as a licensed financial institution in any jurisdiction. The $5 billion account did not exist. The $750 million line of credit did not exist. HSBC London had no involvement with the project. Robinson was not in the process of establishing any HSBC London account. The entire financing story was an elaborate fabrication presented to a public body by a licensed Colorado attorney and his confederates. In fact, the principal of FIDES, Javier Reyna, received $50,000 from Messner's trust account in August 2023, which contained Plaintiffs' money.

**Don Wright of SIS and the Department of Commerce charade**

230. The presentation was further augmented by one Don Wright, appearing by phone, who identified himself as "Chairman and CEO of SIS or Special Intelligence Service." Wright told the Commission he had "known Jackie, or Mister Robinson, for over ten years" and had been asked "by the U.S. State Department to see if we could help Jackie in a number of different ways." Wright told the Commission that his firm had "basically go[ne] out and ma[de] sure the funds are real. They are where they say they are. They're fungible. They're clean. There's no cartel activity or terrorist activity… We found in doing that that the $5 billion aforementioned is real. It is where it's supposed to be. It is clean money." Wright further represented that he and a "Mister Vega" had "set up the account at HSBC."

231. None of Wright's representations was verifiable. No "Special Intelligence Service" of the U.S. State Department by that description was, or is, a publicly known entity. No $5 billion was "real" or "where it's supposed to be." Chair Gibson addressed Wright by saying, "We need you to speak into the microphone" and, later, with evident frustration, "You're telling us that the money is available, and it is in various banks subject to various banking instruments. We've heard that kind of thing… It is under the control of others subject to activities that need to happen, and they can all happen in a two-week period."

**The Commission denied the extension**

232. The deception failed. Sami Real, the Commission's Director of Comprehensive Planning, noted for the record that notwithstanding Kaempfer's representation that all permits had been obtained, "the only permit that's been obtained is an early grading permit. That's not for the full scope of the grading." Real further noted that "the land use applications expired in September" and that All Net needed the extension.

233. Andrew Diss of Meruelo Gaming, the Sahara's operator, addressed the Commission with a rendition of the disastrous project's history. Diss said, "Today we're hearing about a bank in Mexico. A year ago, we were hearing about a family fund in Wyoming. A year before that it was Middle Eastern money that was going to be wired through Switzerland and come to the United States. So, we've heard this song and dance before."

234. Commissioner Tick Segerblom, who had supported the project for five years, and appeared at the October 2022 press conference with Welch and Owen when they lied about Clearwater's non-existent $5 billion in financing, moved to deny the extension. Segerblom stated, "we've asked just one more year, two years. Let's get this done. We'll get it done. We've followed the money everywhere around the world and, truthfully, it hasn't happened. I'm just prepared to make a motion to deny at this point. It breaks my heart to do it." The motion to deny carried unanimously.

**Welch buys time and he continues to search for a way to backfill the stolen money**

235. The Zoning Commission hearing was by no means a swan song. Likely aware that a day of reckoning was coming if the cover-up of the theft of Plaintiffs' money did not succeed, Welch returned to the phantom-bond front. In written correspondence on Messner letterhead in the weeks just before and after the November 21, 2023 hearing, Welch set out, in his own words, a detailed account of Messner's operational role in the Clearwater bond-monetization scheme.

236. On October 20, 2023, an Arizona attorney sent a letter to Welch indicating that he represented a third-party bond broker, who "performed services for you, your law firm, and your client Todd Owen regarding the sale of certain bonds." The letter stated that his client's services "resulted in the sale of those bonds to Benjamin Young, Jr. and/or one of Mr. Young's affiliates," and that the client was owed compensation that Welch had confirmed in a conversation with the

broker "earlier this week." The letter identified Welch, Messner, and Owen as co-clients of a bond broker engaged to sell the Clearwater bonds.

237. On November 8, 2023, less than two weeks before the Zoning Commission hearing, Welch responded in a six-page letter on Messner letterhead on behalf of Clearwater. Welch's November 8, 2023 letter is a contemporaneous written narrative from Welch about the same FIDES Mexico arrangement Welch would present to the Zoning Commission tribunal on November 21, 2023. Welch's letter described, among other things: (i) a February 4, 2023 "Services Agreement" between the bond broker and Clearwater covering "monetization and trade services" for Clearwater's bond portfolio; (ii) the delegation of a $60 billion bond within the Clearwater portfolio; (iii) Welch's representation that "Significant drafting of documents occurred by our office" in support of the attempted bond-monetization transaction; (iv) an attempted bond sale to an undisclosed buyer, routed through "FIDES Gestion Financiera, S.A.P.I. de C.V." in Monterrey, Mexico; (v) Welch's representation that Clearwater's total bond portfolio was "approximately $459 billion"; (vi) an attempted closing on July 7, 2023 that was canceled; (vii) a subsequent seemingly completed transaction on July 11, 2023; (viii) a representation that the bond broker, on the same July 11, 2023 date, "attempted to immediately move $500 million to his Wells Fargo account" and was "unsuccessful"; and (ix) a further representation that, following the purported closing, Clearwater was tasked with "the listing of $325 billion on the Bloomberg private portal."

238. Welch's November 8, 2023 letter is a Messner-authored, contemporaneous, written admission of Messner's deep operational involvement in the Clearwater bond-monetization scheme. Welch wrote and signed the letter on Messner letterhead. In that letter, Welch acknowledged on Messner's behalf that Messner was not a disinterested outside counsel providing ordinary legal services. Messner was drafting the transaction documents, coordinating the FIDES

Mexico banking arrangement, attempting to close the sale of a $60 billion bond (albeit, a fraudulent bond), and participating in the "listing of $325 billion on the Bloomberg private portal." None of these activities is consistent with ordinary legal practice, and each was conducted over an open-ended period of time. Welch appeared before Clark County Zoning Commission that a $5 billion account at the same FIDES Mexico institution was the source of Dribble Dunk's financing. The November 8, 2023 letter establishes that when Welch testified about FIDES on November 21, 2023, he had been working on the same FIDES arrangement, in writing, on Messner letterhead, before that time.

239. Welch's November 8, 2023 letter contradicted Welch's November 21, 2023 representations to the Zoning Commission. On November 21, 2023, Welch told the Commission that Clearwater had $5 billion at FIDES that Welch had personally inspected on the flight to Las Vegas that morning. Welch's own November 8, 2023 letter had described the FIDES transaction differently. Welch's November 8, 2023 letter described FIDES as an institution with "restrictions on movement" of funds, described the buyer as having "cancelled" the underlying transaction, described the bond portfolio as being "held as a 'guarantee of performance,'" and noted that the broker's attempted July 11, 2023 $500 million transfer from FIDES to a Wells Fargo account was "unsuccessful." The November 8, 2023 letter thus described a FIDES arrangement that did not work. Period. Less than two weeks later, Welch told the Zoning Commission that FIDES held $5 billion in readily accessible funds that Welch had personally inspected. Both statements cannot be true. Welch's own letter, written on Messner letterhead, shows that Welch's Zoning Commission representations were false.

240. The November 21, 2023 hearing spectacle featured Welch providing a series of fabricated financing assertions backed by a stream of paid confederates with fabricated credentials,

purporting to verify fabricated accounts containing non-existent money at fabricated institutions. The creditors who had been paid with Plaintiffs' money cheered the project. The enterprise did everything it could to preserve the illusion of a real construction project by stacking fraud upon fraud.

241. The hearing did not trigger any acknowledgment from Messner. Welch did not, the following day, or the following week, or at any time in 2024 or 2025, tell the Plaintiffs that the bank records he had invoked on November 21, 2023 were fabricated. Welch did not tell the Plaintiffs that the $5 billion at FIDES Mexico did not exist. Welch continued to tell the Plaintiffs that their money was safe at Titan Financial well into 2024. He told Boddington that Plaintiffs' deposits were being returned. But the money was stolen long before that.

## X. Clearwater Grabbed an Additional $600,000 Through Its Confederate Counsel Jason Aufdermaur.

242. On July 3, 2023, which is the same day Messner staged Ponzi-style "first tranche" disbursements described in Section XI below, Messner also wired $600,000 out of the Northern Trust COLTAF account to Wyatt Aufdermaur LLC, a Georgia law firm operated by attorney Jason Aufdermaur. No Plaintiff authorized that payment. No Plaintiff had ever heard of Aufdermaur at the time the wire was sent. The BELOC agreements did not name Aufdermaur or his firm. No loan documentation supported the $600,000 transfer. Aufdermaur nonetheless received $600,000 of Plaintiffs' escrow money from Messner's trust account and has never returned it.

243. Aufdermaur was not a Messner employee, Messner partner, Messner affiliate, or Messner client. Aufdermaur operated his own separate Georgia law practice through Wyatt Aufdermaur LLC, which was paid $600,000 directly from the Messner Colorado COLTAF trust account on July 3, 2023.

244. On May 30, 2023, approximately one month before receiving the $600,000 from Messner, Aufdermaur had signed a demand letter on behalf of his purported client Indigo Pharmaceuticals, LLC, a Nevada LLC, asserting a $1 million debt owed by Clearwater to Indigo, with a June 7, 2023 payment deadline. The demand letter was addressed to Todd Owen and Clearwater but sent to Messner Reeves in care of Torben Welch. The first problem is that Indigo Pharmaceutical**s**, LLC does not exist, the company name is Indigo Pharmaceutical, LLC (no "s" at the end of Pharmaceutical). The second problem is that the company appears to be a sham, as the company does not seem to be operational. The third problem is that Prime Capital Ventures, LLC, the other BELOC/Ponzi scheme fraudulent enterprise whose principals have already been indicted, claimed to have "'funded Indigo Pharmaceutical for $20,000,000 for the construction of their new facility' in Las Vegas, Nevada." See *Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC*, et al. 1:24-cv-55 (N.D.N.Y) ECF No. 1, ¶ 113. In fact, a promotional video exists on YouTube entitled "Prime Capital Ventures Presents Indigo Pharmaceutical in Las Vegas, NV" which states that "Prime Capital Ventures just funded Indigo Pharmaceutical for $20,000,000.00 for the construction of their new facility to include the building, state of the art equipment and working capital." https://www.youtube.com/watch?v=GvmECqnuBkY (last visited Apr. 21, 2026). The video shows what appears to be staged or fraudulent construction that did not exist or did not occur. The connection between Prime Capital Ventures and Indigo appears to run deeper. See *Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC*, et al. 1:24-cv-55 (N.D.N.Y) ECF No. 99 at 7; *USA v. Roglieri*, 1:24-cr-0092 (N.D.N.Y), ECF No. 99 at 7; ECF No. 116 (Roglieri sentenced to 97 months in federal prison as CEO of ICA advance fee fraud scheme); USA v. Snyder, 1:25-cr-00195 (N.D.N.Y.), ECF No. 25 (Snyder sentenced to 15 months in federal prison as COO of ICA advance fee fraud scheme).

245. On July 3, 2023, Aufdermaur received a $600,000 wire to his law firm from the Messner account with Plaintiffs' money. Clearwater had received wires of $250,000 on April 24, 2023 and $150,000 on May 1, 2023 from that same account. Thus, in fact, Aufdermaur/Clearwater had received $1 million within about a month of Aufdermaur's demand letter. But this does not explain how Aufdermaur switched teams from being adverse to Clearwater to then stating as follows on December 15, 2023: " I am writing to let you know that it appears as though Clearwater funds will be disbursed imminently to several parties. Right now, the plan is for all funds to deal with the 'INBE Capital Issue' be disbursed into my trust account for me to work through appropriate paperwork for each of the list of parties caught up in the INBE situation. I am working with Messner Reeves and Clearwater to determine an appropriate process and required documentation. Clearwater's goal is to have funds available no later than Friday 12-22 (we have been told that that is an outside date). My goal is to begin drafting paperwork early next week in anticipation of a series of "closings" to end this ordeal. I will keep you informed as things progress."

246. Aufdermaur's email was useful to the enterprise as lulling fodder because it gave the victims a real sense of hope that here would be "a series of 'closings' to end this ordeal." None of those closings occurred and Aufdermaur spent the ensuing months "passing along" information from "Marty" whose information is from "Torben and Dan."

247. There were no "Clearwater funds" to be disbursed. The money was gone, and Aufdermaur had received $600,000 of it five months earlier. The December 22, 2023 "outside date" came and went. On December 28, 2023, Aufdermaur wrote that "the funding is 'on track' but inevitable holiday delays are slowing process… this is not a 'traditional' movement of funds, and each 'breakthrough' that appears to be a clear path to access leads to a new set of unknowns

to work through." On January 8, 2024, Aufdermaur wrote, "I saw a response to another email from Torben yesterday evening that he thought funds release was 'imminent' but hadn't heard anything yesterday." On January 10, 2024, Aufdermaur stated that the return-of-funds timeline was "unrealistic." By January 26, 2024, Aufdermaur claimed "I can't even set up a call with me and Torben."

248. Aufdermaur's confusing representations drew this question on February 15, 2024: "[i]f the ICA funds are 'under the control' of Messner Reeves why is a 'correspondent bank' and 'Chase Treasury Department' needed? The ICA funds were sent to a Messner Reaves IOLA [sic] account. Why are they now with Titan Financial and how are they still under Messner's control if they cannot be accessed?" Aufdermaur did not answer, but continued replying with vague and dilatory responses.

249. Aufdermaur's statements were false. Aufdermaur had, at the moment he wrote each of them, $600,000 of Plaintiffs' money sitting in his firm's account in Georgia. He had received that money six months earlier. He did not return it at any point during the period he was assuring Plaintiffs that Clearwater's funds would be "disbursed imminently."

250. Aufdermaur had no legitimate basis to receive any portion of Plaintiffs' escrow deposits. Aufdermaur had no business relationship with any Plaintiff. It is also unclear why Clearwater would need a second set of attorneys given that Messner purportedly represented Clearwater. As the self-described "Paymaster," Messner would presumably be capable of returning the money it received.

## XI. Messner Concocted Titan Financial to Burnish the Shadow Ledger.

251. By January 2024, five months had passed since the trust account had been emptied. Plaintiffs were no longer accepting vague banking-procedure excuses. Plaintiffs had begun demanding proof that the funds still existed. Welch's solution was to fabricate a bank.

252. On November 7, 2023, which was approximately two and a half months before Welch first claimed the escrow funds were being held there, Welch filed articles of organization in Wyoming for an entity named Titan Financial, LLC. The formation documents were submitted using the email address of Welch's own Messner administrative assistant, Donna DeFalco, and listed as Titan's registered address the same 30 North Gould Street, Sheridan, Wyoming mail drop already used for Clearwater, INBE Capital, and INBE-Clear Capital. Titan Financial, LLC has never been licensed as a bank in any state, has never been registered with any federal banking regulator, has no employees, no offices, no deposits, and no operations. It is a Wyoming shell that exists only on paper, paper that Welch filed himself.

253. The move to Titan was not a necessary part of the shadow-ledger architecture described in Section VI above. It was a cover-up device invented after the money was gone. Welch had run out of banking-procedure excuses, and the shadow-ledger explanation presupposed that Plaintiffs' deposits remained in Messner's custody as purported SBLC collateral. Once the deposits had been distributed to Dribble Dunk's creditors, Chartraw, Owen, and Clearwater, they were no longer available to collateralize anything. Welch therefore repurposed the "off ledger" and "correspondent bank" vocabulary that had been part of the shadow-ledger patter and redirected it toward a new fictional custodian. The fictional custodian was Titan Financial, LLC, which Welch described to Plaintiffs variously as a "private banking server," a "private family office," an institution that required a correspondent bank to transfer funds, and, at one point, as "Titan Private

Bank, LLC." None of those descriptions of Titan was true. Titan was a Wyoming LLC, registered by Welch's secretary's email, at the same mail drop Welch had used for every other shell entity in the scheme, with no accounts, no operations, no personnel, and no money.

254. On December 26, 2023, Welch transmitted a letter on Messner letterhead purporting to represent Titan Financial. The letter described Titan as "a private family office with its own private banking server" and represented that an account at Titan contained "in excess of $10 billion in cash." The letter represented that the unnamed "Partners" of Titan, identified as Clearwater and an entity called 3FR LLC, together held "approximately $92 billion in cash and approximately $1.545 trillion of M00 gold-backed funds." The letter further represented that a transaction of $3,600,000,000 was being delivered "from the Funds to Superior Payments, LLC's accounts."

255. No part of that letter was true. The $10 billion account did not exist. The $92 billion in cash did not exist. The $1.545 trillion in gold-backed funds did not exist. $1.545 trillion exceeds the GDP of Switzerland. The $3.6 billion transaction did not exist. The letter was a catalogue of fantasy figures transmitted on firm letterhead by a partner of a Colorado law firm in connection with five small-business victims trying to find out where their money had gone.

256. On January 25, 2024, Welch escalated the fabrication once again. Welch transmitted to Plaintiffs a letter stating, "the funds remain part of the escrow under our control at Titan Financial, LLC," and attached what he represented to be an account statement. The "account statement" attached to the email depicted an "IOLTA account" in the name of "Messner Reeves, LTD" at "Titan Private Bank, LLC," with a balance of "$10,300,000.00 USD." No such institution as "Titan Private Bank, LLC" exists. No such account appears anywhere in Northern Trust's records of Messner's actual COLTAF account. The document was fabricated. Welch produced it to induce Plaintiffs to continue waiting rather than sue.

**USER DETAILS**

| | |
|---|---|
| COMPANY NAME | Messner Reeves, LTD |
| USERNAME | Messner |
| FULL NAME | Messner Reeves LTD |
| MAILING ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah, 8402 |
| PHYSICAL ADDRESS | 65 East Wadsworth Park Drive Suite 110, Draper, Utah, 8402 |

**ACCOUNT DETAILS**

| | |
|---|---|
| NUMBER | [redacted] |
| TYPE | IOLTA |
| CURRENCY | USD |
| AVAILABLE BALANCE | 10,300,000.00 |
| CURRENT BALANCE | 10,300,000.00 |
| STATUS | Active |

| Date | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| 01/25/2024 14:52 | 73 | TBU/Messner Reeves Account | 10,300,000.00 | 10,300,000.00 |

257. At no point on January 25, 2024, or any other time, did Welch show the candor to inform Plaintiffs or their representatives that Messner had long since spent the deposit money and that there was no money to provide because it was gone.

258. On February 15, 2024, Welch doubled down. Welch transmitted another letter on Messner letterhead:

> These funds have, and continue to be, under the control of our firm and are held in a firm trust account at the delivery institution, Titan Financial, LLC. Movement of the funds from Titan Financial, LLC requires use of a correspondent bank. We are working with JP Morgan Chase and the Chase Treasury Department to facilitate t hat aspect of the funds transfer, including the applicable access and confirmation codes. We should have that approved and funds moving very shortly.

259. That statement was false in every respect. Titan Financial, LLC was not a bank and did not "require" a correspondent. JPMorgan Chase was not working on anything. The "Chase Treasury Department" had no knowledge of the transaction, which did not exist. No "access and confirmation codes" existed because there was no account to access. Welch misappropriated the vocabulary of banking logistics to manufacture the appearance that routine banking steps were the only obstacle to the return of Plaintiffs' money.

260. The fabrication behavior is beyond mere lulling. Welch, a member of the Bar, had resorted to outright lies to buy time to find money to cover up Messner's prior theft.

261. Clearwater continued to manufacture phantom bond-backed "assets" well after the BELOC scheme had collapsed. On March 27, 2024, more than seven months after Plaintiffs' money had been removed from the Messner trust account, Clearwater executed an "Unconditional Pledge for Payment" with Hing Yip International Limited, a Hong Kong entity, memorializing a purported $8 billion obligation owed to Clearwater. The recitals to that agreement describe the supposed asset as "corporate revenue bonds issued by EuroPaxi Mercantile Corp" and transferred through an "Asset Management Agreement signed sealed between 3FR LLC and Hing Yip International Limited." 3FR LLC is the same entity Welch had invoked three months earlier, in his December 26, 2023 Titan letter to Plaintiffs, as one of Titan Financial, LLC's "Partners" holding "approximately $92 billion in cash and approximately $1.545 trillion of M00 gold-backed funds." The Hing Yip pledge confirms that after Messner's trust account was emptied, Chartraw, Owen, and Clearwater continued operating the same Ponzi-bond architecture Welch had presented to the Clark County Zoning Commission in November 2022 and invoked against Plaintiffs in December 2023, with different counterparties and nominally different bond issuers, but the identical fictional-asset construction.

262. The Titan correspondence did not stand alone. Welch transmitted a sequence of false email updates to HomePeople's counsel during the same weeks, each of them falsely invoking "Chase," "the Chase head of treasury in NY," "a secondary account verification," "the correspondent nature," "an expert money mover at Chase," and "Titan." On February 2, 2024, Welch wrote that he was "finalizing some of the details with the bank" and would be "ready to release the agreed upon amount Monday afternoon/Tuesday morning." On February 13, 2024,

Welch wrote, "Chase said it will push out tomorrow. I am on with them now to confirm/question/verify/etc. verbally guaranteed tomorrow to the client and I am in trust but verify mode." On February 14, 2024, Welch wrote, "Just hung up with Chase head of treasury in NY. They are pushing a credit as through as soon as they can… we anticipate it finally being final." On February 21, 2024, Welch wrote, "They are still working on clearance to process the funds because of the correspondent nature… I have just been told the funds will be available tomorrow." On February 27, 2024, Welch wrote, "Titan has also pursued corresponding with two other institutions who can move quicker. Both have agreed to process these commencing tomorrow, which would mean funds to be released to your client Friday." On March 1, 2024, Welch wrote, "Still working on a hold apparently. We have an expert money mover at Chase working on it to drop yet today is the hope."

263. Every one of these statements was false. None of the funds released. No correspondent bank was processing anything. No Chase Treasury official was involved. No Titan institution existed to release funds from.

264. One week after Welch's February 15, 2024 letter, Messner amplified the deception from the institution itself. On February 22, 2024, Messner, not Welch personally but the law firm as an institution, published a statement on its public-facing, search-engine-optimized website directed specifically at Plaintiff Emerald Consulting Partners LLC, which had by then sued the firm in California. The statement read:

> At no time have the funds at issue in the lawsuit disappeared or become lost. The legal requirements regarding the return of the funds have not been satisfied, and the firm is legally prohibited from releasing the money at issue. The Plaintiff is aware of these circumstances, yet has falsely alleged otherwise.

265. Every sentence of that statement was false. The funds had been gone for six months by the date of publication. Messner identified no "legal requirements" that had not been "satisfied."

Messner identified no source of the supposed "legal prohibition." No such requirements existed. No such prohibition existed. Emerald, the "Plaintiff" Messner publicly accused of lying, was telling the truth. Messner, the party with exclusive access to the trust account records and exclusive knowledge of what it had done with the funds, was the party fabricating. Emerald has since filed a federal defamation action against Messner arising from that publication. *Emerald Consulting Partners, LLC v. Messner Reeves, LLP*, No. 8:25-cv-01915-JSM-AEP (M.D. Fla.).

266. On March 11, 2024, Welch wrote to Plaintiffs, "we remain on schedule based upon our clients' statements." On March 20, 2024, Welch wrote, "I have spoken with the national bank partner this morning that is handling the last path of the ICA deposits and they believe they will be in a position to deploy those this week yet. They will provide me with formal confirmation tomorrow morning, but have given no indication of any further delays." There was no national bank partner. No confirmation came. No deposits were deployed. The account had been empty for seven months.

267. On April 15, 2024, after Plaintiffs filed their initial lawsuit against Messner in Orange County California, Welch finally revealed the retaliatory purpose of the cover-up. Welch wrote, "Although we will continue to process the requested return of the balance of the amount held, the filing of the… complaint has rendered this now a lower priority."

268. Nearly a year later, on February 21, 2025, Messner's non-attorney president Jim Smith submitted a declaration. In that declaration, Smith conceded what the bank records have now shown, but which was not known then, namely that there were "no funds remaining in the account held for INBE by July 25, 2024." Smith attempted to explain the unspecified disbursements by asserting that "INBE provided authorizations to Messner Reeves to disburse funds at its direction and benefit on 4 separate occasions totaling $2,490,33 [sic] from the account

holding its funds." The "$2,490,33" figure appeared in Messner's sworn submission with an extra comma and a missing digit. Messner's president declined to correct the error when brought to his attention. Assuming the intended figure was $2,490,330, Smith was purporting to account for less than 30% of the money taken. Smith offered no explanation at all for the other $5,854,667. On October 29, 2025, Smith filed an updated declaration purporting to attach "authorizations" for the $2,490,333 figure. The attached documents reflect no authorizations by INBE to disburse any of Plaintiffs' money. Moreover, Smith's February 21, 2025 affidavit stated that Plaintiffs' funds were dissipated by July 24, 2024, but his October 29, 2025 declaration provided that Plaintiffs' funds were removed by August 2, 2023.

269. On January 22, 2026, Plaintiffs filed a Notice of Accounting of Stolen Funds in a then-pending action, which details the disposition of Plaintiffs' funds from subpoenaed Northern Trust records because Messner "failed to assist in the development of this information in any manner." A summary of the disbursements, in descending order by recipient, from Messner's Northern Trust COLTAF account ending in x8494 between April 2023 and August 2023 is set forth below:

| Amount Disbursed | Recipient | Purpose or Connection |
|---|---|---|
| $1,800,000.00 | Sahara Las Vegas Corp. | Dribble Dunk's landlord; paydown of rent arrears |
| $1,274,000.00 | Master Systems Integrators LLC | Staged Ponzi-style sham "partial funding" of BELOC loan on July 3, 2023 |
| $973,333.00 | HomePeople Corporation | Staged Ponzi-style sham "partial funding" of HomePeople's BELOC on July 3, 2023 |
| $904,777.00 | Valley Bank of Nevada (for Construction Testing Services, LLC) | Payment of Dribble Dunk's engineering creditor |
| $758,918.09 | Dribble Dunk | Direct payment to Messner's insolvent client |

| Amount Disbursed | Recipient | Purpose or Connection |
|---|---|---|
| $600,000.00 | Wyatt Aufdermaur LLC | Payment to Messner's confederate counsel, later cover-up participant |
| $853,898.99 | Chartraw | Direct payment to convicted felon |
| $500,000.00 | Harris Bank NA (Loan IQ) | Apparent loan repayment on Dribble Dunk-related commercial loan |
| $430,000.00 | Clearwater | Chartraw and Owen shell entity |
| $430,000.00 | Owen | Direct payment to Chartraw accomplice |
| $414,705.00 | Hoehn JLR Inc. | Automobile dealership |
| $329,540.77 | Internal Debit Transfer | Internal Messner transfer |
| $250,000.00 | Travis Chatwin | Apparent internal funds transfer |
| $175,000.00 | Brandon Knowldon | Accomplice |
| $155,000.00 | Brownstein Hyatt Farber Schreck | Law firm, likely Dribble Dunk debt |
| $125,000.00 | DKTOHOME, LLC | Unknown third party |
| $120,000.00 | Lawrence Longo Trustee Aelina | House rental payment |
| $100,000.00 | Whiskey Cowboys LLC | Unknown third party |
| $80,242.36 | Autonation Chrysler Dodge | Automobile dealership |
| $80,000.00 | Mountain Mines, LLC | Unknown third party |
| $70,000.00 | Danielle Martin | Las Vegas personality |
| $68,000.00 | Phoenix GC LLC | BELOC broker |
| $60,000.00 | Keller North America, Inc. | Paid invoice |
| $56,722.00 | RBC Capital Markets | Unknown third party |
| $50,000.00 | Javier Reyna | Principal of "FIDES" |
| $50,000.00 | World Buddhism Association | Dribble Dunk creditor |
| $45,250.00 | Private Passport Transfer to x0534 | Internal Messner transfer |
| $30,000.00 | INBE-Clear Capital Group LLC | Wyoming joint venture Welch registered April 10, 2023 |
| $30,000.00 | Ronald Gall | Unknown third party |
| $25,000.00 | Greenfield LLP | Attorney paid on Leonard Chartraw San Joaquin judgment matter |
| $25,000.00 | Law Offices of Frank J. Longo | "INBE-Clear Fees" |
| $25,000.00 | Pacific 9 Transportation | Unknown third party |
| $20,000.00 | Alison Romero | Unknown third party |
| $12,120.00 | ACH Settlement Debit | Internal Messner transfer |

| Amount Disbursed | Recipient | Purpose or Connection |
|---|---|---|
| $12,120.00 | Bloomberg Financ | Bloomberg terminal payment |
| $11,000.00 | ISIN International LLC | Unknown third party |
| $10,500.00 | Private Passport Transfer to x0534 | Internal Messner transfer |
| $10,000.00 | Eric Smith | Memo line reads "CLEARWATER REIMBURSEMENT" |
| **$10,650,227.21** | **Total outbound from x-8494** | |

270. The subpoenaed bank records show that more than $10.65 million was moved out of Messner's Northern Trust COLTAF account between April 2023 and August 2023. Plaintiffs' $8,345,000 is part of that outbound flow. No portion of Plaintiffs' funds was ever returned. Messner has never accounted for how the $8,345,000 was disbursed or produced any contemporaneous instruction from any Plaintiff, or anyone else, authorizing any of these disbursements. The disbursements were unauthorized when made and Messner has admitted that fact by asserting, falsely, that "INBE authorized" only approximately 30% of the movement.

271. As of the filing of this Complaint, more than two and a half years after the trust account was emptied, Messner has not returned a dollar of Plaintiffs' deposits, has not accounted for the funds in any forum, has not responded substantively to more than ten written accounting demands from Plaintiffs, and has not responded to INBE's December 19, 2025 formal Request for Accounting.

272. What Messner has produced instead is a phony Titan Financial statement for a shell LLC that Welch created after the money was gone. The bank statement for the bank named "Titan Private Bank, LLC" does not exist and has never existed. Messner produced a $57 billion account at "FIDES Gestion Financiera" that has never existed, $92 billion in cash and $1.545 trillion in gold-backed funds that have never existed, a "national bank partner" that has never existed, a $5 billion Dribble Dunk account at FIDES Mexico that has never existed, a $750 million McMahon

Capital line of credit that has never existed, "authorizations" from INBE that INBE denies under oath having given, a public website statement accusing the firm's own victim of lying, and, at the end of all of it, silence.

273. Messner Reeves knew the truth on August 2, 2023, the day the trust account was emptied. Every statement Messner has made since that day, on letterhead, on the website, before the Clark County Zoning Commission, in sworn declarations, to regulators, to Plaintiffs, to INBE, and to the courts, has been a choice.

274. Messner did not admit, and Plaintiffs did not and could not reasonably have discovered, the fact and extent of the theft until Messner's president, Jim Smith, conceded under oath on February 21, 2025 that "there were no funds remaining in the account held for INBE by July 25, 2024." Prior to that date, Messner's active and continuing misrepresentations, including its representations that Plaintiffs' funds remained "in the Firm's possession and control," that the funds were held in a "fully insured" trust account, that the funds had been transferred to "Titan Financial, LLC," and that release of the funds was imminent and being processed through a "national bank partner," fraudulently concealed from Plaintiffs the fact of the theft and the accrual of Plaintiffs' causes of action. Colorado law provides that a statute of limitations does not begin to run until the plaintiff knows or should have known of the injury and its cause. C.R.S. § 13-80-108. Messner's active fraudulent concealment tolls the limitations period until the concealment was discovered or, by the exercise of reasonable diligence, should have been discovered by Plaintiffs. The continuing tort doctrine further tolls the limitations period because the wrongful conduct of the conspirators, including the lulling statements, was continuing in nature and did not cease until the last sworn Smith declaration on October 29, 2025. Each of the state-law claims in this Complaint was timely when asserted, and each is pleaded within the applicable limitations period

as tolled by the discovery rule, by active fraudulent concealment, and by the continuing tort doctrine.

## XII. Even After the Scheme Collapsed, Messner Continued to Issue Bond-Custody Paperwork for the Same Phantom Bonds.

275. On February 23, 2024, which was nearly seven months after the trust account holding Plaintiffs' deposits had been fully drained, Welch caused Messner to issue three separate Safe Keeping Receipts (each, an "SKR") on Messner letterhead. Each SKR represented that Messner, acting as a bond custodian, was in possession of an original bond certificate held on behalf of a purported counterparty. Each SKR bore Welch's signature block as "MR Issuing Partner" of Messner, was dated February 23, 2024.

276. The three SKRs aggregated $134 billion in purported face value. The first SKR, numbered 2024-02-00060, identified a bond certificate numbered 74252022UAA0UAA0710073719 with a stated issue amount of $60 billion, described as a "Malibu Homes Master Trust Indenture MONTLIB-#209190" instrument sponsored by "Global Infrastructure Finance & Development Authority, Inc." The second SKR, numbered 2024-02-00040, identified a bond certificate numbered 74252022US3796UAB8 with a stated issue amount of $40 billion, described as an "Atlantic Energy & Utility Products, Inc. Master Trust Indenture MONTLIB-#209190" instrument sponsored by the same "Global Infrastructure Finance & Development Authority, Inc." The third SKR, numbered 2024-02-00034, identified a bond certificate numbered 74252022US37961YAA2 with a stated issue amount of $34 billion, described as an "Appalachian Regional Commission Corridor Master Trust Indenture MONTLIB-#209190" instrument sponsored by the same "Global Infrastructure Finance & Development Authority, Inc." Each SKR recited detailed CUSIP, ISIN, and Bloomberg identifiers for the purported bond. Each was signed by Welch as a Partner of Messner.

277. All three SKRs identified the same purported bond owner, an entity called "OCHO L.B. de CV," with an "Account Owner Representative" named Javier Reyna Lara. The SKRs listed Reyna Lara's contact information as an address at 1750 Heavens Peak, San Antonio, Texas, and a Gmail address, javreyna@gmail.com. None of that contact information is consistent with a counterparty to which a 100-attorney law firm would credibly act as custodian of $134 billion in bond certificates. The residential San Antonio address is a private home. The email account is a free consumer webmail service. The purported Mexican account owner's representative appears nowhere in any publicly searchable database of capital markets counterparties or institutional bond holders.

278. Each SKR contained language in which Messner simultaneously held itself out as the custodian of the bond instrument and disclaimed any verification of the instrument's existence or value. Each SKR stated that Messner "ha[s] not inspected the Instrument and do[es] not certify or guarantee the contents, quality, ownership or current value of the Instrument," that Messner "shall not be held liable for the accuracy of the information provided by the Account Owner," and that the document "shall be used as evidence of storage only and shall not be used in any manner whatsoever for any unlawful purpose and/or in violation of any applicable laws or regulations." The effect of the disclaimer was that Messner put its institutional letterhead and its partner's signature behind a custodial representation that Messner simultaneously refused to verify.

279. The three SKR bonds are not bonds unknown to this litigation. The common "Sponsor" identified on each SKR, "Global Infrastructure Finance & Development Authority, Inc.," is a Shah Mathias entity also identified in the record of the Delaware Court of Chancery proceeding that described the Ameri-Metro and Mathias bond enterprise as a "classic Ponzi scheme." The same "MONTLIB-#209190" trust-indenture reference appears on all three SKRs,

indicating that the three purported bonds were generated from the same indenture infrastructure. Welch served as bond counsel for Ameri-Metro and Mathias at the time the original bonds were notionally issued in 2022, as pleaded in Section III above. The February 23, 2024 SKRs confirm that, even after the Dribble Dunk financing narrative had collapsed and the funds Plaintiffs had deposited with Messner had been fully disbursed, Welch was still issuing custodial paperwork on Messner letterhead for the same Mathias-indenture bond instruments.

280. The timing of the SKRs is significant. By February 23, 2024, more than six months had passed since Messner's trust account was fully drained of Plaintiffs' deposits on August 2, 2023. During February 2024, Welch and Messner were simultaneously transmitting to Plaintiffs the Titan Financial letters and the JPMorgan Chase "correspondent bank" emails described in Section XI below, representing that Plaintiffs' funds were still under Messner's control and on the verge of release. At the very moment Messner was telling Plaintiffs their money was safe at a nonexistent "Titan Private Bank," Messner was simultaneously issuing $134 billion in SKRs for a different set of phantom bonds on behalf of a different phantom counterparty. Messner did not disclose the SKRs to Plaintiffs. Messner did not disclose to Plaintiffs that the firm was continuing to function as the institutional packager for phantom bond custodial arrangements while simultaneously representing that Plaintiffs' funds were being processed for return.

281. The February 23, 2024 SKRs are documentary evidence that the BELOC Enterprise and its institutional packager, Messner, were actively continuing their scheme as of late February 2024. They fall within the same open-ended continuity window as the March 27, 2024 Hing Yip pledge described below. They demonstrate that Messner's participation in the racketeering enterprise did not end when the trust account was emptied in August 2023 or when the Dribble

Dunk financing failed at the Clark County Zoning Commission in November 2023, but continued through at least February 2024 and March 2024, and continues as of the filing of this Complaint.

282. True and correct copies of the three February 23, 2024 Safe Keeping Receipts are attached to this Complaint and incorporated by reference.

## XIII. INDIVIDUAL PLAINTIFFS' ALLEGATIONS

283. Each Plaintiff received the same false representations through the BELOC agreement and its FAQ that Messner drafted. The allegations in this section are common to each Plaintiff unless otherwise stated.

> The most important issue for us is the safety of your capital.
>
> **How will I have certainty that my initial money won't disappear?**
>
> Within our format, we never control your funds, and we ensure that you are never exposed to any risk of loss, as we even pay for your money to be fully insured.
>
> The most important issue for us is the safety of your capital.
>
> And the complete mitigation of financial risk to you (and your investors) throughout your deal.

BELOC FAQ at 10.

284. Messner's BELOC contained an accompanying Capital Options Expanded FAQ, which was signed by Plaintiffs and victims in connection with the BELOC. This FAQ contains the following false representations:

**How is my deposit safeguarded prior to funding?**

- We nominate a third-party trustee (Attorney) [Messner Reeves] to hold the funds.
- Funds remain with the Trustee [Messner Reeves] until we've delivered the loan.
- We contractually agree to reimburse the Borrower the amount of their ICA Advance Cost.
- Because we keep insurance on all funds held by our trustees.
- In other words, we make sure we absorb all the financial risk.
- Leaving the only possible risk as "opportunity risk."
- Rather than having the risk of losing the capital itself.

**How will I have certainty that my initial money won't disappear?**

- Within our format, we never control your funds, and we ensure that you are never exposed to any risk of loss, as we even pay for your money to be fully insured.
- The most important issue for us is the safety of your capital. And the complete mitigation of financial risk to you (and your investors) throughout your deal.

**Is there anything that could potentially interfere with receiving the loan?**

- If your funds are not from illicit sources and will clear compliance then you're good to go.
- Later once funding has started, if you breach the contract in some manner, it could cause the Loan to get delayed. Or stopped. Depending on the severity of the breach.

285. Messner's BELOC contains the following additional nine false statements:

- The ICA deposit is a "Reserve" deposit.
- INBE "has the financial ability and wherewithal to fully fund" millions of dollars of loans.
- INBE will "fully and timely fund each Advance" of the loan.
- The BELOC "omit[s] no material facts."
- No parties other than INBE and the borrower have any rights.
- The ICA deposit will be "held by a nominated Trustee (attorney) [Messner Reeves]."
- The ICA deposit "shall be in Trustee's [Messner Reeves'] sole possession and control."
- If INBE does not fund the loan, "then INBE Capital LLC or one of it's nominated agents will wire return the Deposit Amount to the Borrower promptly."
- INBE "will step in and reimburse" if the ICA money is not returned.

286. Messner's BELOC contains at least 20 false statements as set forth above.

287. Messner's BELOC draft unambiguously and falsely stated that when a borrower enters into a BELOC with INBE, the borrower's ICA deposit is placed into Messner Reeves' COLTAF trust account at Northern Trust Bank and will be "held by a nominated Trustee (attorney) [Messner Reeves]" in Messner Reeves' "sole possession and control."

288. Messner directed that its BELOC draft, riddled with false statements, be conveyed on his behalf to each borrower seeking a loan by a broker, INBE, or an INBE representative.

289. After signing Messner's BELOC, which contained the false statements, the borrower wired the ICA deposit funds to Messner either the same day or shortly thereafter.

290. The first five predicate acts, consisting of wire fraud, are as follows.

291. Prior to execution of the BELOC and remittance of the victims' wire, Messner directed INBE and brokers associated with the scheme, to make false representations, including the 20 false statements in the BELOC, to each of the Plaintiffs.

292. The false statements in the BELOC were intended to defraud, deceive, and induce Plaintiffs into paying millions of dollars into Messner's Northern Trust escrow account, purportedly as part of a BELOC loan to be provided to Plaintiffs.

293. Messner directed INBE and brokers associated with the scheme to transmit Messner's BELOC to Plaintiffs through interstate wires via Zoho Sign, to Plaintiffs in their states, including Florida, New York, and Utah.

294. The Messner BELOC not only contained at least 20 false statements as discussed above, but was also fundamentally fraudulent, as INBE had no ability or intention of issuing a loan to Plaintiffs.

295. In the BELOC, Messner falsely represented that each Plaintiff Kosher Eats would receive a BELOC loan from INBE, repayable with interest only at six percent for ten years, without requiring a personal guarantee or real estate collateral.

296. The purpose of the false representations in the BELOC was to induce the borrower to pay a 25% ICA deposit to Messner Reeves, which totaled $8,345,000 for all five Plaintiffs.

297. Having reasonably relied on the 20 false statements in Messner's BELOC and the follow-up emails from INBE on Messner's behalf, Plaintiffs remitted $8,345,000 to Messner, following the instructions from Messner through its intermediaries.

**A. Kosher Eats, LLC**

298. Plaintiff Kosher Eats operates a kosher food distribution and catering business.

299. In January 2023, Kosher Eats acquired a set of operating food-service assets and began planning an expansion anchored by a new commissary kitchen and a new distribution facility. To fund the expansion, Kosher Eats sought debt financing on terms that would not require Kosher Eats to take on the personal guarantees or real estate collateral traditionally demanded by commercial lenders.

300. In April 2023, Kosher Eats was introduced by a third-party broker to the BELOC product described above. The BELOC provided that Kosher Eats would receive an $8,000,000 loan from INBE at 6% interest-only for ten years, with no personal guarantee, no real estate collateral, and no repayment of principal for a decade.

301. The BELOC required Kosher Eats to deposit $2,000,000, representing 25% of the loan amount, into Messner Reeves' Northern Trust COLTAF trust account as an "ICA deposit," to remain in Messner's "sole possession and control" pending loan funding. The BELOC and its accompanying FAQ expressly represented that the deposited funds would be "held by a nominated Trustee (attorney)," that the ICA deposit would be returned if the loan did not fund.

302. Kosher Eats researched Messner Reeves before proceeding. Messner's website reflected that the firm had more than 100 attorneys, more than 60 partners, and ten offices across the country. Messner's status as a national law firm was a material and dispositive factor in Kosher Eats' decision to transfer its $2,000,000 into the custody of a firm Kosher Eats had not previously retained and whose principals Kosher Eats had never met. If not for the credentials of Messner, Kosher Eats would not have participated in the BELOC.

303. On April 27, 2023, relying on Messner's representations, Kosher Eats wired $2,000,000 to Messner Reeves' Northern Trust COLTAF account ending in x8494. Messner confirmed receipt.

304. Under the BELOC, the 90-day funding deadline expired on or about July 27, 2023. No loan proceeds were ever disbursed to Kosher Eats. No portion of Kosher Eats' $2,000,000 deposit was ever returned.

305. Between August 2023 and March 2024, Messner Reeves, acting through Welch and its agent Martin Hale, directed at Kosher Eats a sustained campaign of false assurances described above. The false statements to Kosher Eats include each Hale text message and email quoted in the paragraphs above concerning Hale's communications, and each Welch statement transmitted on Messner letterhead or from Messner email accounts referenced in the cover-up paragraphs above, all of which are incorporated by reference.

306. Kosher Eats has not received an accounting of the disposition of its $2,000,000 deposit. Messner has refused to produce one.

307. The misappropriation of Kosher Eats' $2,000,000 escrow deposit caused Kosher Eats to incur $480,000 in loan repayment costs, prevented the planned commissary and distribution facility from being built, caused Kosher Eats to default on supplier obligations, and damaged Kosher Eats' reputation in a tightly-networked kosher-food-services industry where reliability is an important aspect of commercial value.

308. Kosher Eats sustained incidental and consequential damages from the loss of the $2,000,000 escrow deposit.

**B. Emerald Consulting Partners, LLC**

309. Plaintiff Emerald provides consulting services to emerging stage companies focused on capitalization and growth.

310. Emerald's exposure to the BELOC scheme arose through its consulting client Hard AF Seltzer, LLC ("Hard AF"), a beverage brand. Hard AF sought $2,800,000 in expansion financing. The same BELOC product described above was presented to Hard AF and Emerald, through its intermediaries, as a vehicle that would fund the needed capital in exchange for a $700,000 ICA deposit.

311. Emerald agreed to provide the $700,000 ICA deposit on behalf of Hard AF in the capacity of Bridge Lender. On June 12, 2023, Emerald and the BELOC parties executed a side letter providing that "the Deposit shall be immediately paid to the BRIDGE LENDER if the LOC is not funded within ninety (90) days after BRIDGE LENDER's Deposit with INBE." That Bridge Lender side letter gave Emerald a direct contractual right to the immediate return of the $700,000 upon non-funding. The right was absolute and did not require a notarized termination letter or any further performance by Emerald.

312. On June 12, 2023, relying on the BELOC representations and the Bridge Lender side letter, Emerald caused a wire of $700,000 to be sent to Messner Reeves' Northern Trust COLTAF account ending in x8494. On June 13, 2023, Welch texted Emerald confirming receipt.

313. Under the Bridge Lender side letter, the 90-day funding deadline expired on or about September 11, 2023. No loan proceeds were ever disbursed to Hard AF. No portion of Emerald's $700,000 was ever returned. Emerald's contractual right to the immediate return of the deposit upon non-funding was ignored.

314. On September 21, 2023, Welch, acting as Messner's agent, texted Emerald's president, Jonathan Fodera, "I haven't heard anything concrete at this point. Reaching out now to get an update. I am dependent on info from INBE to pass on. I will let you know as soon as I have an update." That statement was flagrantly false when Welch made it. INBE had received no funds. INBE had issued no funding instructions. Messner was not "dependent on info from INBE" for any material fact relevant to the return of Emerald's deposit. In fact, the opposite was true.

315. On October 27, 2023, Fodera, on behalf of Emerald, formally demanded in writing the immediate return of the $700,000. Messner, through Welch, responded on November 3, 2023 by stating that Messner was "merely a paymaster" and that the firm would "inform INBE of the request for the deposit's return." That statement was also false. Messner's own BELOC text designated Messner as "Trustee" with "sole possession and control" of the deposit. Messner had never been a passive paymaster. That reformulation of Messner's role was a post-default fabrication designed to shift responsibility to INBE.

316. On February 22, 2024, Messner published on its public-facing website the statement described in the paragraphs above accusing Emerald of falsely alleging that funds had disappeared. That publication gave rise to a separate federal defamation action Emerald maintains against Messner. *Emerald Consulting Partners, LLC v. Messner Reeves, LLP*, No. 8:25-cv-01915-JSM-AEP (M.D. Fla.).

317. The misappropriation of Emerald's $700,000 deposit caused Emerald to suffer operational and reputational damages. Emerald's capacity to serve its consulting clients was impaired during the critical early-growth phase of the firm. Hard AF, Emerald's client, was separately damaged by the failure of the expected expansion financing. Emerald's reputation as a

reliable intermediary in the advance-stage financing market was harmed by Messner's public accusation that Emerald had lied about the disappearance of funds which Messner had in fact taken.

318. Emerald sustained incidental and consequential damages from the loss of the $700,000 escrow deposit.

**C. Abbson, LLC**

319. Plaintiff Abbson was founded in 2013 and, at all times relevant, provided full-service digital marketing and content creation services, including podcast production, live event production, and advertising.

320. As of early 2023, Abbson had achieved its largest operational scale since founding. Abbson employed 25 full-time employees and retained approximately 50 regular independent contractors. Its revenues had nearly doubled between 2020 and 2022. Its live-events business was growing at a 100% annual rate. Abbson operated a headquarters office in New York City, a West Coast office in Los Angeles opened in 2021, and an East Coast expansion office in Washington, D.C. opened in 2023. Abbson had identified a Washington, D.C. production studio as its next planned capital investment.

321. To fund that expansion on terms that preserved Abbson's working capital, Abbson was introduced to the BELOC product. On June 29, 2023, Abbson executed a BELOC under which Abbson would receive a $14,000,000 loan from INBE at 6% interest-only for ten years, with no personal guarantee and no real estate collateral, in exchange for a $3,500,000 ICA deposit into Messner's trust account. That deposit would represent Abbson's largest single cash outlay in its ten-year history.

322. Abbson reviewed Messner's website before proceeding. As with each of the other Plaintiffs, Messner's status as a 100-attorney national law firm was a critical and dispositive factor

in Abbson's decision to part with $3,500,000. Abbson understood that the proposed loan might not fund. Abbson did not understand, and had no reason to suspect, that the trust account itself posed any risk.

323. On June 29, 2023, relying on Messner's representations, Abbson wired $3,500,000 to Messner Reeves' Northern Trust COLTAF account ending in x8494. Abbson's deposit was the last Plaintiff deposit received into that account. Abbson's deposit was also the largest. Abbson never authorized the transfer of its escrowed funds to Clearwater, Dribble Dunk, Titan Financial, or any other party.

324. The BELOC loan was never funded. Abbson's $3,500,000 deposit was never returned.

325. The consequences to Abbson were catastrophic and immediate. Abbson was forced to lay off its entire workforce of more than 25 full-time employees and more than 50 independent contractors. Abbson defaulted on its office lease obligations in New York City, Los Angeles, and Washington, D.C. Abbson abandoned its planned production studio in Washington, D.C. Abbson ceased operations. Abbson now faces multiple creditor lawsuits.

326. The destruction of Abbson took months to unfold because, during the months between the missed funding deadline and the final collapse, Messner's representations that the deposit was safe and would be returned were consistent, emphatic, and, through Hale and Aufdermaur, repeated on a weekly and sometimes daily basis. Had Abbson known on August 2, 2023 that its $3,500,000 was gone, Abbson could have undertaken urgent steps to stabilize its business, including restructuring, emergency investor outreach, and orderly wind-down of underperforming lines. Instead, Abbson relied on the continuing false assurances of a 100-attorney national law firm and watched its business disintegrate.

327. Abbson sustained incidental and consequential damages from the loss of the $3,500,000 escrow deposit.

**D. MSC Companies, LLC**

328. Plaintiff MSC is a hospitality consulting, development, and management group. MSC provides staffing, operations, revenue management, sales, reporting, and in-house accounting services for franchise hotels operating primarily under the Hilton and Marriott brands.

329. As of early 2023, MSC had consolidated its operations to 27 properties across Utah, Wyoming, and Nebraska. MSC employed between 750 and 900 people across its properties. MSC was in the midst of an expansion cycle and needed $4,580,000 in capital to fund the next phase of that expansion.

330. MSC was induced to enter a BELOC providing for a $4,580,000 loan at 6% interest-only for ten years, with no personal guarantee and no real estate collateral, in exchange for a $1,145,000 ICA deposit into Messner's Northern Trust COLTAF account. MSC understood that the loan terms carried a non-trivial risk that the loan might not fund, but understood, based on the express BELOC provisions and on Messner's identity and reputation as a national law firm, that the deposit itself remained safe in all events. MSC would not have wired $1,145,000 to a stranger in Denver on any other basis.

331. On June 22, 2023 and June 23, 2023, MSC wired a combined $1,145,000 to Messner Reeves' Northern Trust COLTAF account ending in x8494. Messner confirmed receipt.

332. The loan was never funded. MSC's $1,145,000 deposit was never returned. After funding was missed, Messner's communications with MSC slowed and then ceased.

333. To bridge the working-capital gap created by the missing $1,145,000, MSC was forced to obtain emergency financing at materially above-market rates. MSC's emergency

financing measures cost MSC in excess of $1,000,000 in additional interest, fees, and transaction costs that would not have been incurred if Messner had honored the BELOC's plain terms and returned the deposit. Those emergency financing costs are direct and proximately caused damages flowing from Messner's misappropriation.

334. MSC sustained incidental and consequential damages from the loss of the $1,145,000 escrow deposit.

**E. HomePeople Corporation**

335. Plaintiff HomePeople owns and operates "Romio," a digital marketplace application that enables users to book services recommended by friends or local experts. Romio is designed to integrate with Instagram and allows influencers to earn referral income by directing their networks to services across a multi-trillion-dollar addressable market. HomePeople was incorporated in 2007 and began assembling its operating team in 2016 in preparation for an official product launch.

336. Between its incorporation and early 2023, HomePeople invested approximately $26 million in platform development, marketing, influencer network development, and reputation-building. In late 2022 and early 2023, HomePeople secured a new round of funding that included a $2 million investment from a key backer who anticipated raising an additional $10 million from his network.

337. HomePeople's final capital need for launch was approximately $4 million. To cover that need on terms that preserved HomePeople's equity and avoided personal guarantees, HomePeople was introduced to the BELOC product.

338. HomePeople entered into a BELOC dated March 23, 2023. The BELOC provided for a $4,000,000 loan from INBE at 6% interest-only for ten years, with no personal guarantee and

no real estate collateral, in exchange for a $1,000,000 ICA deposit into Messner's trust account. The BELOC's outside funding date was September 3, 2023.

339. On April 20, 2023, HomePeople was asked to consent to the transfer of its $1,000,000 deposit to Messner Reeves. HomePeople's president, Tarik Sansal personally researched the firm. He reviewed Messner's website, confirmed its representation as a national law firm with over 100 attorneys, over 60 partners, and ten offices, and made the decision to proceed specifically on the basis of Messner's institutional character and seemingly trustworthy credentials. HomePeople would not have approved a wire of $1,000,000 to Messner Reeves on any other basis.

340. On April 21, 2023, HomePeople directed the wire of $1,000,000 to Messner Reeves' Northern Trust COLTAF account ending in x8494. HomePeople's deposit was the first deposit received into that account from the Plaintiffs in this action.

341. The 90-day period had expired and the loan had not funded. HomePeople's launch plan depended on the funding, and the launch began to slip.

342. On November 22, 2023, HomePeople's prior counsel sent a pointed letter to Welch, as Messner's agent, stating:

> I begin, however, with the basic question that must precede any discussion: Where is the money? The Agreement provided that the ICA funds would be held "in escrow." An escrow account is "a bank account generally held in the name of the depositor and an escrow agent which is returnable to depositor or paid to a third person on the fulfillment of escrow condition." Black's Law Dictionary, 6th Ed., 545… You should therefore be able to provide me with a bank name, account number, and certification from the bank showing that the $1,000,000.00 that my client deposited with your firm is safe and remains in escrow… If, on the other hand, your firm is unable to provide an answer to these very basic questions of where the money is being held and provide the very basic assurance that the funds will remain safely in escrow, my clients are forced to assume the worst and will prepare for litigation.

343. Messner did not provide a bank name, an account number, or bank certification that HomePeople's money remained in escrow. It could not. The money was gone. Instead, Messner directed HomePeople's inquiries to Jason Aufdermaur, who on December 15, 2023 wrote that "it appears as though Clearwater funds will be disbursed imminently to several parties" and that "all funds to deal with the 'INBE Capital Issue'" would be disbursed into Aufdermaur's own Georgia trust account. HomePeople had no prior knowledge of "Clearwater" as an entity associated with the BELOC. HomePeople had never consented to Clearwater holding HomePeople's funds. HomePeople had never authorized any party other than Messner Reeves to act as escrow agent.

344. The Messner statements to HomePeople's counsel during February and March 2024 described above, including the "finalizing some of the details with the bank," "Chase said it will push out tomorrow," "Just hung up with Chase head of treasury in NY," "They are still working on clearance to process the funds because of the correspondent nature," "Titan has also pursued corresponding with two other institutions," and "Still working on a hold apparently" emails, were each transmitted directly to HomePeople's counsel. Each was false. Each was designed to cause HomePeople to continue waiting rather than file suit.

345. HomePeople's launch never occurred. HomePeople's investors, having been promised a product launch that never came, lost confidence. HomePeople's celebrity and influencer network disengaged. Competitors captured the segment of the influencer-driven service-marketplace market HomePeople had spent seven years developing. HomePeople's planned $10 million follow-on capital raise never materialized. HomePeople is now insolvent. HomePeople's $26 million in pre-launch investment has been effectively written off. The $1,000,000 deposit Messner stole was the last increment of capital that would have enabled HomePeople to launch before its competitive window closed. The damages to HomePeople

substantially exceed the nominal $1,000,000 theft, as HomePeople sustained incidental and consequential damages.

## CAUSES OF ACTION

### COUNT I
### Civil RICO Violation, 18 U.S.C. § 1962(c)

(Against All Defendants)

346. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

347. At all times relevant to this Complaint, an association-in-fact enterprise existed within the meaning of 18 U.S.C. § 1961(4) (the "BELOC Enterprise"). The members of the BELOC Enterprise are Messner, Chartraw, Owen, Clearwater, and the non-party participants Martin Hale and his entity Latham Funding, LLC, Jason Aufdermaur and his law firm Wyatt Aufdermaur LLC, each of whom acted within the scope of their respective principal relationships.

348. The BELOC Enterprise is distinct from each of its members, including Messner. The BELOC Enterprise is distinct from Messner because it includes Chartraw, Owen, Clearwater, Martin Hale and Latham Funding LLC, and Jason Aufdermaur and Wyatt Aufdermaur LLC, none of whom is an employee, partner, affiliate, client, or subsidiary of Messner. The BELOC Enterprise has a purpose, a structure, and operational activities that are materially different from the ordinary law practice of Messner. Messner exists and operates to provide legal services to paying clients in matters unrelated to the BELOC scheme; the BELOC Enterprise exists and operates to defraud and lull victims for the financial benefit of its members.

349. The BELOC Enterprise's operational decisions, including when to solicit new victims, how to route misappropriated funds through the Wyoming, Nevada, California, Georgia,

and Mexican accounts of its various members, and how to maintain the scheme's public credibility through the Clark County Zoning Commission and through Messner's public website, were not the decisions of Messner alone or as a matter of law-firm business. They were decisions of an association of independent actors acting in concert. Within the Enterprise, roles were divided. Chartraw effectuated the financial structure of the scheme and made ultimate decisions over the allocation of stolen funds. Messner, operating through Welch, held the collection vehicle (the COLTAF trust account), issued the institutional paperwork of the scheme (the BELOC loan template, the comfort letters, the Titan Financial communications, the SKRs, and the public website statement), and provided the firm-wide legitimacy that induced Plaintiffs' deposits. Owen served as the externally-visible principal of Clearwater and the public face of the scheme. Clearwater issued the Enterprise's core sham instruments and served as a node for the receipt and onward distribution of misappropriated funds. Hale and Aufdermaur managed the Enterprise's post-default communications with Plaintiffs and Plaintiffs' counsel, each on behalf of the Enterprise as a whole rather than on behalf of any single member. No single member of the Enterprise could have operated the scheme alone. The scheme required the combined operational acts of each member.

350. The BELOC Enterprise is an ongoing organization with a common purpose, continuity of structure and personnel, relationships among its members, and a sufficient longevity to permit the members to pursue the Enterprise's common purpose. The BELOC Enterprise has a structure separate and apart from the pattern of racketeering activity alleged below, as established by (a) the enterprise members' joint public appearance at the October 19, 2022 All Net press conference, (b) the joint execution of the November 7, 2022 letter agreements and the subsequent letter agreements among Clearwater, INBE, and Messner, (c) the joint drafting and implementation

of the BELOC agreement template, (d) the joint November 16, 2022 and November 21, 2023 appearances before the Clark County Zoning Commission, (e) the joint cover-up between August 2023 and March 2024 directed through Messner, Welch, Hale, and Aufdermaur, and (f) the continuation of Clearwater's related bond-monetization activities through at least March 27, 2024.

351. The common purpose of the BELOC Enterprise was to induce small businesses to transfer substantial cash deposits into Messner Reeves' Colorado COLTAF trust account through the BELOC loan agreements, to misappropriate those deposits for the benefit of the Enterprise's members and for the benefit of the All Net project operated by Messner's client Dribble Dunk, and to lull Plaintiffs with false statements so that the misappropriation would not be discovered until the stolen funds had been dissipated beyond recovery.

352. The BELOC Enterprise engaged in and affected interstate commerce. Plaintiffs' deposits originated in Florida, Utah, and New York and were wired across state lines into Messner's Colorado trust account. The Enterprise's proceeds were disbursed across state lines to recipients in Nevada, California, Georgia, Mexico, and elsewhere. The Enterprise's communications, including its website statements, its zoning-commission testimony in Nevada, its lulling statements from Hale in Florida and Aufdermaur in Georgia, and its formation of shell entities in Wyoming, used interstate wires and the United States mails.

353. Each Defendant named in this Count conducted or participated, directly or indirectly, in the conduct of the BELOC Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), as follows:

354. Defendant Messner Reeves LLP conducted the Enterprise's affairs by providing the Colorado COLTAF trust account as the collection vehicle, by drafting and issuing the BELOC agreements on firm letterhead, by making and transmitting each representation to Plaintiffs

concerning the safety of the deposits, by receiving Plaintiffs' $8,345,000 into its trust account, by executing or causing the execution of each unauthorized wire transfer out of the account, by issuing or causing the issuance of each subsequent false assurance to Plaintiffs concerning the disposition of the funds, by publishing the February 22, 2024 website statement accusing Plaintiff Emerald of falsely alleging that funds had disappeared, by filing the Jim Smith declarations asserting "INBE authorizations" that do not exist, and by performing these acts at all times through its agents, including its Colorado-Bar-admitted managing partner Welch and its associate Jake Brigham, whose acts and knowledge are imputed to Messner under standard agency principles and Colorado law.

355. Defendant Daniel Chartraw conducted the Enterprise's affairs by designing the financial underpinnings of the BELOC scheme, by forging the PG Asia Investment Bank commitment letter presented to the Clark County Zoning Commission on November 16, 2022, by operating under the alias "Leon Chartue" to conceal his identity from Plaintiffs, by directing the "shadow ledger" and monetization narratives that supplied the BELOC's pretended funding mechanism, by receiving direct wires from Messner's trust account totaling at least $853,898.99 under cover of purported "monetization fees," and by directing Welch's ongoing communications with Plaintiffs during the cover-up.

356. Defendant Todd Owen conducted the Enterprise's affairs by serving as the public face of Clearwater at the October 19, 2022 press conference and in subsequent public appearances designed to conceal Chartraw's identity and criminal history from Plaintiffs, by participating in the cover-up, and by receiving direct wires from Messner's trust account totaling at least $465,000.

357. Defendant Clearwater Premiere Perpetual Master LLC conducted the Enterprise's affairs by holding itself out as an equity partner of Dribble Dunk with $5 billion in financing

capacity, by executing the August 2022 and September 2022 letter agreements purporting to transfer the $60 billion Ameri-Metro bond, by appearing on the BELOC-related documents as INBE's joint venture partner and funding counterparty, by receiving direct wires from Messner's trust account totaling at least $500,000, and by continuing to manufacture fictitious bond-backed assets through the March 27, 2024 Hing Yip pledge.

358. Messner conducted and participated in the operation and management of the BELOC Enterprise. Messner made and directed specific operational decisions on behalf of the Enterprise, including the following. (a) Messner supplied the COLTAF trust account at Northern Trust Bank in Denver, ending x8494, as the defining collection vehicle for the BELOC deposits. No other Enterprise member could have supplied that instrumentality. The decision to use Messner's COLTAF account as the BELOC collection vehicle was an Enterprise operational decision made at Messner, by Messner partners Welch and Brigham, on Messner letterhead. (b) Messner, acting through Welch, decided when and how each outbound wire from the COLTAF account would be made. Welch personally signed or directed each of the wires identified in the Notice of Accounting attached as Exhibit A. No wire was made without Welch's authorization. The decision to transfer Plaintiffs' funds to Dribble Dunk, Sahara Las Vegas Corp., Chartraw personally, Owen personally, and Aufdermaur was an Enterprise operational decision executed at Messner. (c) Messner drafted the BELOC loan template and the ICA deposit provisions that funneled Plaintiffs' money into the Messner trust account. Messner's decision to adopt the Prime Capital Ventures template and to designate itself as "Trustee" with "sole possession and control" was an Enterprise-level operational decision. (d) Messner, through Welch, decided the content, timing, and wording of every comfort letter and fabricated banking communication issued to Plaintiffs between August 2023 and March 2024. Welch decided when to invoke Titan Financial,

when to invoke the "national bank partner," when to invoke Chase Treasury, and when to invoke correspondent-banking requirements. Those were not responses to client instructions. They were Enterprise communication decisions made by Messner. (e) Messner, through Welch, personally appeared before the Clark County Zoning Commission on November 21, 2023 and decided what to testify. Messner's decision to put Welch in front of a public body to assert the existence of a nonexistent $5 billion account at FIDES Mexico was an Enterprise operational decision. (f) Messner, through Welch, decided to register Titan Financial, LLC in Wyoming on November 7, 2023 using Welch's own administrative assistant's email. That was a unilateral decision by Messner to create a fictional financial institution that Messner would thereafter invoke in communications to Plaintiffs. It was an Enterprise operational decision. (g) Messner, through Welch, decided to issue the February 23, 2024 SKRs on Messner letterhead for $134 billion in phantom bonds on behalf of OCHO L.B. de CV. That was an Enterprise operational decision made by Messner as a formal bond custodian. (h) Messner decided to publish the February 22, 2024 website statement accusing Plaintiff Emerald of falsely alleging that Plaintiffs' funds had disappeared. Messner's decision to respond institutionally to its own defrauded non-client, on Messner's corporate website, was not a response to a client instruction. It was an Enterprise self-protection decision. (i) Messner, through Jim Smith as its non-attorney president, decided to execute the sworn declarations asserting "INBE authorizations" that INBE has denied giving. That was a Messner corporate decision at the highest level, made in the name of the firm. Each of these decisions was a decision of how to operate the BELOC Enterprise, not a decision of how to represent a client. Each was made at Messner and by Messner. Each satisfies the operation-or-participation requirement of § 1962(c).

359. Each of the other Defendants likewise conducted and participated in the operation and management of the BELOC Enterprise. Chartraw designed the financial structure of the scheme, including the advance-fee deposit collection model, the "shadow ledger" monetization narrative, and the disbursement-allocation priorities. Chartraw personally approved and directed the inclusion of specific recipients on the outbound wire list, including himself (at least $853,898.99), Owen (at least $430,000), Clearwater (at least $430,000), Dribble Dunk (at least $758,918.09), and Sahara Las Vegas Corp. (at least $1,800,000). Chartraw personally operated under the alias "Leon Chartue" to conceal his federal criminal history from Plaintiffs. Chartraw directed Hale's lulling communications, as documented in Hale's own text messages referencing "I will speak to Danny shortly," "Once I speak with Danny today I will reach out to everyone," and "Danny is about to stop everything because you will not stop harassing torben." Chartraw's role was that of the Enterprise's visionary and ultimate decision-maker. Owen served as Clearwater's public face at the October 19, 2022 All Net press conference, approved Clearwater's execution of the August 2, 2022 and September 8, 2022 letter agreements with Messner concerning the $60 billion Ameri-Metro bond, directed the cover-up communications invoking Aufdermaur's Georgia trust account as a purported "alternative" custodian, and personally received at least $430,000 in direct wires from the Messner trust account. Owen's role was to function as the externally-visible principal of Clearwater, shielding Chartraw from public exposure and providing Clearwater the veneer of a legitimate counterparty. Clearwater executed the sham letter agreements with Messner asserting Clearwater's purported ownership of $60 billion in Ameri-Metro bonds, appeared in BELOC-related documents as the joint-venture partner of INBE, executed the March 27, 2024 Hing Yip International pledge purporting $8 billion in bond-backed assets, received at least $430,000 in direct wires from the Messner trust account, and served as a principal node for

the onward distribution of misappropriated funds to Chartraw-controlled accounts. Clearwater was the Enterprise's corporate vehicle for the fabrication and movement of phantom-asset paperwork and the receipt and distribution of proceeds. None of these acts was ministerial. Each constituted direction over some aspect of the Enterprise's operations.

360. The pattern of racketeering activity included, without limitation, multiple predicate acts of wire fraud in violation of 18 U.S.C. § 1343 and interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314. The acts of wire fraud by which Plaintiffs' $8,345,000 was induced into the Messner trust account are set forth in the following table:

**Predicate Acts of Wire Fraud, 18 U.S.C. § 1343, Induced Wires of Plaintiffs' Deposits into Messner Trust Account**

| Predicate Act | Statute | BELOC Date | Wire Date | Amount | Plaintiff | Receiving Account |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1343 | March 23, 2023 | April 21, 2023 | $1,000,000 | HomePeople | Messner Reeves Northern Trust COLTAF x8494 |
| 2 | 18 U.S.C. § 1343 | April 24, 2023 | April 27, 2023 | $2,000,000 | Kosher Eats | Messner Reeves Northern Trust COLTAF x8494 |
| 3 | 18 U.S.C. § 1343 | June 12, 2023 | June 12, 2023 | $700,000 | Emerald | Messner Reeves Northern Trust COLTAF x8494 |
| 4 | 18 U.S.C. § 1343 | May 9, 2023 | June 22, 2023 | $1,145,000 | MSC | Messner Reeves Northern Trust COLTAF x8494 |
| 5 | 18 U.S.C. § 1343 | June 21, 2023 | June 29, 2023 | $3,500,000 | Abbson | Messner Reeves Northern Trust COLTAF x8494 |

361. The acts of interstate transportation of money taken by fraud, by which Plaintiffs' $8,345,000 was moved without authorization out of the Messner trust account to accounts

controlled by members of the Enterprise and to recipients in other states, are set forth in the following table:

**Predicate Acts of Interstate Transportation of Stolen Money, 18 U.S.C. § 2314, Unauthorized Outbound Wires from Messner Trust Account**

| Predicate Act | Statute | Wire Date | Amount | Unauthorized Recipient | Unauthorized Recipient's Bank |
|---|---|---|---|---|---|
| 6 | 18 U.S.C. § 2314 | 4/24/2023 | $250,000.00 | Clearwater | Bank of America |
| 7 | 18 U.S.C. § 2314 | 4/24/2023 | $500,000.00 | Sahara Las Vegas Corp | Zions Bankcorporation |
| 8 | 18 U.S.C. § 2314 | 4/25/2023 | $20,000.00 | Danielle Martin | First Republic Bank |
| 9 | 18 U.S.C. § 2314 | 4/25/2023 | $30,000.00 | Ronald Gall | Bank of America |
| 10 | 18 U.S.C. § 2314 | 4/25/2023 | $50,000.00 | Travis Chatwin | US Bank, NA |
| 11 | 18 U.S.C. § 2314 | 4/25/2023 | $55,000.00 | Mountain Mines, LLC | Bank of America |
| 12 | 18 U.S.C. § 2314 | 4/28/2023 | $55,572.02 | Dribble Dunk LLC | JP Morgan Chase |
| 13 | 18 U.S.C. § 2314 | 5/1/2023 | $25,000.00 | Mountain Mines, LLC | Bank of America |
| 14 | 18 U.S.C. § 2314 | 5/1/2023 | $50,000.00 | Travis Chatwin | US Bank, NA |
| 15 | 18 U.S.C. § 2314 | 5/1/2023 | $75,000.00 | Chartraw | Citibank |
| 16 | 18 U.S.C. § 2314 | 5/1/2023 | $75,000.00 | Owen | JP Morgan Chase |
| 17 | 18 U.S.C. § 2314 | 5/1/2023 | $150,000.00 | Clearwater | Bank of America |
| 18 | 18 U.S.C. § 2314 | 5/1/2023 | $400,000.00 | Dribble Dunk LLC | JP Morgan Chase |
| 19 | 18 U.S.C. § 2314 | 5/3/2023 | $300,590.77 | Internal Debit Transfer (01117247) | Northern Trust to x-0534 |
| 20 | 18 U.S.C. § 2314 | 5/8/2023 | $12,120.00 | Bloomberg Finance | Bank of America |
| 21 | 18 U.S.C. § 2314 | 5/11/2023 | $6,500.00 | Pacific 9 Transportation | Woori America Bank |
| 22 | 18 U.S.C. § 2314 | 5/11/2023 | $11,000.00 | ISIN International LLC | Washington Mutual Savings Bank |

| | | | | | |
|---|---|---|---|---|---|
| 23 | 18 U.S.C. § 2314 | 5/11/2023 | $15,000.00 | Danielle Martin | First Republic Bank |
| 24 | 18 U.S.C. § 2314 | 5/11/2023 | $15,734.00 | RBC Capital Markets | US National Bank |
| 25 | 18 U.S.C. § 2314 | 5/11/2023 | $50,000.00 | Chartraw | Citibank |
| 26 | 18 U.S.C. § 2314 | 5/11/2023 | $60,000.00 | Owen | JP Morgan Chase |
| 27 | 18 U.S.C. § 2314 | 5/11/2023 | $125,000.00 | Travis Chatwin | US Bank, NA |
| 28 | 18 U.S.C. § 2314 | 5/11/2023 | $155,000.00 | Brownstein Hyatt Farber Schreck | Wells Fargo |
| 29 | 18 U.S.C. § 2314 | 5/15/2023 | $10,000.00 | Eric Smith | SAFE Credit Union (Fulsom, CA) |
| 30 | 18 U.S.C. § 2314 | 5/15/2023 | $50,000.00 | World Buddhism Association | Bank of America |
| 31 | 18 U.S.C. § 2314 | 5/15/2023 | $904,777.00 | Valley Bank of Nevada (CTS) | Pacific Coast Bankers Bank |
| 32 | 18 U.S.C. § 2314 | 5/22/2023 | $25,000.00 | Greenfield LLP | Zions Bankcorporation |
| 33 | 18 U.S.C. § 2314 | 6/1/2023 | $20,000.00 | Owen | JP Morgan Chase |
| 34 | 18 U.S.C. § 2314 | 6/1/2023 | $25,000.00 | Danielle Martin | First Republic Bank |
| 35 | 18 U.S.C. § 2314 | 6/1/2023 | $25,000.00 | Travis Chatwin | US Bank, NA |
| 36 | 18 U.S.C. § 2314 | 6/1/2023 | $45,000.00 | Chartraw | Citibank |
| 37 | 18 U.S.C. § 2314 | 6/1/2023 | $100,000.00 | Sahara Las Vegas Corp. | Zions Bankcorporation |
| 38 | 18 U.S.C. § 2314 | 6/12/2023 | $500,000.00 | Harris Bank NA (Loan IQ) | BMO HARRIS BANK NA |
| 39 | 18 U.S.C. § 2314 | 6/20/2023 | $6,500.00 | Pacific 9 Transportation, Inc. | Woori America Bank |
| 40 | 18 U.S.C. § 2314 | 6/20/2023 | $15,000.00 | Clearwater | Axos Bank / Bank of Internet |
| 41 | 18 U.S.C. § 2314 | 6/20/2023 | $15,000.00 | Clearwater | Axos Bank / Bank of Internet |
| 42 | 18 U.S.C. § 2314 | 6/20/2023 | $15,000.00 | INBE-Clear Capital Group LLC | Axos Bank / Bank of Internet |
| 43 | 18 U.S.C. § 2314 | 6/20/2023 | $15,000.00 | INBE-Clear Capital Group LLC | Axos Bank / Bank of Internet |

| | | | | | |
|---|---|---|---|---|---|
| 44 | 18 U.S.C. § 2314 | 6/20/2023 | $15,734.00 | RBC Capital Markets Corp. | US National Bank |
| 45 | 18 U.S.C. § 2314 | 6/20/2023 | $20,000.00 | Keller North America, Inc. | Wells Fargo (San Francisco) |
| 46 | 18 U.S.C. § 2314 | 6/20/2023 | $25,000.00 | Owen | JP Morgan Chase |
| 47 | 18 U.S.C. § 2314 | 6/20/2023 | $30,000.00 | Dribble Dunk LLC | JP Morgan Chase |
| 48 | 18 U.S.C. § 2314 | 6/20/2023 | $100,000.00 | Chartraw | Citibank |
| 49 | 18 U.S.C. § 2314 | 6/20/2023 | $100,000.00 | Whiskey Cowboys LLC | JP Morgan Chase |
| 50 | 18 U.S.C. § 2314 | 6/20/2023 | $120,000.00 | Lawrence M Longo Trustee Aelina J | Bank of America |
| 51 | 18 U.S.C. § 2314 | 6/26/2023 | $59,966.07 | Dribble Dunk LLC | JP Morgan Chase |
| 52 | 18 U.S.C. § 2314 | 6/26/2023 | $600,000.00 | Sahara Las Vegas Corp. | Zions Bankcorporation |
| 53 | 18 U.S.C. § 2314 | 6/27/2023 | $28,950.00 | Internal Debit Transfer (01298687) | Northern Trust to x-0534 |
| 54 | 18 U.S.C. § 2314 | 6/30/2023 | $38,500.00 | Private Passport Transfer to x0534 | Phone transfer credit |
| 55 | 18 U.S.C. § 2314 | 7/3/2023 | $1.00 | DKTOHOME, LLC | Citibank Federal Savings Bank |
| 56 | 18 U.S.C. § 2314 | 7/3/2023 | $50,000.00 | Owen | JP Morgan Chase |
| 57 | 18 U.S.C. § 2314 | 7/3/2023 | $68,000.00 | Phoenix GC LLC | Bank of America |
| 58 | 18 U.S.C. § 2314 | 7/3/2023 | $207,500.00 | Dribble Dunk LLC | JP Morgan Chase |
| 59 | 18 U.S.C. § 2314 | 7/3/2023 | $218,998.99 | Chartraw | Citibank |
| 60 | 18 U.S.C. § 2314 | 7/3/2023 | $600,000.00 | Wyatt Aufdermaur LLC | Truist Bank |
| 61 | 18 U.S.C. § 2314 | 7/3/2023 | $973,333.00 | Homepeople Corp. | Bank of America |
| 62 | 18 U.S.C. § 2314 | 7/3/2023 | $1,274,000.00 | Master Systems Integrators LLC | Wells Fargo |
| 63 | 18 U.S.C. § 2314 | 7/7/2023 | $6,500.00 | Pacific 9 Transportation | Woori America Bank |
| 64 | 18 U.S.C. § 2314 | 7/10/2023 | $15,734.00 | RBC Capital Markets | FFC: HNB CAPITAL LLC, A/C 312 17473 |

| | | | | | |
|---|---|---|---|---|---|
| 65 | 18 U.S.C. § 2314 | 7/11/2023 | $40,000.00 | Keller North America, Inc. | Wells Fargo |
| 66 | 18 U.S.C. § 2314 | 7/12/2023 | $10,500.00 | Private Passport Transfer to x0534 | |
| 67 | 18 U.S.C. § 2314 | 7/12/2023 | $175,000.00 | Brandon Knowldon | JP Morgan Chase |
| 68 | 18 U.S.C. § 2314 | 7/13/2023 | $4,000.00 | Dribble Dunk LLC | JP Morgan Chase |
| 69 | 18 U.S.C. § 2314 | 7/13/2023 | $600,000.00 | Sahara Las Vegas Corp. | Zions Bankcorporation |
| 70 | 18 U.S.C. § 2314 | 7/17/2023 | $264,832.04 | Hoehn JLR Inc. | Zions Bankcorporation |
| 71 | 18 U.S.C. § 2314 | 7/18/2023 | $80,242.36 | Autonation Chrysler Dodge Jeep | JP Morgan Chase |
| 72 | 18 U.S.C. § 2314 | 7/18/2023 | $149,872.96 | Hoehn JLR Inc. | Zions Bankcorporation |
| 73 | 18 U.S.C. § 2314 | 7/18/2023 | $150,000.00 | Owen | JP Morgan Chase |
| 74 | 18 U.S.C. § 2314 | 7/20/2023 | $358.85 | ACH Debit | |
| 75 | 18 U.S.C. § 2314 | 7/28/2023 | $24,999.00 | DKTOHOME, LLC | Citibank Federal Savings Bank |
| 76 | 18 U.S.C. § 2314 | 8/2/2023 | $6,750.00 | Private Passport Transfer to x0534 | |
| 77 | 18 U.S.C. § 2314 | 8/2/2023 | $10,000.00 | Javier Reyna | PNC Bank |
| 78 | 18 U.S.C. § 2314 | 8/2/2023 | $25,000.00 | Law Offices of Frank J. Longo | Bank of America |
| 79 | 18 U.S.C. § 2314 | 8/3/2023 | $50,000.00 | Owen | JP Morgan Chase |
| 80 | 18 U.S.C. § 2314 | 8/3/2023 | $50,000.00 | Chartraw | Citibank |
| 81 | 18 U.S.C. § 2314 | 8/3/2023 | $100,000.00 | DKTOHOME, LLC | Citibank Federal Savings Bank |
| 82 | 18 U.S.C. § 2314 | 8/7/2023 | $10,000.00 | Danielle Martin | First Republic Bank |
| 83 | 18 U.S.C. § 2314 | 8/7/2023 | $12,120.00 | ACH Settlement Debit | |
| 84 | 18 U.S.C. § 2314 | 8/7/2023 | $20,000.00 | Alison Romero | Bank of America (New York) |
| 85 | 18 U.S.C. § 2314 | 8/9/2023 | $40,000.00 | Javier Reyna | PNC Bank |

| | | | | | |
|---|---|---|---|---|---|
| 86 | 18 U.S.C. § 2314 | 8/14/2023 | $750.00 | Electro Venture Holdings PTY LTD | Community Federal Savings Bank |
| 87 | 18 U.S.C. § 2314 | 8/16/2023 | $1,880.00 | Dribble Dunk LLC | JP Morgan Chase |
| | | TOTAL | $10,636,316.06 | | |

The pattern of racketeering activity further includes the following additional acts, which may also constitute wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341:

I. The August 2, 2022 and September 8, 2022 letters transmitted on Messner letterhead representing Clearwater's purported $60 billion bond-monetization assets.

II. The November 16, 2022 transmission of the forged PG Asia Investment Bank commitment letter and related materials for presentation to the Clark County Zoning Commission in Nevada.

III. The sequence of eleven comfort letters and similar written representations transmitted on Messner letterhead between April 2023 and March 2024 asserting that Plaintiffs' deposits were safe, held at a "fully insured" trust account, and would be returned.

IV. The August 23, 2023 comfort letter representing that INBE "stands ready, willing and able" to fund the BELOC loans, transmitted by interstate wire to Plaintiffs after the trust account had been emptied.

V. The October 5, 2023 text message from Hale to Kosher Eats stating "Do not call torben… I will speak to Danny shortly," transmitted by interstate wire communication and designed to isolate Plaintiffs from Welch while the theft was being concealed.

VI. The October 11, 2023 text message from Hale to Kosher Eats stating "You will never get proof of a wire. It's just not done for compliance purposes," a fabricated banking-procedure claim designed to prevent Plaintiffs from discovering that no wire had been or would be sent.

VII. The November 1, 2023 text message from Hale to Kosher Eats first mentioning the entity "Clearwater" as a purported source of imminent fund release, an entity that Plaintiffs had never heard of and that was in fact a node for the onward distribution of the stolen funds.

VIII. The December 13, 2023 text message from Hale to Kosher Eats stating "We do have a plan… We are working on details… Once I speak with Danny today I will reach out to everyone," falsely representing that fund release was progressing when in fact the trust account had been empty for more than four months.

IX. The December 19, 2023 text message from Hale to Plaintiffs' counsel stating "I'm not going to play the 'are we there yet' game with everyone… ALL OF YOU were told NOT to contact torben. ONLY JASON," designed to route Plaintiffs away from Welch and toward Aufdermaur to further insulate Messner from Plaintiffs' discovery efforts.

X. The February 7, 2024 text message from Hale to Kosher Eats stating "if suit is filed it doesn't hurt us it only hurts all of you," designed to deter Plaintiffs from filing suit and pursuing the legal remedies that would have protected them from further dissipation of their funds.

XI. The February 8, 2024 text message from Hale to Kosher Eats stating "the money IS in our banks. Just not released… We are LITERALLY expecting a phone call at any time telling us funds are 'free to move,'" a fabricated banking-procedure narrative designed to forestall suit by manufacturing the false impression that fund release was imminent.

XII. The February 12, 2024 text message from Hale to Kosher Eats stating "Everything cleared… Totally done," a categorical false statement of fact designed to prevent Plaintiffs from taking protective action.

XIII. The March 4, 2024 text message from Hale to Kosher Eats stating "we are almost over the finish line," transmitted by interstate wire communication.

XIV. The March 19, 2024 text message from Hale to Kosher Eats stating "YOU are going to be made whole… Not everyone will be," designed to secure Plaintiffs' continued forbearance through a false promise of selective payment.

XV. The March 21, 2024 text message from Hale to Kosher Eats stating "my word is my bond… I don't lie… I don't deceive… I don't misrepresent… It's real. 10,000%," a personal testimonial designed to secure continued forbearance immediately following Welch's "national bank partner" fabrication.

XVI. The March 22, 2024 text message from Hale to Kosher Eats stating "I'm telling you that you're making a poor choice [by pursuing legal action]," designed to deter imminent suit.

XVII. The November 21, 2023 testimony to the Clark County Zoning Commission regarding the purported Clearwater $5 billion account at FIDES Mexico, the purported McMahon Capital $750 million line of credit, and the purported HSBC London funding arrangement, all transmitted by interstate communication.

XVIII. The December 5, 2023 letter representing the purported $57 billion Clearwater account at FIDES Gestion Financiera.

XIX. The December 26, 2023 letter representing that Titan Financial, LLC held $10 billion in cash and that Clearwater and 3FR LLC held $92 billion in cash and $1.545 trillion in gold-backed funds.

XX. The January 25, 2024 letter transmitting the fabricated "Titan Private Bank, LLC" account statement showing $10,300,000 in Messner's purported trust account at a nonexistent institution.

XXI. The February 15, 2024 letter invoking JPMorgan Chase, the Chase Treasury Department, and correspondent banking requirements as explanations for delayed fund release.

XXII. The December 15, 2023 email from Aufdermaur to HomePeople's counsel stating "it appears as though Clearwater funds will be disbursed imminently" and proposing that "all funds to deal with the 'INBE Capital Issue' be disbursed into my trust account," a false representation that Clearwater had funds available to disburse when in fact the funds had been gone for four months and $600,000 of the stolen money had already been wired to Aufdermaur's firm.

XXIII. The December 22, 2023 "outside date" misrepresentation by Aufdermaur to HomePeople's counsel, a date by which Aufdermaur had represented that Clearwater funds would be available and which came and went without any funds being available.

XXIV. The December 28, 2023 email from Aufdermaur to HomePeople's counsel stating that "the funding is 'on track' but inevitable holiday delays are slowing process," a fabricated delay narrative transmitted after the trust account had been empty for nearly five months.

XXV. The January 8, 2024 email from Aufdermaur to HomePeople's counsel stating that Welch "thought funds release was 'imminent,'" a false statement invoking Welch's prior false statements to extend the cover-up.

XXVI. The January 10, 2024 email from Aufdermaur to HomePeople's counsel stating that the return-of-funds timeline proposed by Plaintiffs was

"unrealistic," designed to deter Plaintiffs from enforcing their contractual return rights.

XXVII. The February 22, 2024 website publication accusing Emerald of falsely alleging that funds had disappeared.

XXVIII. The February 23, 2024 issuance and interstate transmission by Welch, on Messner letterhead, of three Safe Keeping Receipts identifying purported bond instruments with face values of $60 billion, $40 billion, and $34 billion, on behalf of a purported Mexican counterparty, while Messner simultaneously disclaimed any inspection or verification of the instruments, each SKR constituting a separate act of wire fraud in violation of 18 U.S.C. § 1343.

XXIX. The March 27, 2024 Hing Yip pledge and related interstate communications continuing Clearwater's bond-monetization activity.

362. Defendants' pattern of racketeering activity spans from 2022 through at least 2025 and multiple structurally related schemes executed with overlapping personnel, overlapping instrumentalities, and overlapping victim-targeting methodologies. Those schemes include: (a) the Ameri-Metro and Shah Mathias bond fraud, in which Messner and Welch served as bond counsel and letterhead-issuers for Clearwater's purported monetization of $60 billion in fraudulent bonds described by the Delaware Court of Chancery in *Lentz v. Mathias*, No. 2022-0374-JTL, as a "classic Ponzi scheme," and in which Chartraw's entity TDA Global Systems LLC served as a nominal third-party investment counterparty; (b) the DTEC Ventures / Bluegrass BioExtracts escrow-fraud scheme of 2019-2020, in which Chartraw and Owen partnered to induce a $75 million purported purchase of a Kentucky hemp company through a staged escrow process, collected the escrow deposits, failed to fund the purported purchase, and were sued in a federal RICO class-action in the Western District of Kentucky; (c) the eight federal advance-fee fraud schemes for which Chartraw was indicted in 2012 in the Eastern District of California and for which he served 57 months in federal prison; (d) the BELOC scheme that is the subject of this action, from April 2023 through March 2024; and (e) the Crypto-Pal advance-fee fraud scheme

running in parallel with and continuing past the BELOC scheme, for which Chartraw and Owen are co-conspirators in an active federal indictment in the Eastern District of California, with trial commencing April 28, 2026.

363. These schemes are related. Each scheme uses the same method, which is the induction of escrow or advance-fee deposits through institutional credibility, followed by misappropriation of those deposits, followed by a sustained lulling cover-up. Each scheme targets a similar class of victims, namely commercial counterparties who wire substantial cash deposits in reliance on a sham transaction structure. Each scheme involves the creation and use of shell entities, the deployment of pseudonyms or aliases to conceal Chartraw's federal criminal history, and the recycling of fabricated instruments, including sham bonds, sham bank accounts, and sham escrow structures. The schemes involve overlapping personnel, in particular Chartraw, Owen, Welch, Messner, and at various points Hale and Aufdermaur.

364. The pattern threatens continued racketeering activity. On March 27, 2024, more than seven months after Plaintiffs' funds had been drained from the Messner COLTAF account, Clearwater executed the Hing Yip International pledge, invoking the same 3FR LLC entity that Welch had invoked in his December 26, 2023 letter to Plaintiffs, and purporting to represent $8 billion in bond-backed assets held on Clearwater's behalf. On information and belief, the Hing Yip transaction represents a continuation of the same scheme, with different victims, using the same fraudulent instruments. The BELOC Enterprise and its principals continue to operate and continue to threaten additional racketeering activity as of the filing of this Complaint, subject only to the active federal prosecution of Chartraw, which has not resulted in conviction, incarceration, or dissolution of the Enterprise's residual instrumentalities.

365. Each of the predicate acts set forth above is related to the others. Each advanced the same common scheme. Each had the same participants or subsets of participants. Each targeted the same class of victims, namely Plaintiffs. Each was designed to produce or perpetuate the same result, which is the misappropriation and retention of Plaintiffs' escrow deposits. The predicate acts span a period of more than three years, beginning no later than August 2, 2022 and continuing through the filing of this Complaint. The predicate acts satisfy both the relatedness and continuity requirements for a RICO pattern. The predicate acts also satisfy the "open-ended continuity" test because the conduct of the BELOC Enterprise evidences a specific threat of continuation.

366. Plaintiffs' injury of $8,345,000 plus consequential damages was proximately caused by Defendants' RICO violations. Defendants' misrepresentations concerning the safety of the Messner COLTAF trust account, the existence of a funded loan facility at INBE, the identity and capacity of Clearwater as a financing counterparty, and the conduct of Messner as a neutral fiduciary escrow trustee directly induced each Plaintiff to wire its respective ICA deposit to Messner's Colorado trust account. Upon receipt, each of those deposits was transferred out of the trust account through predicate acts of interstate transportation of stolen money in violation of 18 U.S.C. § 2314. Defendants' subsequent lulling communications caused Plaintiffs to forgo taking the steps, including litigation, asset-freeze motions, law enforcement referrals, and notification of parallel counterparties, that would have protected some or all of Plaintiffs' funds from further dissipation. There is no independent intervening cause of Plaintiffs' loss. Plaintiffs' injury is the direct and foreseeable consequence of Defendants' predicate acts.

367. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in an aggregate amount of $8,345,000, plus consequential damages that substantially exceed that amount. No intervening cause of injury

exists. Plaintiffs' losses flow directly from Defendants' predicate acts of wire fraud and interstate transportation of stolen money, and from Defendants' continued lulling communications, without any intervening or superseding act by any non-party.

368. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, costs of suit, and reasonable attorneys' fees.

**COUNT II**
**Civil RICO Conspiracy, 18 U.S.C. § 1962(d)**

(Against All Defendants)

369. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above, together with the racketeering allegations of Count I, as if fully set forth herein.

370. Each Defendant named in this Count knowingly agreed and conspired with the other Defendants and with the non-parties identified in paragraph 264 to conduct the affairs of the BELOC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Each Defendant agreed that someone, whether that Defendant or another member of the enterprise, would commit at least two acts of racketeering in furtherance of the enterprise's common purpose.

371. Each Defendant named in this Count agreed to the commission of at least two of the predicate acts identified herein. The scheme could not have been conducted by any single member. It required (a) Messner's provision of the COLTAF trust account as the collection vehicle and Messner's issuance of the BELOC agreements on firm letterhead, (b) Chartraw's design of the financial structure and his operation under the "Leon Chartue" alias to conceal his federal criminal history, (c) Owen's deployment as the public face of Clearwater to conceal Chartraw's identity, (d) Clearwater's holding out as a financing source and its receipt of misappropriated funds, (e) the use of INBE as the nominal lender of record, (f) the deployment of Hale and Aufdermaur to field and

delay Plaintiffs' post-default inquiries, and (g) Messner's post-default fabrication of the Titan Financial cover story. Each Defendant named in this Count knowingly agreed to, and knowingly facilitated, the others' roles.

372. Plaintiffs have been injured in their business and property by the overt acts of the conspirators in furtherance of the conspiracy, each of which constitutes the commission of a predicate act of racketeering activity. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, costs of suit, and reasonable attorneys' fees.

**COUNT III**
**Civil Theft, Colo. Rev. Stat. § 18-4-405**

(Against All Defendants)

373. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

374. Colorado Revised Statutes § 18-4-405 provides that all property obtained by theft, robbery, or burglary shall be restored to the owner, and that the owner may maintain a civil action to recover the property, actual damages, costs of suit, and reasonable attorney fees. The statute further provides that the owner is entitled to recover three times the amount of the actual damages sustained.

375. Defendants' conduct satisfies every element of civil theft under Colorado Revised Statutes § 18-4-401 and § 18-4-405. Defendants knowingly obtained, retained, and exercised control over Plaintiffs' $8,345,000 in property. Defendants did so without Plaintiffs' authorization and by the deception of inducing Plaintiffs' deposits through material misrepresentations concerning Messner's role as neutral fiduciary, the existence and capacity of INBE as lender, and the safety of the funds in Messner's trust account. At the time Defendants induced each deposit

and at all times thereafter, Defendants had the specific intent to permanently deprive Plaintiffs of those funds. That specific intent is established by the following facts, each of which appears on the face of this Complaint: (a) every Plaintiff deposit was moved out of the Messner trust account within weeks of its receipt, before any BELOC loan could have been funded; (b) the proceeds were used to pay the creditors of Messner's insolvent client Dribble Dunk, not to fund any loan; (c) the proceeds were used to pay Chartraw, Owen, and Clearwater in their personal capacities, not to fund any loan; (d) the BELOC template on its face offered terms no legitimate lender would offer, which is evidence the scheme was never intended to result in a funded loan; (e) INBE had no capital, no lending license, and no capacity to fund any loan, which Messner knew; and (f) after the theft, Defendants conducted an eighteen-month cover-up rather than return the funds, a pattern inconsistent with any legitimate fiduciary intent. This is not a dispute about a failure to fund a loan or a breach of a contractual refund obligation. Defendants obtained Plaintiffs' funds by deception, misappropriated the funds before any opportunity for legitimate loan funding, concealed the misappropriation through sham institutions and fabricated banking documents, and used the stolen funds to pay Defendants' personal obligations and the obligations of Messner's other clients. That pattern is the pattern of civil theft under Colorado law.

376. Plaintiffs never authorized Messner, Chartraw, Owen, Clearwater, or any other person or entity to transfer Plaintiffs' funds out of the Messner trust account to Clearwater, Dribble Dunk, Sahara Las Vegas Corp., Valley Bank of Nevada, Harris Bank, Hoehn JLR Inc., Autonation Chrysler Dodge, or any of the other unrelated recipients identified in Exhibit A. Any claim by Defendants that "INBE authorized" any portion of the disbursements is inconsistent with the sworn denial by INBE's principal. Plaintiffs' authorizations extended only to the holding of the funds in

the Messner trust account pending loan funding and to the return of the funds to Plaintiffs if no loan funded within 90 days. No other disposition was ever authorized by any Plaintiff.

377. Messner, as the custodian of the COLTAF trust account, obtained and retained Plaintiffs' funds under circumstances creating an express legal duty to hold the funds in trust. Messner then exercised control over those funds by causing, through its agents including Welch, their transfer out of the trust account without Plaintiffs' authorization, and by continuing to retain the proceeds in the form of the fees and benefits Messner derived from the scheme.

378. Chartraw, Owen, and Clearwater obtained portions of Plaintiffs' funds knowing that those funds originated from Plaintiffs' trust-account deposits, knowing that the funds had been misappropriated without Plaintiffs' authorization, and knowing that the funds constituted stolen property under Colorado law. *See* Colo. Rev. Stat. § 18-4-410 (theft by receiving). Chartraw personally received at least $853,898.99. Owen personally received at least $465,000. Clearwater received at least $500,000 in addition to further transfers to related entities.

379. Clearwater and its controllers Chartraw and Owen had actual knowledge at the time of receipt that the funds wired from the Messner Colorado COLTAF trust account to Clearwater were escrow deposits that had been entrusted to Messner as "Trustee" pursuant to the BELOC agreements Clearwater had itself helped design and promote. Clearwater and its controllers had actual knowledge that the funds were received by Clearwater without the authorization of any Plaintiff-depositor. Clearwater and its controllers had actual knowledge that the funds were being used to pay for obligations entirely unrelated to any legitimate BELOC funding or bond-monetization activity. By knowingly receiving and exercising control over funds it knew to be misappropriated Plaintiff escrow deposits, Clearwater is liable for civil theft by receiving under Colo. Rev. Stat. § 18-4-410 and for direct civil theft under § 18-4-401.

380. The loci of the thefts were Colorado, where Messner's trust account was maintained and from which the unauthorized transfers originated.

381. Pursuant to Colorado Revised Statutes § 18-4-405, Plaintiffs are entitled to recover the full $8,345,000 of stolen funds, three times the actual damages sustained, costs of suit, and reasonable attorneys' fees.

**COUNT IV**
**Conversion**

(Against Messner Reeves LLP)

382. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

383. Plaintiffs had a possessory right to the $8,345,000 in escrow deposits at all times while the funds remained in Messner's trust account. The BELOC expressly provided that the deposits would remain in Messner's sole possession and control until the loan funded, and that the deposits would be refunded to Plaintiffs if the loan did not fund within 90 days.

384. At all times while Plaintiffs' funds remained in Messner's Northern Trust COLTAF account ending in x8494, those funds retained their specific identity as Plaintiffs' property. Colorado Rule of Professional Conduct 1.15, including as amended, required Messner to maintain Plaintiffs' funds separately from firm property and separately identified by client or by third-party source. Messner's own records identified each Plaintiff's ICA deposit individually by Plaintiff name, amount, and date of receipt. Messner's February 21, 2025 sworn declaration conceded that the funds in the account were "held for INBE" on behalf of specifically identified counterparties. The Northern Trust records reflect the distinct receipt and disposition of each Plaintiff's deposit.

The funds in question are specific, identifiable property subject to a claim for conversion under Colorado law, and are not a general debt obligation.

385. Messner intentionally exercised dominion and control over Plaintiffs' property inconsistent with Plaintiffs' possessory rights, by transferring the deposits out of the trust account without authorization and by refusing to return the funds upon Plaintiffs' demand.

386. Plaintiffs have demanded the return of their funds on numerous occasions. Defendants have refused.

387. As a direct and proximate result of Defendants' conversion, Plaintiffs have been damaged in the amount of $8,345,000, plus consequential damages.

388. Defendants acted with malice, fraud, or oppression sufficient to support an award of punitive damages under Colorado Revised Statutes § 13-21-102.

**COUNT V**
**Fraud, False Promise**

(Against Messner Reeves LLP)

389. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

390. Messner, acting through Welch on its own behalf and on behalf of Clearwater, Chartraw, and Owen, represented to Plaintiffs in writing that Plaintiffs' deposits would remain in Messner's "sole possession and control," that the deposits would be returned if the BELOC loans did not fund within 90 days, that the deposits would be held in a "fully insured" trust account, that Plaintiffs were "never exposed to any risk of loss," and that Messner would "contractually agree to reimburse the Borrower" in the event of non-funding.

391. Each of those representations was a material promise of future performance.

392. At the time Messner, acting through Welch, caused those promises to be made to Plaintiffs, and at the time Chartraw, Owen, and Clearwater participated in the scheme to procure those deposits, each of them knew that the promises would not be kept. The purpose of the scheme was to obtain the deposits, not to fund the loans. Chartraw had run materially identical schemes across two decades. The BELOC terms on their face were not the terms of a loan any legitimate lender would offer. INBE had no lending capacity. Clearwater had no assets. The funds were targeted for disbursement to pay Dribble Dunk's creditors and the enterprise members personally, not to be held pending loan funding.

393. Each Plaintiff individually and justifiably relied on the respective BELOC representations and related Messner communications identified in the Plaintiff-specific paragraphs above. Kosher Eats received the BELOC on or about April 24, 2023, justifiably relied on the BELOC's representations that Messner would hold the ICA deposit in "sole possession and control," and wired $2,000,000 on April 27, 2023 in direct reliance on those representations, which wire Kosher Eats would not have made but for those representations. Emerald received the BELOC and Bridge Lender side letter on or about June 12, 2023, justifiably relied on the representation that the $700,000 ICA deposit would be returned to Emerald as Bridge Lender upon non-funding of the Hard AF loan, and wired $700,000 on June 12, 2023 in direct reliance on those representations, which wire Emerald would not have made but for those representations. MSC received the BELOC on or about May 9, 2023, justifiably relied on Messner's representations concerning the escrow trusteeship of the ICA deposit, and wired $1,145,000 on June 22, 2023 in direct reliance on those representations, which wire MSC would not have made but for those representations. Abbson received the BELOC on or about June 21, 2023, justifiably relied on Messner's representations concerning the escrow trusteeship of the $3,500,000 ICA deposit, and

wired $3,500,000 on June 29, 2023 in direct reliance on those representations, which wire Abbson would not have made but for those representations. HomePeople received the BELOC on March 23, 2023, justifiably relied on Messner's representations concerning the escrow trusteeship of the $1,000,000 ICA deposit, researched Messner's status as a 100-attorney national law firm as a dispositive factor in proceeding, and wired $1,000,000 on April 21, 2023 in direct reliance on those representations, which wire HomePeople would not have made but for those representations.

394. Reliance on the safety of a 100-attorney national law firm's trust account was reasonable as a matter of law. Colorado Rule of Professional Conduct 1.15 required Messner to hold Plaintiffs' funds as represented. Plaintiffs had no reason to suspect that Messner intended, from the inception, to violate that rule.

395. Plaintiffs' reliance caused them to wire a total of $8,345,000 into Messner's COLTAF trust account. Plaintiffs would not have done so but for the false promises.

396. Plaintiffs suffered damages as a direct and proximate result of the false promises, in the amount of $8,345,000 plus consequential damages, and are entitled to punitive damages under Colorado Revised Statutes § 13-21-102.

**COUNT VI**
**Fraud, Concealment**

(Against Messner Reeves LLP only)

397. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

398. At the time Messner induced Plaintiffs' deposits, Messner had superior and exclusive knowledge of material facts it had a duty to disclose, and concealed those facts from Plaintiffs. The concealed facts included, at a minimum:

A. That Messner simultaneously represented Clearwater, INBE, Chartraw, Owen, Dribble Dunk, Ameri-Metro, and Shah Mathias, creating irreconcilable conflicts of interest that rendered impossible Messner's purported role as neutral escrow trustee.

B. That Chartraw, the operational mastermind of the financial structure behind the BELOCs, was a convicted federal felon who had served 57 months in federal prison for materially identical advance-fee fraud schemes, and was operating under the alias "Leon Chartue."

C. That Owen, the public face of Clearwater, was Chartraw's longtime partner in prior advance-fee fraud schemes, including the DTEC Ventures / Bluegrass BioExtracts scheme and the Crypto-Pal scheme.

D. That INBE, the nominal lender, had no capital, no lending license, and no capacity to fund any loan.

E. That the BELOC template had been copied from a known advance-fee fraud operated by Prime Capital Ventures, LLC, whose principals have since been indicted for wire fraud in the Northern District of New York.

F. That the "shadow ledger" mechanism on which the BELOC loans were nominally to be funded had no basis in any legitimate banking practice and had never been successfully executed by any Defendant.

G. That the principal business purpose of the scheme was to generate cash to pay the creditors of Messner's floundering client Dribble Dunk in advance of the November 2023 Clark County Zoning Commission deadline.

399. Messner had a duty to disclose these material facts to Plaintiffs by virtue of Messner's status as the fiduciary custodian of Plaintiffs' funds under Colorado Rule of Professional Conduct 1.15, as amended, and by virtue of Messner's affirmative representations concerning its role as "Trustee" with "sole possession and control" over Plaintiffs' deposits.

400. Messner concealed these facts with the intent that Plaintiffs rely on the affirmative representations made to them without knowledge of the concealed facts.

401. Each Plaintiff individually and justifiably relied on the incomplete representations it received from Messner. The facts concealed by Messner, including without limitation Chartraw's identity as the operational architect of the scheme, Chartraw's prior federal conviction, Owen's

prior partnership with Chartraw in the DTEC/Bluegrass escrow fraud, Messner's simultaneous representation of every party to the purportedly arm's-length BELOC transactions, INBE's lack of lending capacity, and the derivation of the BELOC template from an indicted advance-fee fraud, were each material to each Plaintiff's decision to wire funds into the Messner trust account. Had any of those facts been disclosed to any Plaintiff, that Plaintiff would not have wired any funds to Messner. The reliance was justifiable as a matter of Colorado law because Messner's status as a 100-attorney Colorado limited liability partnership whose trust account was governed by Colorado Rule of Professional Conduct 1.15 created a reasonable expectation that Messner would disclose any material conflict of interest or any material participant-history bearing on the safety of the deposits.

402. Plaintiffs suffered damages as a direct and proximate result of the concealment, in the amount of $8,345,000 plus consequential damages, and are entitled to punitive damages.

**COUNT VII**
**Breach of Fiduciary Duty**

(Against Messner Reeves LLP)

403. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

404. Messner held Plaintiffs' $8,345,000 as escrow trustee in its Colorado COLTAF trust account. Messner acted as a fiduciary of each Plaintiff. As escrow trustee, Messner owed Plaintiffs the full range of fiduciary duties imposed by Colorado law on custodians of third-party funds. Those duties include the duties of loyalty, care, disclosure, and accounting.

405. Messner's fiduciary duty to Plaintiffs arises from Messner's status as "Trustee" of the escrow deposits, independent of any attorney-client relationship between Messner and

Plaintiffs. The BELOC expressly designated Messner as "Trustee" with "sole possession and control" of each Plaintiff's ICA deposit. By accepting Plaintiffs' deposits into its Colorado COLTAF trust account pursuant to that designation, Messner expressly assumed the role of escrow trustee with respect to each Plaintiff. Under Colorado law, a party holding funds as "escrow trustee" or "escrow agent" owes fiduciary duties to both parties of the escrow, including the depositor, independent of any attorney-client relationship.

406. Messner's fiduciary duty to Plaintiffs is also grounded in Colorado Rule of Professional Conduct 1.15, which expressly imposes on Colorado-licensed lawyers a duty to safeguard the funds of "a client or third person" that come into the lawyer's possession in connection with a representation. Colorado RPC 1.15 extends by its own terms to non-clients whose funds are entrusted to a lawyer's care. Plaintiffs are within the class of third persons whose funds came into Messner's possession in connection with Messner's representation of INBE, Clearwater, Dribble Dunk, Chartraw, and Owen, and to whom Messner therefore owed a direct fiduciary duty to safeguard those funds.

407. Messner's fiduciary duties were reinforced by Colorado Rule of Professional Conduct 1.15, which required Messner to hold Plaintiffs' funds separately from firm property, to disburse the funds only as authorized, and to deliver the funds promptly to the persons entitled to receive them.

408. Messner breached every one of those fiduciary duties. Messner transferred Plaintiffs' funds out of the trust account without authorization. Messner disbursed the funds to itself, to its other clients, and to third parties. Messner concealed the disbursements from Plaintiffs. Messner refused to provide an accounting when demanded. Messner actively misrepresented the

status of the funds for more than eighteen months. Messner published false statements about Plaintiff Emerald on Messner's public-facing website.

409. The conflicts of interest identified in paragraph 311(a) above constitute an additional, independent breach of Messner's duty of loyalty.

410. Plaintiffs suffered damages as a direct and proximate result of Messner's breaches of fiduciary duty, in the amount of $8,345,000 plus consequential damages, and are entitled to punitive damages, attorneys' fees, and disgorgement of any fees Messner earned in connection with the BELOC engagements.

**COUNT VIII**
**Unjust Enrichment and Constructive Trust**

(Against All Defendants)

411. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

412. Each Defendant has been unjustly enriched at Plaintiffs' expense by the receipt or retention of proceeds of Plaintiffs' $8,345,000 in escrow deposits. Messner was enriched by fees retained out of Plaintiffs' funds and by the use of Plaintiffs' funds to pay Messner's clients' creditors, thereby preserving Messner's own client relationships. Chartraw was enriched by direct wires from Messner's trust account totaling at least $853,898.99. Owen was enriched by direct wires from Messner's trust account totaling at least $465,000. Clearwater was enriched by direct wires from Messner's trust account totaling at least $500,000 and by additional transfers to related entities it controlled.

413. It would be inequitable and unconscionable for Defendants to retain the proceeds of Plaintiffs' deposits. Plaintiffs parted with their funds in reliance on express written promises

that the funds would remain safely held in a law firm's trust account and would be returned if no loan funded.

414. Plaintiffs are entitled to restitution of the amounts unjustly retained by each Defendant.

415. A constructive trust should be imposed over all proceeds of Plaintiffs' $8,345,000 in the hands of any Defendant or any entity controlled by any Defendant, including any real or personal property purchased with those proceeds, any financial accounts holding those proceeds, and any tangible or intangible asset into which those proceeds were traceable.

**COUNT IX**
**Aiding and Abetting; Civil Conspiracy**

(Against Chartraw, Owen, and Clearwater)

416. Plaintiffs plead this Count IX in the alternative to Counts I, II, III, IV, V, VI, and VIII pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3). To the extent that Chartraw, Owen, or Clearwater are found liable as principals under any other Count, the allegations of this Count IX are pleaded as a contingent alternative theory of liability for aiding and abetting and for civil conspiracy.

417. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

418. Chartraw, Owen, and Clearwater are liable both for (i) aiding and abetting Messner's torts through knowing and substantial assistance, and (ii) civil conspiracy based on their agreement to accomplish the unlawful objectives described herein.

419. Chartraw, Owen, and Clearwater agreed with Messner, expressly and by course of conduct, to commit the unlawful acts alleged in Counts III, IV, V, VI, and VII against Plaintiffs.

As discussed herein, Chartraw, Owen, and Clearwater provided substantial assistance in the commission of those acts.

420. Defendant Messner Reeves LLP, as alleged above, committed breaches of fiduciary duty, acts of fraudulent concealment, and conversion against Plaintiffs. Those breaches, fraudulent concealments, and conversions are independent torts under Colorado law.

421. Chartraw, Owen, and Clearwater knew that Messner owed Plaintiffs fiduciary duties as escrow trustee. Chartraw, Owen, and Clearwater substantially assisted Messner in committing those torts by, among other things:

A. Designing the financial architecture of the BELOC scheme, including the shadow-ledger monetization narrative that supplied Messner's agents with false justifications for delayed loan funding.

B. Providing INBE-related documentation to Messner for use in the scheme.

C. Receiving misappropriated funds from Messner's trust account under cover of purported "monetization fees" and "reimbursements."

D. Concealing Chartraw's identity and federal criminal history from Plaintiffs by participating in the scheme under the "Leon Chartue" alias and by operating Clearwater behind Owen as the public face.

E. Participating in the post-default cover-up by providing fabricated explanations, sham documentation, and ongoing false narratives for Messner's transmission to Plaintiffs.

422. Chartraw, Owen, and Clearwater agreed with Messner, expressly and by course of conduct, to commit the unlawful acts alleged in Counts I, II, IV, V, and VI against Plaintiffs. There was a meeting of the minds among Chartraw, Owen, Clearwater, and Messner regarding the common object of the conspiracy, which was to induce Plaintiffs to wire their ICA deposits into the Messner Colorado COLTAF trust account, to misappropriate those deposits without Plaintiffs' authorization for the mutual financial benefit of the conspirators and for the benefit of Messner's client Dribble Dunk, and to lull Plaintiffs with false assurances so that the misappropriation would

not be discovered until the stolen funds had been dissipated beyond recovery. That meeting of the minds is established by, among other facts, the coordinated timing of the wire transfers out of the Messner trust account, the division of proceeds among Chartraw, Owen, Clearwater, and Dribble Dunk, and the coordinated post-default lulling communications among Messner, Hale, and Aufdermaur. Overt acts in furtherance of the conspiracy include, at a minimum, each of the wire transfers out of Messner's trust account to Chartraw, Owen, and Clearwater identified in the Notice of Accounting attached as Exhibit A, and each of the false lulling statements transmitted to Plaintiffs on Messner letterhead between August 2023 and March 2024. Plaintiffs suffered damages as the proximate result of these unlawful overt acts.

423. Plaintiffs suffered damages as a direct and proximate result of the aiding, abetting, and conspiracy described in this Count, in the amount of $8,345,000 plus consequential damages, and are entitled to punitive damages.

**COUNT X**
**Negligence**

(Against Messner Reeves LLP)

424. Plaintiffs incorporate the factual allegations set forth in the Introduction, Parties, Jurisdiction and Venue, Statement of Facts, and Individual Plaintiffs' Allegations sections above as if fully set forth herein.

425. Messner owed Plaintiffs a duty of care. That duty is independent of any contract and arises from two non-contractual sources. First, as a Colorado-licensed law firm accepting trust funds, Messner was subject to Colorado Rule of Professional Conduct 1.15, as amended, which imposes on attorneys a professional duty, enforceable independent of any contractual obligation, to hold the funds of clients and of third persons separately from the attorney's property, to disburse those funds only as authorized, to promptly notify the persons entitled to the funds, and to promptly

deliver those funds. Colorado RPC 1.15 expressly extends to funds of "a client or third person" that come into the lawyer's possession. Plaintiffs were third persons to whom this professional duty was owed. The duty exists regardless of whether any contract governs the relationship between Plaintiffs and Messner, and is owed even where no attorney-client relationship exists. Second, under Colorado common law, a lawyer or law firm that accepts funds into a trust account as an escrow trustee assumes a fiduciary duty, sounding in tort and not in contract, to safeguard those funds, to disburse them only as authorized, and to return them to the rightful depositor. That escrow-trustee duty is a common-law duty owed by a trustee to a beneficiary of the trust, and exists independent of any underlying contract that may or may not also govern the parties' relationship. The duty Plaintiffs allege Messner breached in this Count is the duty imposed by Colorado RPC 1.15 and by Colorado common law on a lawyer and escrow trustee. Plaintiffs do not in this Count allege breach of any contract, and the duty alleged does not arise from and is not measured by any contract.

426. Messner breached the duty of care owed to Plaintiffs in multiple ways, including but not limited to: (a) failing to safeguard Plaintiffs' funds in the Messner COLTAF trust account; (b) failing to obtain Plaintiffs' authorization before disbursing Plaintiffs' funds out of the trust account; (c) disbursing Plaintiffs' funds to third parties, including Clearwater, Chartraw, Owen, Dribble Dunk, Sahara Las Vegas Corp., Construction Testing Services, auto dealerships, and other recipients, without authorization; (d) failing to return Plaintiffs' deposits within 90 days as expressly required by the BELOC agreements; (e) failing to maintain proper records and failing to provide Plaintiffs with an accounting of the disposition of the funds despite more than ten written demands; (f) failing to identify, disclose, or address the irreconcilable conflicts of interest that arose from Messner's simultaneous representation of multiple parties to the purportedly arm's-

length BELOC transactions; and (g) failing to exercise reasonable diligence in the vetting of Chartraw, Owen, Clearwater, and INBE before allowing Plaintiffs' funds to be directed to accounts controlled by those parties.

427. Messner's breaches of duty were the direct and proximate cause of Plaintiffs' damages. Had Messner safeguarded Plaintiffs' funds, obtained authorization before any disbursement, and returned the funds upon non-funding of the BELOC loans, Plaintiffs would not have suffered the loss of their $8,345,000 in deposits or the substantial consequential damages that flowed from that loss.

428. Plaintiffs have been damaged in the amount of $8,345,000, plus consequential damages as alleged in the Individual Plaintiffs' Allegations section above.

429. This Count X is timely. The two-year limitations period for negligence under C.R.S. § 13-80-102(1)(a) is tolled by the discovery rule and by Messner's active fraudulent concealment as alleged in the general tolling paragraph at the end of the Statement of Facts, which is incorporated here by reference. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the fact and extent of Messner's negligence until Messner's president conceded under oath on February 21, 2025 that "there were no funds remaining in the account held for INBE by July 25, 2024." This Complaint is filed within two years of that accrual date.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kosher Eats, LLC, Emerald Consulting Partners, LLC, Abbson, LLC, MSC Companies, LLC, and HomePeople Corporation respectfully pray that this Court enter judgment in their favor and against Defendants Messner Reeves LLP, Daniel Chartraw, Todd Owen, and Clearwater Premiere Perpetual Master LLC, jointly and severally as appropriate to each Count (and against Messner only on Counts IV, V, VI, VII, and X), and award the following relief:

I. Compensatory damages in the aggregate amount of $8,345,000, reflecting the full amount of Plaintiffs' stolen escrow deposits, allocated among Plaintiffs as follows: HomePeople Corporation in the amount of $1,000,000; Kosher Eats, LLC in the amount of $2,000,000; Emerald Consulting Partners, LLC in the amount of $700,000; MSC Companies, LLC in the amount of $1,145,000; and Abbson, LLC in the amount of $3,500,000;

II. Consequential damages in amounts to be proven at trial;

III. Treble damages pursuant to 18 U.S.C. § 1964(c) on Counts I and II;

IV. Treble damages pursuant to Colorado Revised Statutes § 18-4-405 on Count III;

V. Punitive damages pursuant to Colorado Revised Statutes § 13-21-102 on Counts IV, V, VI, VII, and IX;

VI. Disgorgement of all fees earned by Messner in connection with the BELOC engagements and the related representations of Clearwater, INBE, Dribble Dunk, Ameri-Metro, Shah Mathias, and Titan Financial, LLC;

VII. Imposition of a constructive trust over all proceeds of Plaintiffs' $8,345,000 traceable to any asset in the hands of any Defendant or any entity controlled by any Defendant;

VIII. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

IX. Costs of suit, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), Colorado Revised Statutes § 18-4-405, the BELOC agreements, and all other applicable law;

X. A full accounting of the disposition of Plaintiffs' $8,345,000, including all transfers into and out of Messner's Northern Trust COLTAF account number ending in x8494, all subsequent tracing of those funds into accounts controlled by any Defendant or any entity controlled by any Defendant, and all fees or benefits any Defendant derived from the BELOC engagements; and

XI. Such further and additional relief, at law and in equity, as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By: /s/ *Kenneth E. Chase*

Kenneth E. Chase
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Counsel for Plaintiffs*
*Kosher Eats LLC,*
*Emerald Consulting Partners LLC,*
*Abbson LLC,*
*MSC Companies LLC, and*
*HomePeople Corporation*

# EXHIBIT A

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***

Page 1 of 2

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**04/01/23 through 04/30/23**

## Interest Checking — Account Number: [redacted]3494

| | |
|---|---|
| Beginning Balance on April 1, 2023 | 13,262.65 |
| Deposits and Credits | 3,719,020.00 |
| Interest Credited | 83.88 |
| Checks and Other Items Paid | (979,027.60 ) |
| Ending Balance on April 30, 2023 | 2,753,338.93 |
| Average Collected Balance | 524,269.00 |

## Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 04-03 | Domestic Wire Recvd | WIRE IN #01274475 BY FWR# ORG=RELAW APC | 19,020.00 |
| 04-21 | Domestic Wire Recvd | WIRE IN #01106632 BY FWR#000480 ORG= BYRD CAMPBELL PA | 1,000,000.00 |
| 04-26 | Domestic Wire Recvd | WIRE IN #01030256 BY FWR#010966 ORG= DONNA DUGAN , FOR MASTER SYSTEMS IN | 700,000.00 |
| 04-27 | Domestic Wire Recvd | WIRE IN #01263647 BY FWR#018429 ORG= NOAH A LASKO REF: INBE CAP, FUNDS A | 2,000,000.00 |

## Interest Credited

| Date | Description | Amount |
|---|---|---|
| 04-30 | Interest | 83.88 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

*Statement of Account*

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number:** [redacted]3494

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 04-10 | Domestic Wire Sent | WIRE OUT#00957043 BY FWR#006345 BNP= PACIFIC 9 TRANSPORTATION, | 5,500.00 |
| 04-10 | Domestic Wire Sent | WIRE OUT#00956739 BY FWR#006272 BNP= RBC CAPITAL MARKETS CORP | 9,520.00 |
| 04-19 | Domestic Wire Sent | WIRE OUT#01145976 BY FWR#007702 BNP= 14930 SAN PEDRO STREET LLC | 3,351.70 |
| 04-24 | Domestic Wire Sent | WIRE OUT#01059718 BY FWR#004927 BNP= CLEARWATER PREMIERE | 250,000.00 |
| 04-24 | Domestic Wire Sent | WIRE OUT#01058748 BY FWR#005165 BNP= SAHARA LAS VEGAS CORP 878703701 | 500,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01098313 BY FWR#005664 BNP= DANIELLE MARTIN 881252301 | 20,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01103693 BY FWR#005686 BNP= RONALD GALL 881260201 | 30,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01099765 BY FWR#005670 BNP= TRAVIS CHATWIN 881253401 | 50,000.00 |
| 04-25 | Domestic Wire Sent | WIRE OUT#01101046 BY FWR#005677 BNP= MOUNTAIN MINES, LLC 881257601 | 55,000.00 |
| 04-28 | Domestic Wire Sent | WIRE OUT#01410499 BY FWR#011508 BNP= DRIBBLE DUNK LLC 892991701 | 55,572.02 |
| 04-30 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 83.88 |

## Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 04-01 | 13,262.65 | 04-21 | 1,013,910.95 | 04-27 | 2,808,910.95 |
| 04-03 | 32,282.65 | 04-24 | 263,910.95 | 04-28 | 2,753,338.93 |
| 04-10 | 17,262.65 | 04-25 | 108,910.95 | 04-30 | 2,753,338.93 |
| 04-19 | 13,910.95 | 04-26 | 808,910.95 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.



Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**05/01/23 through 05/31/23**

## Interest Checking — Account Number: [redacted]8494

| | |
|---|---|
| Beginning Balance on May 1, 2023 | 2,753,338.93 |
| Deposits and Credits | 22,234.00 |
| Interest Credited | 144.84 |
| Checks and Other Items Paid | (2,515,866.61 ) |
| Ending Balance on May 31, 2023 | 259,851.16 |
| Average Collected Balance | 874,553.00 |

## Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 05-03 | Domestic Wire Recvd | WIRE IN #01196826 BY FWR#001350 ORG= RELAW APC | 22,234.00 |

## Interest Credited

| Date | Description | Amount |
|---|---|---|
| 05-31 | Interest | 144.84 |

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 05-01 | Domestic Wire Sent | WIRE OUT#01149455 BY FWR#009606 BNP= MOUNTAIN MINES LLC 896895801 | 25,000.00 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]494**

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 05-01 | Domestic Wire Sent | WIRE OUT#01149967 BY FWR#009607 BNP= TRAVIS CHATWIN 896888401 | 50,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01150273 BY FWR#009803 BNP= DANIEL CHARTRAW 896897401 | 75,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01154064 BY FWR#009702 BNP= TODD A OWEN 896899101 | 75,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01153826 BY FWR#009699 BNP= CLEARWATER PREMIERE | 150,000.00 |
| 05-01 | Domestic Wire Sent | WIRE OUT#01176725 BY FWR#010019 BNP= DRIBBLE DUNK LLC 898180301 | 400,000.00 |
| 05-03 | Debit Transfer | FUND TRF#01117247 INTERN | 300,590.77 |
| 05-08 | Domestic Wire Sent | WIRE OUT#01221709 BY FWR#006908 BNP= BLOOMBERG FINANCE LP 910886101 | 12,120.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01454129 BY FWR#008567 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01453917 BY FWR#008517 BNP= ISIN INTERNATIONAL LLC | 11,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442448 BY FWR#008404 BNP= DANIELLE MARTIN 917288601 | 15,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01454073 BY FWR#008523 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442483 BY FWR#008591 BNP= DANIEL CHARTRAW 917289501 | 50,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442552 BY FWR#008416 BNP= TODD A OWEN 917285701 | 60,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01442364 BY FWR#008610 BNP= TRAVIS CHATWIN 917287301 | 125,000.00 |
| 05-11 | Domestic Wire Sent | WIRE OUT#01453760 BY FWR#008513 BNP= BROWNSTEIN HYATT FARBER SCHRECK | 155,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01316306 BY FWR#008746 BNP= ERIC SMITH 921628101 | 10,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01369286 BY FWR#008358 BNP= WORLD BUDDHISM ASSOCIATION | 50,000.00 |
| 05-15 | Domestic Wire Sent | WIRE OUT#01431373 BY FWR#008557 BNP= VALLEY BANK OF NEVADA 921840301 | 904,777.00 |
| 05-22 | Domestic Wire Sent | WIRE OUT#01336332 BY FWR#007961 BNP= GREENFIELD LLP PROFESSIONAL | 25,000.00 |
| 05-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 144.84 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***

Page 3 of 3

COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]8494**

## Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 05-01 | 1,978,338.93 | 05-11 | 1,249,628.16 | 05-31 | 259,851.16 |
| 05-03 | 1,699,982.16 | 05-15 | 284,851.16 | | |
| 05-08 | 1,687,862.16 | 05-22 | 259,851.16 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.



Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

## *Statement of Account*

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**06/01/23 through 06/30/23**

## Interest Checking — Account Number: [redacted]8494

| | |
|---|---|
| Beginning Balance on June 1, 2023 | 259,851.16 |
| Deposits and Credits | 5,867,234.00 |
| Interest Credited | 132.63 |
| Checks and Other Items Paid | (1,919,782.70 ) |
| Ending Balance on June 30, 2023 | 4,207,435.09 |
| Average Collected Balance | 827,497.00 |

## Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 06-05 | Domestic Wire Recvd | WIRE IN #01589608 BY FWR#001425 ORG= RELAW APC | 22,234.00 |
| 06-08 | Domestic Wire Recvd | WIRE IN #01190600 BY FWR#000191 ORG= CARDINAL INVESTMENTS LLC | 500,000.00 |
| 06-13 | Domestic Wire Recvd | WIRE IN #00944448 BY FWR#006558 ORG= SCOTT SIMONS | 700,000.00 |
| 06-22 | Domestic Wire Recvd | WIRE IN #01272686 BY FWR#000138 ORG= COTTONWOOD HOSPITALITY LLC | 845,000.00 |
| 06-23 | Domestic Wire Recvd | WIRE IN #00996382 BY FWR#011719 ORG= MULJIBHAI CHAUDHARI | 300,000.00 |
| 06-29 | Domestic Wire Recvd | WIRE IN #00912317 BY FWR#011381 ORG= ABBSON LLC 1325 AVENUE OF THE | 3,500,000.00 |

## Interest Credited

| Date | Description | Amount |
|---|---|---|
| 06-30 | Interest | 132.63 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

*Statement of Account*

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]8494**

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 06-01 | Domestic Wire Sent | WIRE OUT#01380781 BY FWR#008645 BNP= TODD A. OWEN | 20,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380782 BY FWR#008650 BNP= DANIELLE MARTIN | 25,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380784 BY FWR#008649 BNP= TRAVIS CHATWIN | 25,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380785 BY FWR#008808 BNP= DANIEL CHARTRAW | 45,000.00 |
| 06-01 | Domestic Wire Sent | WIRE OUT#01380780 BY FWR#009292 BNP= SAHARA LAS VEGAS CORP. | 100,000.00 |
| 06-12 | Domestic Wire Sent | WIRE OUT#01252281 BY FWR#006867 BNP= CCLO BMO HARRIS BANK N.A. LOAN IQ | 500,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023434 BY FWR#006834 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023453 BY FWR#005647 BNP= CLEARWATER PREMIER PERPETUAL | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023454 BY FWR#005646 BNP= CLEARWATER PREMIER PERPETUAL | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023456 BY FWR#005648 BNP= INBE-CLEAR CAPITAL GROUP | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023457 BY FWR#005649 BNP= INBE-CLEAR CAPITAL GROUP | 15,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01054824 BY FWR#006081 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023452 BY FWR#005645 BNP= KELLER NORTH AMERICA, INC. | 20,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023444 BY FWR#005641 BNP= TODD A. OWEN | 25,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023451 BY FWR#005644 BNP= DRIBBLE DUNK, LLC | 30,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023443 BY FWR#006889 BNP= DANIEL CHARTRAW | 100,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023450 BY FWR#005643 BNP= WHISKEY COWBOYS, LLC | 100,000.00 |
| 06-20 | Domestic Wire Sent | WIRE OUT#01023445 BY FWR#005642 BNP= LAWRENCE M LONGO TRUSTEE AELINA J | 120,000.00 |
| 06-26 | Domestic Wire Sent | WIRE OUT#01285485 BY FWR#007235 BNP= DRIBBLE DUNK, LLC | 59,966.07 |
| 06-26 | Domestic Wire Sent | WIRE OUT#01285478 BY FWR#007241 BNP= SAHARA LAS VEGAS CORP. | 600,000.00 |
| 06-27 | Debit Transfer | FUND TRF#01298687 INTERN | 28,950.00 |
| 06-30 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 38,500.00 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]8494**

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 06-30 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 132.63 |

## Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 06-01 | 44,851.16 | 06-13 | 767,085.16 | 06-26 | 774,885.09 |
| 06-05 | 67,085.16 | 06-20 | 289,851.16 | 06-27 | 745,935.09 |
| 06-08 | 567,085.16 | 06-22 | 1,134,851.16 | 06-29 | 4,245,935.09 |
| 06-12 | 67,085.16 | 06-23 | 1,434,851.16 | 06-30 | 4,207,435.09 |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.



Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***

Page 1 of 3

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**07/01/23 through 07/31/23**

## Interest Checking — Account Number: [redacted]494

| | |
|---|---|
| Beginning Balance on July 1, 2023 | 4,207,435.09 |
| Deposits and Credits | 722,592.85 |
| Interest Credited | 129.49 |
| Checks and Other Items Paid | (4,914,001.69 ) |
| Ending Balance on July 31, 2023 | 16,155.74 |
| Average Collected Balance | 781,900.00 |

## Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 07-05 | Domestic Wire Recvd | WIRE IN #01069694 BY FWR#001004 ORG= RELAW APC | 22,234.00 |
| 07-07 | Domestic Wire Recvd | WIRE IN #01120220 BY FWR#016810 ORG= MASTER SYSTEMS INTERGRATORS LLC | 700,000.00 |
| 07-20 | Phone Trnsfer Credit | PRVT PASSPORT TRF FROM xxxxxx0534 | 358.85 |

## Interest Credited

| Date | Description | Amount |
|---|---|---|
| 07-31 | Interest | 129.49 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

***Statement of Account***

Page 2 of 3

COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]494**

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 07-03 | Domestic Wire Sent | WIRE OUT#01174668 BY FWR#008120 BNP= DKTOHOME, LLC | 1.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174671 BY FWR#008121 BNP= TODD A. OWEN | 50,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824521 BY FWR#003573 BNP= PHOENIX CG LLC | 68,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824524 BY FWR#003732 BNP= DRIBBLE DUNK, LLC | 207,500.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174670 BY FWR#008327 BNP= DANIEL CHARTRAW | 218,998.99 |
| 07-03 | Domestic Wire Sent | WIRE OUT#01174672 BY FWR#008122 BNP= WYATT AUFDERMAUR LLC, IOLTA | 600,000.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824523 BY FWR#003723 BNP= HOMEPEOPLE CORP | 973,333.00 |
| 07-03 | Domestic Wire Sent | WIRE OUT#00824522 BY FWR#003338 BNP= MASTER SYSTEMS INTEGRATORS LLC | 1,274,000.00 |
| 07-07 | Domestic Wire Sent | WIRE OUT#01252298 BY FWR#009078 BNP= PACIFIC 9 TRANSPORTATION, | 6,500.00 |
| 07-10 | Domestic Wire Sent | WIRE OUT#01096493 BY FWR#005373 BNP= RBC CAPITAL MARKETS CORP | 15,734.00 |
| 07-11 | Domestic Wire Sent | WIRE OUT#01105678 BY FWR#006052 BNP= KELLER NORTH AMERICA, INC. | 40,000.00 |
| 07-12 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 10,500.00 |
| 07-12 | Domestic Wire Sent | WIRE OUT#01164555 BY FWR#006814 BNP= BRANDON L KNOWLDEN | 175,000.00 |
| 07-13 | Domestic Wire Sent | WIRE OUT#01134167 BY FWR#006898 BNP= DRIBBLE DUNK, LLC | 4,000.00 |
| 07-13 | Domestic Wire Sent | WIRE OUT#01134164 BY FWR#007179 BNP= SAHARA LAS VEGAS CORP. | 600,000.00 |
| 07-17 | Domestic Wire Sent | WIRE OUT#00999500 BY FWR#005051 BNP= HOEHN JLR INC. | 264,832.04 |
| 07-18 | Domestic Wire Sent | WIRE OUT#01096362 BY FWR#006205 BNP= AUTONATION CHRYSLER DODGE | 80,242.36 |
| 07-18 | Domestic Wire Sent | WIRE OUT#00982871 BY FWR#004461 BNP= HOEHN JLR INC. | 149,872.96 |
| 07-18 | Domestic Wire Sent | WIRE OUT#00982872 BY FWR#004462 BNP= TODD A. OWEN | 150,000.00 |
| 07-20 | ACH Debit | ACH DEBIT Northern Trust Transfer PP #xxxxxx8494 07/20 7418258 PPD | 358.85 |
| 07-28 | Domestic Wire Sent | WIRE OUT#01037608 BY FWR#006919 BNP= DKTOHOME, LLC | 24,999.00 |
| 07-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 129.49 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

*Statement of Account*

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number: [redacted]494**

## Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 07-01 | 4,207,435.09 | 07-11 | 1,475,602.10 | 07-20 | 41,154.74 |
| 07-03 | 815,602.10 | 07-12 | 1,290,102.10 | 07-28 | 16,155.74 |
| 07-05 | 837,836.10 | 07-13 | 686,102.10 | 07-31 | 16,155.74 |
| 07-07 | 1,531,336.10 | 07-17 | 421,270.06 | | |
| 07-10 | 1,515,602.10 | 07-18 | 41,154.74 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.



Member FDIC
00NNNNNNN2333NNXXXXXX

Equal Housing Lender

NORTHERN TRUST

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202

## *Statement of Account*

Page 1 of 2

Please refer statement inquiries to:
**888-289-6542**
**outside US & Canada 312-444-4454**
or
For other banking services
**William B Howard**
**303-335-1436**

COLORADO LAWYER TRUST ACCOUNT FOUNDATION
MESSNER REEVES LLP
COLTAF TRUST ACCOUNT
1550 WEWATTA ST SUITE 710
DENVER CO 80202-6481

**Statement Period**
**08/01/23 through 08/31/23**

## Interest Checking — Account Number: [redacted]3494

| | |
|---|---|
| Beginning Balance on August 1, 2023 | 16,155.74 |
| Deposits and Credits | 325,750.00 |
| Interest Credited | 8.14 |
| Checks and Other Items Paid | (326,508.14 ) |
| Ending Balance on August 31, 2023 | 15,405.74 |
| Average Collected Balance | 49,161.00 |

## Deposits and Credits

| Date | Description | | Amount |
|---|---|---|---|
| 08-01 | Domestic Wire Recvd | WIRE IN #01164826 BY FWR#019091 ORG= MSL FBO JOSEPH V BARNES PYMT REF | 325,000.00 |
| 08-09 | Domestic Wire Recvd | WIRE IN #00641199 BY FWR#000631 ORG= ELECTRO VENTURE HOLDINGS PTY LTD | 750.00 |

## Interest Credited

| Date | Description | Amount |
|---|---|---|
| 08-31 | Interest | 8.14 |

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 08-02 | Phone Transfer Debit | PRVT PASSPORT TRF TO xxxxxx0534 | 6,750.00 |



Member FDIC

Equal Housing Lender

NORTHERN TRUST

**Statement of Account**

The Northern Trust Company
1401 Lawrence Street, Suite 1500
Denver, Colorado 80202



COLORADO LAWYER TRUST ACCOUNT FOUNDATION

**Interest Checking** **Account Number:** [redacted]494

## Other Items Paid

| Date | Description | | Amount |
|---|---|---|---|
| 08-02 | Domestic Wire Sent | WIRE OUT#01106671 BY FWR#006540 BNP= JAVIER REYNA | 10,000.00 |
| 08-02 | Domestic Wire Sent | WIRE OUT#01127565 BY FWR#006929 BNP= LAW OFFICES OF FRANK J. LONGO | 25,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993326 BY FWR#005194 BNP= TODD A. OWEN | 50,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993327 BY FWR#005256 BNP= DANIEL CHARTRAW | 50,000.00 |
| 08-03 | Domestic Wire Sent | WIRE OUT#00993325 BY FWR#005195 BNP= DKTOHOME, LLC | 100,000.00 |
| 08-07 | Domestic Wire Sent | WIRE OUT#01122365 BY FWR#005899 BNP= DANIELLE MARTIN | 10,000.00 |
| 08-07 | ACH Settlement | ACH SETTLEMENT DEBIT | 12,120.00 |
| 08-07 | Domestic Wire Sent | WIRE OUT#01122366 BY FWR#005900 BNP= ALISON M ROMERO | 20,000.00 |
| 08-09 | Domestic Wire Sent | WIRE OUT#01009309 BY FWR#006405 BNP= JAVIER REYNA | 40,000.00 |
| 08-14 | Domestic Wire Sent | WIRE OUT#01054425 BY FWR#006537 BNP= ELECTRO VENTURE HOLDINGS PTY LTD | 750.00 |
| 08-16 | Domestic Wire Sent | WIRE OUT#01128061 BY FWR#007097 BNP= DRIBBLE DUNK, LLC | 1,880.00 |
| 08-31 | Interest Transfer | TO ACCOUNT NO XXXXXX3471 | 8.14 |

## Interest Checking Daily Ledger Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 08-01 | 341,155.74 | 08-07 | 57,285.74 | 08-16 | 15,405.74 |
| 08-02 | 299,405.74 | 08-09 | 18,035.74 | 08-31 | 15,405.74 |
| 08-03 | 99,405.74 | 08-14 | 17,285.74 | | |

YOUR PRIVACY AND SECURITY ARE VERY IMPORTANT TO US. NORTHERN TRUST WILL NEVER CONTACT YOU AND ASK FOR YOUR USER ID, PIN, PASSWORD OR AUTHORIZATION CODES. NEVER PROVIDE INFORMATION TO UNSOLICITED CONTACTS. USE CAUTION AND MAKE SURE THAT YOU KNOW THE RECIPIENT WHEN SENDING MONEY VIA WIRE OR ZELLE. CONTACT NORTHERN TRUST @ 888-289-6542 IMMEDIATELY IF SOMETHING SEEMS SUSPICIOUS OR MAKES YOU UNCOMFORTABLE.



Member FDIC
00NNNNNNN2333NNXXXXXX
Equal Housing Lender